**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VYAIRE MEDICAL, INC., *et al.*,[1] | ) | Case No. 24-11217 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11**
**PLAN OF VYAIRE MEDICAL, INC. AND ITS DEBTOR AFFILIATES**

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Ave
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com

- and -

Spencer A. Winters, P.C. (admitted *pro hac vice*)
Yusuf U. Salloum (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          spencer.winters@kirkland.com
                yusuf.salloum@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

Dated: September 30, 2024

**COLE SCHOTZ P.C.**
Patrick J. Reilley, Esq. (DE Bar No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:      (302) 652-3131
Facsimile:      (302) 652-3117
Email:          preilley@coleschotz.com

- and -

Michael D. Sirota, Esq. (admitted *pro hac vice*)
Warren A. Usatine, Esq (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:      (201) 489-3000
Facsimile:      (201) 489-1536
Email:          msirota@coleschotz.com
                wusatine@coleschotz.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

---

[1]   The last four digits of Debtor Vyaire Medical, Inc.'s federal tax identification number are 6495. A complete list of each of the Debtors in these chapter 11 cases and each such Debtor's federal tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Vyaire. The location of Debtor Vyaire Medical, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 26125 North Riverwoods Boulevard, Mettawa, Illinois, USA 60045.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF VYAIRE MEDICAL, INC. AND ITS DEBTOR AFFILIATES.*  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE IX</u> HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN CREDITORS OF THE DEBTORS. HOWEVER, AS OF THE DATE HEREOF, IT IS NOT SUPPORTED BY THE COMMITTEE.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS THEREFORE HIGHLY SPECULATIVE. THE DEBTORS RECOMMEND THAT INTERESTED PARTIES CONSULT THEIR OWN LEGAL COUNSEL.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW

INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC")

OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE.   THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; AND ADVERSE TAX CHANGES.

THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.

# TABLE OF CONTENTS

<div align="right">

**Page**

</div>

I.      INTRODUCTION. ................................................................................................................1

II.     PRELIMINARY STATEMENT. ....................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN. ..........................................................................................................................4
        A.      What is chapter 11?.................................................................................................4
        B.      Why are the Debtors sending me this Disclosure Statement?.................................5
        C.      Am I entitled to vote on the Plan?..........................................................................5
        D.      What will I receive from the Debtors if the Plan is consummated?........................6
        E.      Are any regulatory approvals required to consummate the Plan?...........................8
        F.      What happens to my recovery if the Plan is not confirmed or does not go effective?.....8
        G.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation"?....................................................................................................9
        H.      What are the Sale Transactions? .............................................................................9
        I.      What are the sources of Cash and other consideration required to fund the Plan?........9
        J.      Is there potential litigation related to the Plan?....................................................10
        K.      Will there be releases and exculpation granted to parties in interest as part of the Plan? .............10
        L.      What is the deadline to vote on the Plan? .............................................................11
        M.      How do I vote for or against the Plan?..................................................................11
        N.      Why is the Bankruptcy Court holding a Confirmation Hearing?..........................11
        O.      When is the Confirmation Hearing set to occur? .................................................12
        P.      What is the purpose of the Confirmation Hearing?...............................................12
        Q.      What is the effect of the Plan on the Debtors' ongoing business? ........................12
        R.      Whom do I contact if I have additional questions with respect to this Disclosure
                Statement or the Plan?...........................................................................................12
        S.      Who Supports the Plan?.........................................................................................13
        T.      Could subsequent events potentially affect recoveries under the Plan?...............13
        U.      Do the Debtors recommend voting in favor of the Plan?......................................13

IV.     SUMMARY OF THE PLAN. ..........................................................................................14
        A.      Classification and Treatment of Claims and Interests..........................................14
                1.      Classification of Claims and Interests......................................................14
                2.      Special Provision Governing Unimpaired Claims.....................................14
                3.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
                        Code...........................................................................................................15
                4.      Subordinated Claims.................................................................................15
                5.      Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes..............15
                6.      Intercompany Interests..............................................................................15
                7.      Controversy Concerning Impairment. ......................................................15
        B.      Means for Implementation of the Plan. ................................................................16
                1.      Restructuring Transactions........................................................................16
                2.      Sources of Consideration for Plan Distributions......................................16
                3.      Wind-Down Debtors..................................................................................17
                4.      Liquidating Trust.......................................................................................17
                1.      Liquidating Trust Treatment......................................................................18
                2.      Disputed Ownership Fund Treatment........................................................19
                5.      Plan Administrator.....................................................................................19
                6.      Exculpation, Indemnification, Insurance, and Liability Limitation. ........20
                7.      Tax Returns................................................................................................20

|  |  | 8. | Dissolution of the Wind-Down Debtors. | 20 |
|  |  | 9. | Statutory Committee and Cessation of Fee and Expense Payment. | 21 |
|  |  | 10. | Cancellation of Securities and Agreements. | 21 |
|  |  | 11. | Corporate Action. | 21 |
|  |  | 12. | Effectuating Documents; Further Transactions. | 22 |
|  |  | 13. | Section 1146 Exemption. | 22 |
|  |  | 14. | Director and Officer Liability Insurance; Other Insurance. | 23 |
|  |  | 15. | Causes of Action. | 23 |
|  |  | 16. | Section 1145 Exemption. | 23 |
|  | C. | Treatment of Executory Contracts and Unexpired Leases. |  | 24 |
|  |  | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 24 |
|  |  | 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 25 |
|  |  | 3. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 25 |
|  |  | 4. | Insurance Policies. | 26 |
|  |  | 5. | Indemnification Obligations | 27 |
|  |  | 6. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | 27 |
|  |  | 7. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 27 |
|  |  | 8. | Reservation of Rights. | 27 |
|  |  | 9. | Nonoccurrence of Effective Date. | 28 |
|  | D. | Settlement, Release, Injunction, and Related Provisions. |  | 28 |
|  |  | 1. | Release of Liens. | 28 |
|  |  | 2. | Releases by the Debtors. | 28 |
|  |  | 3. | Releases by Holders of Claims and Interests. | 30 |
|  |  | 4. | Exculpation. | 31 |
|  |  | 5. | Injunction. | 32 |
|  |  | 6. | Protection Against Discriminatory Treatment. | 33 |
|  |  | 7. | Document Retention. | 33 |
|  |  | 8. | Reimbursement or Contribution. | 33 |
|  |  | 9. | Term of Injunctions or Stays. | 33 |
|  | E. | Conditions Precedent to Confirmation and the Effective Date. |  | 33 |
|  |  | 1. | Conditions Precedent to the Effective Date. | 33 |
|  |  | 2. | Waiver of Conditions. | 35 |
|  |  | 3. | Effect of Failure of Conditions. | 35 |
| **V.** | **THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW.** |  |  | **35** |
|  | A. | Creation of Vyaire Medical. |  | 35 |
|  | B. | Vyaire's Product, Service, and Consumable Offerings. |  | 36 |
| **VI.** | **THE COMPANY'S PREPETITION CAPITAL STRUCTURE.** |  |  | **37** |
|  | B. | First Lien Notes. |  | 38 |
|  | C. | Second Lien Facility. |  | 38 |
|  | D. | Equity Interests. |  | 38 |
| **VII.** | **EVENTS LEADING TO THESE CHAPTER 11 CASES.** |  |  | **39** |
|  | A. | Challenging Macroeconomic Conditions. |  | 39 |
|  | B. | Internal Business Challenges. |  | 40 |
|  | C. | Business Plan and Operational Pivot |  | 40 |

D.       Prepetition Efforts to Address the Company's Balance Sheet. ........................41
E.       The Prepetition Marketing and Sale Process and the RSA. ............................42
F.       Corporate Governance Efforts. ....................................................................42

**VIII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11
        CASES. ...................................................................................................................43**
A.       First Day Relief. ...........................................................................................43
B.       Appointment of Official Committee of Unsecured Creditors ..........................43
C.       Second Day Relief. .......................................................................................44
D.       The Debtors' Professionals' Retention Applications. .....................................44
E.       Approval of Debtor in Possession Financing. ................................................45
F.       Schedules and Statements. .............................................................................45
G.       Bar Date Motion. ..........................................................................................46
H.       Bidding Procedures and Marketing Process....................................................46
I.        Litigation Matters..........................................................................................48

**IX.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING. ...........................48**
A.       Risks Related to the Confirmation and Consummation of the Plan. ................49
        1.       Parties in Interest May Object to the Plan's Classification of Claims and
                 Interests.........................................................................................49
        2.       The Conditions Precedent to the Effective Date of the Plan May Not Occur.......49
        3.       The Debtors May Fail to Satisfy Vote Requirements. ...................49
        4.       The Debtors May Not Be Able to Secure Confirmation of the Plan.....................49
        5.       Nonconsensual Confirmation. ......................................................50
        6.       The Debtors Could Lose Exclusivity.............................................50
        7.       These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the
                 Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed. ...........50
        8.       The Debtors May Object to the Amount or Classification of a Claim or Interest............51
        9.       Risk of Non-Occurrence of the Effective Date................................51
        10.      Contingencies May Affect Votes of Impaired Classes to Accept or Reject the
                 Plan. .............................................................................................51
        11.      The Plan's Release, Injunction, and Exculpation Provisions May Not Be
                 Approved. ......................................................................................51
        12.      The Total Amount of Allowed Administrative Claims and/or General Unsecured
                 Claims May Be Higher Than Anticipated by the Debtors. .....................52
        13.      Certain Tax Implications of the Plan. ............................................52
B.       Disclosure Statement Disclaimer. ..................................................................52
        1.       The Financial Information Contained in this Disclosure Statement Has Not Been
                 Audited. ........................................................................................52
        2.       Information Contained in this Disclosure Statement is for Soliciting Votes. ..........52
        3.       This Disclosure Statement Was Not Approved by the United States Securities
                 and Exchange Commission.............................................................52
        4.       No Legal or Tax Advice Is Provided to You by this Disclosure Statement.....................53
        5.       This Disclosure Statement May Contain Forward Looking Statements. ..........................53
        6.       No Admissions Made. ...................................................................53
        7.       Failure to Identify Litigation Claims or Projected Objections..........................53
        8.       No Waiver of Right to Object Claims or Interests..........................53
        9.       Information Was Provided by the Debtors and Was Relied Upon by the Debtors'
                 Advisors.........................................................................................54
        10.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update. ...............54
        11.      No Representations Outside this Disclosure Statement Are Authorized. .......................54

**X.    SOLICITATION AND VOTING PROCEDURES.** ................................................................**54**
 A. Holders of Claims Entitled to Vote on the Plan. ....................................................55
 B. Voting Record Date. ...............................................................................................55
 C. Voting on the Plan. ..................................................................................................55
 D. Ballots Not Counted. ...............................................................................................56

**XI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN.** ....................**56**
 A. Confirmation Hearing. ............................................................................................57
 B. Confirmation Standards. .........................................................................................57
  1. Requirements of Section 1129(a) of the Bankruptcy Code. ........................57
  2. Best Interests of Creditors—Liquidation Analysis. ....................................57
  3. Feasibility. .................................................................................................59
  4. Valuation ...................................................................................................59
 C. Acceptance by Impaired Classes. ...........................................................................59
 D. Confirmation Without Acceptance by All Impaired Classes. ...................................60
  1. No Unfair Discrimination. ..........................................................................60
  2. Fair and Equitable Test. .............................................................................60

**XII.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ...............**61**
 A. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ...................62
 B. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class
  4 First Lien Claims and Allowed Class 5 Second Lien Claims.......................................63
 C. Character of Gain or Loss .......................................................................................63
 D. Market Discount......................................................................................................63
 E. Accrued Interest. .....................................................................................................64
 F. Limitation on Use of Capital Losses........................................................................64
 G. Information Reporting and Backup Withholding......................................................65
 H. U.S. Federal Income Tax Treatment of the Liquidating Trust ...................................65
  1. Liquidating Trust ......................................................................................65
  2. Reporting. ..................................................................................................67
  3. Valuation. ..................................................................................................67
  4. Tax Returns. ...............................................................................................68
  5. Attribution of Income. ...............................................................................68
  6. Tax Identification Numbers. .......................................................................68
  7. Annual Statements. ....................................................................................69
  8. Notices. ......................................................................................................69
  9. Expedited Determination ...........................................................................69
  10. Withholding. ..............................................................................................69

**XIII.    RECOMMENDATION.** .................................................................................................**69**

## EXHIBITS

**EXHIBIT A**    Chapter 11 Plan

**EXHIBIT B**    Liquidation Analysis

## I.    INTRODUCTION.

Vyaire Medical, Inc. and its affiliated debtors, as debtors and debtors in possession (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>"), submit this disclosure statement (this "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Vyaire Medical, Inc. and Its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time, the "<u>Plan</u>").[2]   A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors will seek the Bankruptcy Court's approval of the Plan and strongly urge all Holders of Claims and Interests entitled to vote to accept the Plan by returning their ballots, so as to be **actually received** by Omni Agent Solutions, Inc., the Debtors' notice and claims agent (the "<u>Claims and Noticing Agent</u>"), no later than **November 4, 2024, at 4:00 p.m., prevailing Eastern Time**.  The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## II.    PRELIMINARY STATEMENT.

The Debtors and their non-Debtor affiliates (collectively, "<u>Vyaire</u>" or the "<u>Company</u>") are a global company focused on supporting breathing through every stage of life.  Specifically, Vyaire designs, manufactures, and sells a broad range of products—and services—focused on respiratory health, including respiratory diagnostics, ventilation, airway management, and operative care consumables.

Vyaire operates two business segments:  ventilation and respiratory diagnostics.  The Debtors' ventilation business ("<u>Ventilation</u>") focuses on helping patients breathe by offering products, and related services, that mechanically pump air in-and-out of ailing lungs.  The Debtors' respiratory diagnostics business ("<u>Respiratory Diagnostics</u>") develops, manufactures, and commercializes devices to diagnose pulmonary and cardiopulmonary diseases.  The Company historically operated a third segment, its consumables business ("<u>Consumables</u>"), which provided leading airway management and operative care technology.

In May 2023, Vyaire completed the sale of its Consumables business to fund a go-forward business plan.  The COVID-19 pandemic significantly increased demand for the Company's products and services, but post-pandemic macroeconomic challenges, including higher interest rates, inflationary pressure, and supply chain disruption forced the Company to reposition itself for the long term.  The Company sought to focus on the opportunities present in Ventilation and Respiratory Diagnostics, right-size overhead costs, and drive the Company to cash-flow positive operations in a new-normal state after years of heightened demand during the pandemic era.

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

Accordingly, the Company initiated a financial and operational turnaround focused on product line innovation, footprint optimization, supply chain simplification, organizational cost cutting, and liquidity enhancements. Beginning in the summer of 2023, the Company and its advisors began discussions with certain key stakeholders on the terms of a comprehensive balance sheet solution to support the Company's operational initiatives and go-forward business plan. Vigorous negotiations regarding a path forward continued between the Company and its stakeholders for the duration of 2023 and into the early months of 2024. Unfortunately, during the same period, the Company's liquidity position continued to worsen. The Company faced various macroeconomic and Company-specific challenges that complicated its go-forward business plan.

Recognizing the need to act quickly, on April 2, 2024, the board of directors of Vyaire Holding Company (the "Board") formed a special committee comprising of disinterested directors Paul Aronzon, Ron Labrum, and Bret Wise (the "Independent Directors" and, such committee, the "Special Committee") to pursue a potential recapitalization, reorganization, sale, or restructuring transaction (each, a "Strategic Transaction"). David Barse, a new Independent Director, was appointed to the Board and Special Committee on April 10, 2024. Under advisement of the Special Committee, the Company and its advisors continued to work to maximize the value of the Company for the benefit of all stakeholders, working to launch a sale process and to negotiate the terms of a $45 million new-money debtor in possession financing facility (the "DIP Facility" or "DIP Financing") in order to support the Company's marketing and sale efforts.

Beginning in April and May 2024 and leading up to the Petition Date, the Company's advisors connected with many potentially interested parties, comprising both potential strategic and financial partners. Company management and PJT prepared confidential information memoranda separately for the Ventilation and Respiratory Diagnostics businesses and populated virtual data sites containing significant diligence documentation. 55 parties executed non-disclosure agreements and received confidential business information, 6 have discussed sale efforts with Company management, and multiple submitted nonbinding indications of interest. In conjunction with these efforts, and after extensive, arm's length negotiations, the Debtors entered into that certain Restructuring Support Agreement (the "Restructuring Support Agreement" or "RSA") with certain First Lien Term Lenders holding over 90% of the First Lien Term Loan, Second Lien Lenders holding 100% of the Second Lien Term Loan, and Apax, the controlling equity holder in Vyaire Intermediate HoldCo LP (together, the "RSA Parties"), to support the sale process and ultimate resolution of the Debtors' Chapter 11 Cases.

As contemplated by the Restructuring Support Agreement, on June 9, 2024 (the "Petition Date") the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to execute value maximizing section 363 sales to sell all or substantially all of the Debtors' assets free and clear of all Claims and Interests, followed by a chapter 11 plan. On June 10, 2024, the Debtors filed a bidding procedures motion requesting that the Court enter an order establishing bidding procedures for a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. The Court approved the bidding procedures on July 11, 2024 [Docket No. 249] (the "Bidding Procedures Order"), through which the Debtors obtained approval for the manner and notice of the auction and sale hearing procedures to govern an efficient and flexible auction process to realize the full value of existing assets.

Following a robust marketing process that began prepetition and continued postpetition, as well as a three-day auction conducted on August 12-14, 2024 for the Debtors' ventilation business unit, the Debtors obtained approval on August 30, 2024 for a sale of certain of the assets of the Debtors' Respiratory Diagnostics business (the "Respiratory Diagnostics Assets") to Trudell Medical Limited ("Trudell") for a purchase price of $53.5 million in cash consideration, and a sale of certain of the assets of the Debtors' ventilation business (the "Ventilation Assets") to Zoll Medical Corporation ("Zoll") for approximately $37 million (in each case, the consideration received included the assumption of certain obligations and liabilities). The Bankruptcy Court entered the Sale Orders approving each sale transaction on September 4, 2024. *See* Docket Nos. 496 and 497.

Pursuant to the Zoll asset purchase agreement, Zoll is responsible for cure costs in an amount not to exceed $5 million (the "Zoll Cure Cap") and the Debtors being responsible for all cure costs over and above the Zoll Cure Cap, which, at this time, are estimated to be approximately $4.1 million. At present, there is no allocation in the Wind-Down Budget with respect to any cure amounts in excess of the Zoll Cure Cap for which the Debtors may be obligated. The Debtors have consistently advised all parties, including at the auction and on the record at the sale hearing, that the Debtors do not intend to pay cure costs in excess of the Zoll Cure Cap and the Debtors cannot assign contracts to Zoll to the extent cure costs are in excess of $5 million.

Pursuant to the *Order (I) Approving the Zoll Asset Purchase Agreement and Authorizing the Sale of Certain of the Ventilation Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (III) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection therewith, and (IV) Granting Related Relief* [Docket No. 496] (the "Zoll Sale Order") and the *Order (I) Approving the Trudell Asset Purchase Agreement and Authorizing the Sale of Certain Respiratory Diagnostics Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (III) Authorizing the Assumption and Assignment of the Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* (the "Trudell Sale Order" and together with the Zoll Sale Order, the "Sale Orders"), the Court approved a holdback schedule (the "Holdback Schedule"). The Holdback Schedule sets forth the terms of an agreement between the Debtors and the DIP Lenders (as set forth in the Sale Orders and the Holdback Schedule attached thereto, the "Allocation Agreement") to, among other things, reduce the new money commitment under the DIP Facility by $5 million and allocate $21.5 million of proceeds of the sales to Zoll and Trudell to fund the Debtors' winddown. The Holdback Schedule also set forth the budget for the Debtors' winddown. The Committee was not involved in the negotiation of, nor did it consent to, the entry of the Allocation Agreement between the Debtors and the DIP Lenders.

Subsequent to the consummation of the Sale Transactions, subject to Bankruptcy Court approval, the Debtors propose to liquidate any remaining assets under chapter 11 of the Bankruptcy Code. Under chapter 11, a debtor may reorganize or liquidate its business for the benefit of its stakeholders. The consummation of going-concern sale transactions followed by an orderly liquidation of any assets not sold is the principal objective of these Chapter 11 Cases.

The Debtors believe that the Plan maximizes the value of recoveries to all stakeholders and generally distributes all property of the Debtors' estates (after the sale closings) that is or becomes available for distribution according to the priorities established by the Bankruptcy Code and applicable law.  The Plan provides the ability of the Debtors to satisfy administrative and priority claims in full.

The primary objective of the Plan is to maximize value for all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

Generally speaking, the Plan:

- provides the vesting of certain assets following the Sale Transactions in the Wind-Down Debtors for the purpose of distribution to Holders of Claims;

- designates a Plan Administrator to wind down the Debtors' affairs, pay, and reconcile Claims, and administer the Plan in an efficient manner; and

- contemplates recoveries to Holders of Administrative Claims and Other Priority Claims as is necessary to satisfy section 1129 of the Bankruptcy Code.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any alternative would materially reduce recoveries to Holders of Claims.  Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that the Claims and Noticing Agent actually receives such ballots by **November 4, 2024, at 4:00 p.m.** prevailing Eastern Time (the "Voting Deadline").  Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

A.    *What is chapter 11?*

Chapter 11 is the principal business chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

The Plan contemplates the possibility of one or more asset sales of some or substantially all of the Debtors' assets as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and a sale order entered by the Bankruptcy Court. Following any Sale Transaction, the Plan provides for the efficient distribution of distributable cash (including the proceeds of the Sale Transactions, if any, to Holders of Allowed Claims and Allowed Interests and the orderly Wind-Down and dissolution of the Debtors' Estates. This Disclosure Statement is being submitted to provide information about the transactions contemplated under the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.    *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | First Lien Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

5

| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
|---|---|---|---|
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims and Interests against each Debtor (as applicable) under the Plan. As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III of the Plan.

D. *What will I receive from the Debtors if the Plan is consummated?*

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND**

6

**TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|-------|-------------------------|--------------------------------------|
| 1 | Secured Tax Claims | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of a Secured Tax Claim shall receive, at the option of the Plan Administrator:  (i) payment in full in Cash of such Holder's Allowed Secured Tax Claim; or (ii) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period. |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtors or Wind-Down Debtors:  (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) the collateral securing such Holder's Allowed Other Secured Claim; (iii) Reinstatement of such Holder's Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or (iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Administrative, Allowed Priority Tax Claim, or Allowed Other Claims, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| 4 | First Lien Claims | Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed First Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed First Lien Claim shall receive solely its pro rata share of Distributable Value, if any, after all Allowed DIP Claims have been satisfied in full in accordance with Article II.C; *provided, however,* that: (i) in no event shall any Holder of a First Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim, and (ii) notwithstanding anything herein to the contrary, the Prepetition First Lien RCF Loan Paydown Amount and the First Lien Agent Adequate Protection Claims shall have been paid in full in cash on or before the Effective Date. |
| 5 | Second Lien Claims | Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Second Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Second Lien Claim shall receive solely its pro rata share of Distributable |

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| | | Value, if any, after all Allowed DIP Claims and all Allowed Claims in Class 4 have been satisfied in full; provided, however, that in no event shall any Holder of Second Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. |
| 6 | General Unsecured Claims | On the Effective Date, each General Unsecured Claim shall be released, and each Holder of a General Unsecured Claim shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claim. |
| 7 | Intercompany Claims | Each Allowed Intercompany Claim, to the extent not assumed pursuant to the terms of any Sale Order, shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated, (b) converted to equity, (c) otherwise set off, settled, distributed, contributed, cancelled, or released; or (d) otherwise addressed at the option of the Debtors or Wind-Down Debtors without any distribution on account of such Intercompany Claims. |
| 8 | Intercompany Interests | Allowed Intercompany Interests, to the extent not assumed pursuant to the terms of any Sale Order, shall, at the election of the Debtors or Wind Down Debtors, be (a) Reinstated or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, or (c) otherwise addressed at the option of the Wind Down Debtors or Debtors without any distribution on account of such Intercompany Interests. |
| 9 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests shall be cancelled, released, and extinguished, and will be of no further force or effect. Holders of Interests shall receive no recovery or distribution on account of their Interests. |
| 10 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims shall be cancelled, released, and extinguished, and will be of no further force or effect. Holders of Section 510(b) Claims shall receive not recovery or distribution on account of such Claims. |

E.      *Are any regulatory approvals required to consummate the Plan?*

The Company holds several types of state licenses and permits, including medical device manufacturer, medical device distributorship, and durable medical equipment distributorship licenses. Some of these states require notice prior to effecting a change of control at the Company. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

F.      *What happens to my recovery if the Plan is not confirmed or does not go effective?*

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code, and in the alternative, the Chapter 11 Cases may be dismissed. Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c). Either alternative will bring additional risks and uncertainties.

G.    *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?*

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective."  Distributions to Holders of Allowed Claims and Allowed Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article IV.E of this Disclosure Statement, entitled "*Conditions Precedent to Confirmation and the Effective Date*," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" means the occurrence of the Effective Date.

H.    *What are the Sale Transactions?*

The Sale Transactions include: (i) the sale of certain of the Debtors' Respiratory Diagnostics Assets, as explained in that certain asset purchase agreement between the Debtors and Trudell,[3] and (ii) the sale of certain of the Debtors' Ventilation Assets, as explained in that certain asset purchase agreement between the Debtors and Zoll.[4]  On August 12-14, 2024, the Debtors held an auction for certain of the Debtors' Ventilation Assets.  After three days of competitive bidding that lasted over three days and ten rounds, the Debtors selected Zoll as the Successful Bidder for the Ventilation Assets.  While a number of parties expressed interest in the Debtors' Respiratory Diagnostics Assets, the Debtors received a single actionable proposal prior to the Bid Deadline from Trudell.  Following three weeks of continued negotiations with Trudell, the Debtors selected Trudell as the Successful Bidder for the Debtors' Respiratory Diagnostics Assets.

I.    *What are the sources of Cash and other consideration required to fund the Plan?*

The Debtors shall fund or make distributions under the Plan, including the conveyance and funding of the Wind-Down Debtor Account Amount, with: (i) the proceeds from the Sale Transactions; (ii) the Debtors' Cash on hand; and (iii) proceeds from the Wind Down, including the Wind-Down Debtor Assets.  The Allowed DIP Claims shall be satisfied in accordance with Article II.C of the Plan.

---

[3]    The asset purchase agreement for the sale of the Respiratory Diagnostics Assets is attached as Exhibit A to the *Notice of Successful Bidder for the Sale of Certain of the Debtors' Respiratory Diagnostics Assets, (II) Proposed Purchase Agreement in Connection Therewith, and (III) Proposed Sale Order in Connection Therewith* [Docket No. 400].

[4]    The asset purchase agreement for the sale of the Ventilation Assets is attached as Exhibit A to the *Notice of (I) Successful Bidder for the Sale of Certain of the Debtors' Ventilation Assets, (II) Proposed Purchase Agreement in Connection Therewith, and (III) Proposed Sale Order in Connection Therewith* [Docket No. 388].

J.      *Is there potential litigation related to the Plan?*

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* <u>Article IX.A.4</u> of this Disclosure Statement, entitled "*The Debtors May Not Be Able to Secure Confirmation of the Plan.*"

K.      *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall chapter 11 efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize the assets distributable by the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Releasing Parties are each of, and in each case in its capacity as such:  (a) the Debtors and the Wind-Down Debtors, as applicable; (b) the Plan Administrator; (c) each Consenting Stakeholder; (d) the Committee and its members; (e) the Purchasers; (f) the DIP Lenders; (g) the Agents; (h) all Holders of Claims who opt in to granting the releases set forth in the Plan; (i) Holders of Interests who opt in the granting the releases set forth in the Plan; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j), for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided, however*, that in each case, an Entity shall not be a Releasing Party if it timely objects to the releases set forth in Article VIII.C of the Plan and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

The Released Parties are each of, and in each case in its capacity as such:  (a) the Debtors and the Wind-Down Debtors, as applicable; (b) the Plan Administrator; (c) each Consenting Stakeholder; (d) the Committee and its members; (e) the Purchasers; (f) the DIP Lenders; (g) the Agents; (h) all Holders of Claims who opt in to granting the releases set forth in the Plan; (i) all Holders of Interests who opt in to granting the releases set forth in the Plan; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (k) each Related Party of each Entity in clause (a) through this clause (k), each in their capacity as such; provided

that, in each case, an Entity shall not be a Released Party if it timely objects to the releases set forth in Article VIII.C of the Plan and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

The Exculpated Parties are: (a) each of the Debtors; (b) the Independent Directors; (c) the Committee and its members; and (d) with respect to the Debtors and the Committee, each of their respective current and former directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors, as applicable, that served in such capacity between the Petition Date and Effective Date.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.D of this Disclosure Statement, entitled "*Settlement, Release, Injunction, and Related Provisions.*"

As of the date hereof, the Committee does not support the releases or exculpations set forth in Article VIII of the Plan (collectively, the "Plan Releases"), because the Committee asserts that such Plan Releases are overly broad, covering a universe of unknown Affiliates and Related Parties, who, among certain Released Parties, have provided no consideration in exchange for receiving the Plan Releases, as required under prevailing Third Circuit law.

Further, notwithstanding the fact that the Plan provides that if Holders of Claims will be deemed Released Parties and receive the Plan Releases to the extent such Holders of Claims elect to opt into the releases set forth in Article VIII.C. of the Plan by submitting an Opt-In Form pursuant to the Opt-In Procedures, such Holders of Claims will nonetheless remain potential targets of Retained Causes of Action, including Avoidance Actions, as such Retained Causes of Action are carved out of the claims and causes of action being released under the Plan.

L.    *What is the deadline to vote on the Plan?*

**The Voting Deadline is November 4, 2024, at 4:00 p.m., prevailing Eastern Time**.

M.    *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.  For your vote to be counted, you must submit your ballot in accordance with the instructions provided in Article X of this Disclosure Statement.  **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

N.    *Why is the Bankruptcy Court holding a Confirmation Hearing?*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

O.    *When is the Confirmation Hearing set to occur?*

The Bankruptcy Court has scheduled the Confirmation Hearing for **November 14, 2024, at 10:00 a.m., prevailing Eastern Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.  The Confirmation Hearing is being held on the same day as the hearing to approve the adequacy of this Disclosure Statement.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objecting to the Plan and the date and time of the Confirmation Hearing, in a nationally recognized publication to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

The deadline by which all objections to the Plan must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is **November 4, 2024, at 4:00 p.m., prevailing Eastern Time**, pursuant to the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

P.    *What is the purpose of the Confirmation Hearing?*

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

Q.    *What is the effect of the Plan on the Debtors' ongoing business?*

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived.  On or after the Effective Date, and unless otherwise provided in the Plan, the Plan Administrator will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

R.    *Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Omi Agent Solutions, Inc.:

*By regular mail, hand delivery or overnight mail at:*

Vyaire Medical, Inc. *et al*.
c/o Omni Agent Solutions, Inc.
5955 De Soto Avenue, Suite 100
Woodland Hills, CA 91367

*By electronic mail at:*

Vyaireinquiries@omniagnt.com

Please reference "Vyaire Medical, Inc. – Solicitation Inquiry" in the subject line.

*By telephone at:*

(866) 956-2140 (Toll Free) or +1 (818) 666-3635 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims and Noticing Agent at https://omniagentsolutions.com/Vyaire (free of charge) or the Bankruptcy Court's website at https://deb.uscourts.gov (for a fee).

    S.    *Who Supports the Plan?*

The Plan, which remains subject to further negotiation, is supported by the Debtors. The Debtors are engaged in negotiations with, among other parties, the DIP Lenders, the Consenting Stakeholders, and the Committee regarding the terms of the Plan. As of the date hereof, the Plan and the Restructuring Transactions remain subject to further negotiation and finalization.

As of the date hereof, the Committee does not support the Plan, including the Releases contained in Art. VIII of the Plan.

    T.    *Could subsequent events potentially affect recoveries under the Plan?*

Potentially, yes. Recoveries under the Plan are only guaranteed after the Plan is confirmed and the Effective Date is reached. Any number of subsequent events may interfere with Plan recoveries.

    U.    *Do the Debtors recommend voting in favor of the Plan?*

Yes. The Debtors believe the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan is in the best interests of all Holders of Claims and Interests, and that other alternatives

(to the extent they exist) fail to realize or recognize the value inherent under the Plan. As noted above, at this time, the Committee does not support the Plan.

## IV.    SUMMARY OF THE PLAN.

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Wind-Down Debtors, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *Classification and Treatment of Claims and Interests.*

1.    Classification of Claims and Interests.

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or an Interest to be classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

2.    Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

3.      <u>Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code</u>.

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

4.      <u>Subordinated Claims</u>.

Except as expressly provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

5.      <u>Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes</u>.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.      <u>Intercompany Interests</u>

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are being received by Holders of such Intercompany Interests solely to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Wind-Down Debtors to the Holders of certain Allowed Claims and otherwise for uses as are contemplated by the Plan, in each case, in accordance with the terms of the applicable Sale Order.

7.      <u>Controversy Concerning Impairment</u>.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

15

B.      *Means for Implementation of the Plan.*

1.      <u>Restructuring Transactions.</u>

On or before the Effective Date, the applicable Debtors or the Wind-Down Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, consummation of the Sale Transactions pursuant to the Asset Purchase Agreements or any transactions set forth in the Restructuring Transactions Memorandum, the issuance of all certificates and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, contributions, distributions, novations, setoffs, or other corporate transactions (collectively, the "<u>Restructuring Transactions</u>").  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and Asset Purchase Agreements and that satisfy the applicable requirements of applicable Law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.  To the extent practicable and if applicable, the Restructuring Transactions contemplated herein shall be structured so as to obtain the most beneficial tax structure for the Debtors subject to the consent of the Required DIP Lenders and the applicable Purchasers.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, contemplated by, or necessary to effectuate the Plan.

2.      <u>Sources of Consideration for Plan Distributions.</u>

The Debtors shall fund or make distributions under the Plan, subject to the terms of the Sale Orders and the Asset Purchase Agreements, as applicable, from:  (i) the proceeds from the Sale Transactions (after, for the avoidance of doubt, giving effect to the DIP Paydown Amount, payment in full of the Prepetition First Lien RCF Loan Paydown Amount and funding the Wind-Down Debtor Account in accordance with the Wind-Down Budget); (ii) the Debtors' Cash on hand; and (iii) in accordance with the Wind-Down Budget, proceeds from the Wind Down, including the Wind-Down Debtor Assets.  The Allowed DIP Claims shall be satisfied in accordance with Article II.C of the Plan.

3.      Wind-Down Debtors.

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors solely for the purposes of (i) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, and liquidating all Wind-Down Debtor Assets, (ii) performing any obligations under any transition services agreement entered into before, on, or after the Effective Date, including pursuant to any of the Asset Purchase Agreements; (iii) enforcing and prosecuting Claims, interests, rights, and privileges under the Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith; (iv) resolving any Disputed Claims, (v) paying or otherwise satisfying Allowed Claims, (vi) filing appropriate tax returns (and, for the avoidance of doubt, may pursue any refunds, credits, or other tax benefits to which the Debtors and/or the Wind-Down Debtor are entitled and file any tax returns or other filings as are required in connection therewith), (vii) complying with its continuing obligations under the Asset Purchase Agreements, if any, (viii) otherwise administering the Plan in an efficacious manner, and (ix) undertaking any restructuring transactions as are necessary or advisable in connection with the foregoing. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to File motions or substitutions of parties or counsel in each such matter.

On the Effective Date, the Wind-Down Debtor Assets shall vest in the Wind-Down Debtors for the primary purpose of liquidating the Wind-Down Debtor Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business, other than performance under any transition services agreement for the benefit of Zoll Medical or Trudell for the conduct and continuation of the and the Ventilation business and the Respiratory Diagnostics business. The Wind-Down Debtors will, in an expeditious but orderly manner, subject to the requirements of any transition services agreements, liquidate and convert to Cash the Wind-Down Debtor Assets, make timely distributions pursuant to the Plan and Confirmation Order, and not unduly prolong its duration. The Wind-Down Debtor Assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. The Wind-Down Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

4.      Liquidating Trust.

Notwithstanding anything to the contrary herein, the Plan Administrator, in his or her discretion, may transfer all or any portion of the assets of the Wind-Down Debtors to the Liquidating Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations. For the avoidance of doubt, in the event of a Permitted Transfer, the provisions set forth in Article IV.Q herein shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Retained Causes of Action transferred to the Liquidating Trust. The Liquidating Trust shall be established for the primary purpose of liquidating the Liquidating Trust's assets, reconciling claims asserted against the Wind-Down Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to

continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust.  Upon the transfer of the Wind-Down Debtors' assets to the Liquidating Trust, the Wind-Down Debtors will have no reversionary or further interest in or with respect to the assets of the Liquidating Trust.  To the extent beneficial interests in the Liquidating Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests.  Prior to any Permitted Transfer, the Plan Administrator may designate trustee(s) for the Liquidating Trust for the purposes of administering the Liquidating Trust.  The reasonable costs and expenses of the trustee(s) shall be paid from the Liquidating Trust.

      1.   <u>Liquidating Trust Treatment</u>.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly.  For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust.  If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of the Liquidating

Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than 5 years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the 6 month period prior to the fifth anniversary (or within the 6 month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 5 years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

2. Disputed Ownership Fund Treatment.

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

5. Plan Administrator.

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by each Debtor, with the consent of the Required DIP Lenders, as the sole director and the sole officer of such Wind-Down Debtor and shall succeed to the powers of such Debtor's directors and officers. The Plan Administrator shall be the sole representative of, and shall act for each Wind-Down Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all Governance Documents are

deemed amended by the Plan to permit and authorize the same). For the avoidance of doubt, the Plan Administrator shall administer the Wind-Down and terms of the Plan in accordance with the Wind-Down Budget and shall have the authority to authorize, make, or cause to be made payments in accordance the Wind-Down Budget to satisfy certain claims and liabilities of the Debtors' non-Debtor Affiliates as deemed necessary in the Plan Administrator's reasonable judgment. The Plan Administrator shall use commercially reasonable efforts to adhere to (or outperform) the Wind-Down Budget; provided that the Plan Administrator shall have the authority to reallocate funding between line items within the Wind-Down Budget without further order of the Court.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator and in accordance with the Wind-Down Budget. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

6.      Exculpation, Indemnification, Insurance, and Liability Limitation.

The Plan Administrator and all professionals retained by the Plan Administrator shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by each Wind-Down Debtor. The Plan Administrator may each obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

7.      Tax Returns.

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, local, and non-U.S. tax returns for each of the Debtors and the Wind-Down Debtor (including, as applicable, with respect to tax refunds or credits), and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

8.      Dissolution of the Wind-Down Debtors.

Upon a certification to be filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, each Wind-Down Debtor shall be deemed to be dissolved without any further action by such Wind-Down Debtor, including the filing of any documents with the secretary of state for the state in which each such Wind-Down Debtor is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve each Wind-Down Debtor in and withdraw each Wind-Down Debtor from applicable states.

9.      Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except in connection with applications for compensation and objections thereto.  The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with (a) applications for payment of any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court; and (b) objections to applications for payment of fees and expenses rendered prior to the Effective Date.

10.      Cancellation of Securities and Agreements.

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Loan Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except (i) such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan and (ii) any indemnification obligations set forth in Article V.E hereof) shall be cancelled solely as to the Debtors and their Affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Debtor affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds (but not including any surety bonds issued on behalf of any of the Debtors), indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. Notwithstanding the foregoing, no executory contract or unexpired lease that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code shall be terminated or cancelled on the Effective Date.

11.      Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including:    (1) selection of the Plan Administrator; (2) implementation of the Restructuring Transactions; (3) consummation of the Sale Transactions under the Asset Purchase Agreements; (4) funding of all applicable escrows and accounts;  and (5) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan or corporate structure of the Debtors or Wind-Down

Debtors, as applicable, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors, as applicable.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements and documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors.  The authorizations and approvals contemplated by Article IV.L of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

            12.     Effectuating Documents; Further Transactions.

On and after the Effective Date the Plan Administrator and the Agents may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Confirmation Order and the Restructuring Transactions, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Confirmation Order.

            13.     Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the Wind-Down Debtor or to any other Person or from any of the Wind-Down Debtors to the Liquidating Trust or any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors or the Wind-Down Debtors; (2) the Restructuring Transactions; (3) any Sale Transaction; (4) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (5) the making, assignment, or recording of any lease or sublease; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate or bulk transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  No provision of the plan or of the Confirmation Order shall be construed to broaden the tax exemption under section 1146(a) beyond what the statute allows.

14.    Director and Officer Liability Insurance; Other Insurance.

Any directors and officers insurance policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtors effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the Debtors or the Estates pursuant to a Final Order or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under any such policies shall remain available to all individuals within the definition of "Insured" in any such policies.

In addition, on and after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date, shall be entitled to the full benefits of any directors and officers insurance policy in effect or purchased as of the Effective Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions on or after the Effective Date, in each case, to the extent set forth in such policies.

Subject to the occurrence of the Effective Date, to the fullest extent permitted by applicable law, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively, against any Claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtors or the Liquidating Trust, as applicable, which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date.

15.    Causes of Action.

Pursuant to the Sale Transactions Documentation, the Debtors assigned and transferred to the Purchasers all of the Transferred Causes of Action pursuant to the Sale Transactions Documentation in connection with the Sale Transactions and in accordance with the Sale Orders. For the avoidance of doubt, the Debtors or the Plan Administrator, as applicable, will retain the right to enforce the terms of the Sale Transactions Documentation. The Retained Causes of Action shall initially remain with the Debtors and shall immediately vest with the Wind-Down Debtors as of the Effective Date.

16.    Section 1145 Exemption.

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of any Interests pursuant to the Plan is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security. As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, Interests issued pursuant to the Plan are not "restricted

securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Wind-Down Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

      C.    *Treatment of Executory Contracts and Unexpired Leases.*

      1.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>.

On the Effective Date, except as otherwise provided herein or in the Sale Orders, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is: (1) identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) a D&O Liability Insurance Policy; (5) an Asset Purchase Agreement; or (6) to be assumed by the Debtors and assigned to any Purchaser in connection with any Sale Transaction and pursuant to any Sale Transaction Documentation.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases pursuant to the Plan; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Sale Orders to assume and assign Executory Contracts and Unexpired Leases to the Purchasers pursuant to the Asset Purchase Agreements. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any Final Order, including the Confirmation Order, which has not been assigned to a Purchaser pursuant to the applicable Asset Purchase Agreement or the applicable Sale Order, shall revest in and be fully enforceable by the Wind-Down Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal Law.

Notwithstanding anything to the contrary in the Plan or the Sale Transactions Documentation, the Debtors, the Wind-Down Debtors, and the Plan Administrator, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases, the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Schedule of Retained Causes of Action identified in Article V of the Plan and in the Plan Supplement at any time through and including 90 days after the Effective Date. The Debtors or the Wind-Down Debtors, as applicable, shall provide notice of any amendments to the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases to the parties to the Executory Contracts or Unexpired Leases affected thereby. For the avoidance of doubt, Article V of the Plan relates to Executory

Contracts or Unexpired Leases other than such agreements assumed, assumed and assigned, or rejected in accordance with the terms of any Sale Order.

2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date (the "Rejection Damages Claims Bar Date"). **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, the Liquidating Trust (if any), the Purchasers, or their respective property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, and released, notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the Wind-Down Debtors and the Holder of such Claim.

3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Except as otherwise provided by a Final Order of the Bankruptcy Court (including, for the avoidance of doubt, any Executory Contract or Unexpired Lease assumed or assumed and assigned in connection with any Sale Transactions pursuant to a Sale Order), any monetary defaults under an assumed Executory Contract or Unexpired Lease, as reflected on the Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Wind-Down Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and actually received by the Debtors at least seven days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment or cure

amount will be deemed to have assented to such assumption or assumption and assignment and cure amount. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such 14-day deadline, a Cure Notice of proposed assumption or assumption and assignment and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned; *provided* that such hearing shall take place at the next scheduled omnibus hearing, which shall be set 14 days after the Confirmation Hearing, subject to Bankruptcy Court availability, unless the Debtors or Wind-Down Debtors, as applicable, and objecting party agree to a different time.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Wind-Down Debtors, as applicable, may add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Subject to satisfaction in full of any applicable Cure Claim, the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary (solely to the extent agreed between the Debtors and the counterparty to an applicable Executory Contract or Unexpired Lease), including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Following satisfaction in full of any applicable Cure Claims, any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, Article V.C of the Plan does not apply to any Executory Contract or Unexpired Lease that was assumed or assumed and assigned in connection with the Sale Transactions in accordance with the Sale Orders.

4.      Insurance Policies.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Wind-Down Debtors. For the avoidance of doubt, Article V.D of the Plan does not apply to insurance policies or any agreements, documents, or instruments relating thereto that were transferred to the Purchasers in the Sale Transactions.

5.      Indemnification Obligations

Subject to the occurrence of the Effective Date, to the fullest extent permitted by applicable law, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively, against any Claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtors or their successors and assigns, which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date.

6.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

7.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided for in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

8.      Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Schedule of Rejected Executory Contracts and Unexpired Leases, or any other exhibit, schedule or annex, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Wind-Down Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is

27

or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

        9.    <u>Nonoccurrence of Effective Date</u>.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

        D.    *Settlement, Release, Injunction, and Related Provisions.*

        1.    <u>Release of Liens.</u>

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order or any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan, and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien and/or security interest, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**If any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

        2.    <u>Releases by the Debtors.</u>

**Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the**

Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Debtors, the Wind Down Debtors, and their Estates, that the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Note Purchase Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other Definitive Document, any of the Restructuring Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

3.      <u>Releases by Holders of Claims and Interests.</u>

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or recission of any security of the Debtors or the Wind Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Note Purchase Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other Definitive Document, any of the Restructuring Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction,**

agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Article VIII.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in Article VIII.C of the Plan; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in Article VIII.C of the Plan.

4.      Exculpation.

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law and solely to the extent such acts or omissions occurred between the Petition Date and the Effective Date, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transactions, the Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transaction, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transactions, any other Definitive Document, any of the Restructuring Transactions, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of the Sale Transactions, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and

**responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

        5.    <u>Injunction.</u>

       **In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released or are subject to exculpation pursuant to the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, and any successors, assigns or representatives of such Persons or Entities: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post Effective Date transaction contemplated by the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

       **Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.E of the Plan.**

6.      <u>Protection Against Discriminatory Treatment.</u>

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

7.      <u>Document Retention.</u>

On and after the Effective Date, the Wind-Down Debtors, or the Debtors, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors, subject to the applicable provisions of the Plan Administrator Agreement.

8.      <u>Reimbursement or Contribution.</u>

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

9.      <u>Term of Injunctions or Stays.</u>

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

E.      *Conditions Precedent to Confirmation and the Effective Date.*

1.      <u>Conditions Precedent to the Effective Date</u>.

It shall be a condition precedent to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to Article IX of the Plan:

a.  the Restructuring Transactions, including the Sale Transactions, shall have been implemented and/or consummated, as applicable, in accordance with the Restructuring Transactions Memorandum in all material respects;

b.  the Bankruptcy Court shall have entered an order approving the Disclosure Statement, in form and substance acceptable to the Required DIP Lenders;

c.  the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with the Plan, and acceptable to the Required DIP Lenders and such order shall have become a Final Order;

d.  the DIP Facility shall be in full force and effect, and there shall be no defaults under the DIP Facility Documents continuing unless waived by the Required DIP Lenders in accordance with the terms and conditions of the DIP Facility Documents;

e.   the Plan Supplement, Definitive Documents, Plan, and all schedules, documents, supplements, and exhibits thereto, as applicable, shall be acceptable to the Required DIP Lenders and have become effective and shall be in full force and effect;

f.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

g.  all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date into the Professional Fee Escrow Account pending approval of such fees and expenses by the Bankruptcy Court;

h.  no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

i.  the following documents shall be in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions (including shall not be stayed, modified, revised, or vacated, or subject to any pending appeal), and shall not have been terminated prior to the Effective Date:  (a) any Sale Orders; (b) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by the Plan; (c) all other material customary documents delivered in connection with transactions of this type (including any and all other documents implementing, achieving, contemplated by or relating to the Restructuring Transactions); and

j.  the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in the Plan, in a manner consistent in all respects with the Plan, pursuant to documentation acceptable to the Debtors and the Required DIP Lenders.

2.      Waiver of Conditions.

The conditions to Consummation set forth in Article IX of the Plan may be waived by the Debtors, subject to the consent of the Required DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

3.      Effect of Failure of Conditions.

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.  Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of the Sale Transactions under the Asset Purchase Agreements or the revocation of the Debtors' authority under the Sale Orders to consummate such Sale Transaction.

## V.      THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW.

A.      *Creation of Vyaire Medical.*

During World War II, Forrest Bird, an experienced Army pilot, carefully studied the high-altitude respiratory problems experienced by his fellow pilots, developing modified plane mechanics to enable pilots to breathe easier at higher altitudes than ever before.  Over a decade later, after retiring from the armed services, Bird leveraged his experience in pilot breathing to address respiratory ailments on the ground.  Ultimately, Bird invented the first mechanical ventilator.  Among Bird's inventions was a small, portable ventilation device popularly known as "Baby Bird," which was profoundly successful in ameliorating pediatric respiratory illnesses.  Thus, Vyaire was born.

Over the coming decades, Vyaire grew into a comprehensive respiratory solutions provider and, ultimately, a full-service breathing-focused division of Becton, Dickinson and Company ("BD").  In October 2016, certain funds advised by Apax Partners LP ("Apax") acquired a 50.1% controlling interest in the Company from BD.  By 2017, sustained organic growth coupled with periodic merger activity had transformed Vyaire into a global enterprise with approximately $800 million in annual revenue, and in 2018, Apax acquired BD's remaining ownership stake in Vyaire.

*Ventilation Business.*   Ventilation is centered around its Palm Springs, California, manufacturing and repair facility and its key research and development center in Irvine, California; but its international third-party manufacturing facilities stretch from Mexico to Malaysia.  The Ventilation business is divided into product categories with associated consumable and service offerings, and such product categories serve three marketplaces:  acute, non-acute, and neonatal.  While the pandemic increased demand for Ventilation, its growth tailed off as the pandemic waned, further challenging the Company's overall business because of COVID-19 related overinvestment in the sector and slowing sales.  In addition to decreasing Ventilation demand generally, Vyaire lost over 10% of its market share in the sub-acute ventilation segment between 2021 and 2022,

35

due in part to other vendors entering the space and Vyaire's business challenges, which influenced certain customers to favor Vyaire's competitors.

*Respiratory Diagnostics Business.*  Respiratory Diagnostics is built around its Hochberg, Germany headquarters, where its primary manufacturing plant is also located.  Vyaire continues to experience success in its Respiratory Diagnostics business, as this unit has routinely achieved year over year success and increased profitability.  Respiratory Diagnostics offerings relate to pulmonary function testing, cardiopulmonary testing, and spirometry (a subset of pulmonary function testing).  Respiratory Diagnostics is structured around device and software product categories, with associated consumable and service offerings.  Vyaire offers best-in-class products and is currently a market share leader in this space.  The overall respiratory diagnostics market continues to expand, growing at a high compound annual growth rate, providing further tailwinds to Respiratory Diagnostics.

*Sale of Consumables Business.*  In May 2023, following a 12-month marketing process, Vyaire sold Consumables to SunMed Group Holdings, LLC (the "Consumables Sale") for approximately $310 million ($133.9 million in net cash after pay-down of its then-outstanding and now-terminated revolving credit facility) in order to focus management time and effort on Ventilation and Respiratory Diagnostics.  While the Consumables Sale provided the Company with critical liquidity to manage its balance sheet and for general corporate purposes, ultimately the Company required a more comprehensive solution.

B.    *Vyaire's Product, Service, and Consumable Offerings.*

*Ventilation.*   The Ventilation business is divided into discrete product lines, and the Company also offers related consumables and services.  Ventilation consumables generally support one or more associated product lines, and the Company offers corresponding training, education, and maintenance services.  Ventilation product lines include the Bellavista, 3100, SIPAP, LTV, Avea, Vela, ReVel, and Fabian business segments.  Ventilation consumables include circuits, flow sensors, and valves.  Ventilation product lines serve one or more of the acute, non-acute, or neonatal marketplaces, and certain product categories serve multiple marketplaces (*e.g.*, acute and neonatal).   Ventilation's Bellavista product category—with cutting-edge technology, advanced software, and an intuitive user interface—is Vyaire's dominant device line serving the acute marketplace.  The Company's 3100 product category serves countless neonatal intensive care units in the U.S., and together with certain Bellavista and Fabian devices, serves the neonatal market.  Vyaire's LTV series and ReVel series, both sophisticated portable ventilators with emergency transport capabilities, serve the non-acute marketplace.

*Respiratory Diagnostics.*   The Respiratory Diagnostics business is structured around certain product and software offerings, and the Company also offers associated consumables and services.  Respiratory Diagnostics products are the gold standard for noninvasive pulmonary and cardiopulmonary testing, lung volume measurement, and cardiopulmonary exercise testing.  For example, Vyaire's state-of-the-art Vyntus devices test lung and heart function and measure extensive respiratory data.  SentrySuite is Respiratory Diagnostics' proprietary operating software platform that powers its Vyntus devices, and which offers remote viewing capabilities, clinician coaching, and a multitude of detailed measurement applications.  Respiratory Diagnostics' consumables assist the Vyntus device line, and include MicroGard Filters, which are a single-use

36

consumable filter protecting patients and clinicians from cross-contamination during diagnostic testing.

Service offerings for Ventilation and Respiratory Diagnosis include equipment maintenance and device support, clinician-led education and training programs, and other on-site and off-site services.  Vyaire has also developed a differentiated portfolio of valuable intellectual property related to its product offerings consisting of, among other things, over 700 U.S. patents.

Vyaire Holding Company is the parent entity of Vyaire and has 63 wholly owned, direct, and indirect subsidiaries, 28 of which are Debtors in these Chapter 11 Cases.

## VI.    THE COMPANY'S PREPETITION CAPITAL STRUCTURE.

As of the Petition Date, the Debtors had an aggregate principal amount of approximately $533.6 million in aggregate outstanding principal of funded debt obligations.

| *Funded Debt* | *Approximate Outstanding  Principal Amount (in USD)* |
|---|---|
| **First Lien Term Loan** | **$339.3 million** |
| **First Lien Notes** | **$78.6 million** |
| **Second Lien Term Loan** | **$115.7 million** |
| **Total Funded Debt Obligations** | **$533.6 million** |

A.    *First Lien Facility.*

On April 16, 2018, Vyaire Medical, Inc., Vyaire Company, and Vyaire Finance B.V., a private limited liability company incorporated under the laws of the Netherlands and an indirect, wholly owned subsidiary of Vyaire Holding Company, and certain other subsidiaries of the Company (all such subsidiaries of Vyaire Holding Company, whether in the capacity of a borrower, guarantor, obligor, or pledgor thereunder, the "Obligated Subsidiaries"), and the lenders party thereto from time to time (the "First Lien Term Lenders"), entered into that certain First Lien Credit Agreement (the "First Lien Credit Agreement," as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), which provides for a "First Lien Term Loan" in an initial principal amount of $360,000,000, priced at SOFR + 4.75% for Eurocurrency rate loans and 3.75% for base rate loans, payable every one, three, or six months (at the option of the Obligated Subsidiary) in arrears on each interest payment date.

The secured parties under the First Lien Credit Agreement have first-priority liens on all or substantially all assets and property of Vyaire Medical, Inc. and all guarantors.  The First Lien Term Loan, unless amended, modified, or extended, will mature on April 16, 2025.  At present, interest on the First Lien Term Loan is SOFR + 4.75%, which, as of May 17, 2024, equated to 10.1%.  Bank of America, N.A. acts as administrative agent and collateral agent.

B.    *First Lien Notes.*

On May 3, 2019, the Obligated Subsidiaries, as issuers, and the purchasers party thereto from time to time (the "Notes Purchasers" and, together with the First Lien Term Lenders, the "First Lien Lenders") entered into that certain Note Purchase Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Purchase Agreement") with Wilmington Trust, National Association acting as notes agent and collateral agent. The Note Purchase Agreement provides for the purchase of a bank note (the "First Lien Notes") for approximately $60,000,000, at the fixed rate adjusted EURIBOR rate of 5.75%, payable every one, three, or six months (at the option of the Obligated Subsidiary) in arrears on each interest payment date. As a result of certain amendments to the Note Purchase Agreement, the borrowing capacity increased by $20,000,000, and as of September 30, 2023, the outstanding principal balance was approximately $76,262,000. At present, interest on the First Lien Notes is EURIBOR + 4.75%, which, as of May 17, 2024, equated to 8.5%. The First Lien Notes will mature on April 16, 2025, unless earlier converted, redeemed, or repurchased. The secured parties under the Note Purchase Agreement have first-priority liens on substantially the same assets and property as in the First Lien Credit Agreement.

C.    *Second Lien Facility.*

On April 16, 2018, the Obligated Subsidiaries, and the lenders party thereto from time to time (the "Second Lien Lenders"), entered into that certain Second Lien Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Credit Agreements"), which provides for a "Second Lien Term Loan" in an initial principal amount of €75,000,000, initially priced at EURIBOR + 7.25%, payable every one, three, or six months (at the option of the Obligated Subsidiary) in arrears on each interest payment date. Wilmington Trust, National Association acts as administrative agent and collateral agent.

Between November 6, 2018, and May 31, 2023, certain amendments to the Second Lien Credit Agreement were executed that allowed the Obligated Subsidiaries to make PIK interest payments on the relevant interest payment date. At present, interest on the Second Lien Term Loan is EURIBOR + 8.25%, which, as of May 17, 2024, equated to 12.08%.

The Second Lien Term Loan, unless amended, modified, or extended, will mature on April 16, 2026.

The collateral priority and enforcement rights as between the First Lien Credit Agreement and the Note Purchase Agreement are governed by a *pari passu* intercreditor agreement; and the collateral priority and enforcement rights as between the First Lien Credit Agreement, Note Purchase Agreement, and Second Lien Credit Agreement are governed by a first lien-second lien intercreditor agreement.

D.    *Equity Interests.*

The equity of Vyaire Holding Company, the topco Debtor, is 100% owned by Vyaire Intermediate HoldCo LP which, in turn, is 99.8% beneficially owned by Apax. Vyaire Holding

Company is authorized to issue 4,000,000 shares of preferred stock at $.01 par value, but no shares are currently issued and outstanding.

## VII.    EVENTS LEADING TO THESE CHAPTER 11 CASES.

A.    *Challenging Macroeconomic Conditions.*

The pandemic and its lingering consequences complicated the Company's go-forward plans. The COVID-19 pandemic was simultaneously a headwind reversing Company fortunes and a tailwind thrusting the Company forward. The COVID-19 virus acutely impacts the human respiratory system and can notably cause shortness of breath and difficulty breathing, creating heightened demand for Vyaire's ventilators and related devices and services. The pandemic also boosted Respiratory Diagnostics because of the increased need for diagnostic pulmonary testing, an increased patient population with cardiopulmonary illness (*e.g.*, chronic obstructive pulmonary disease), and complications stemming from long-term COVID-19 after-effects that necessitate ongoing patient monitoring and management. The pandemic also intensified the Company's product line rationalization efforts as Vyaire shifted away from outdated legacy brands and focused on in-demand innovative devices to combat COVID-19. The confluence of these factors improved Company performance. In fact, Respiratory Diagnostics revenue increased from roughly $112 million in 2019 to a projected $139 million in 2024 and is estimated to grow significantly over the next decade. Further, Ventilation generated $215 million in revenue in 2019, which nearly tripled to $620 million in 2020, in light of COVID-19 demand.

However, like many businesses around the world, the Company was not immune to the negative residual effects borne by the COVID-19 pandemic. After the pandemic, Vyaire's healthcare customers rapidly shifted their approach to patient treatment away from ventilation support to pharmaceutical options, and the Company pivoted toward an emphasis on repair/maintenance services, which undercut the Company's capital investment in further manufacturing capacity. The Company had scaled its inventory to meet high sales forecasts and unprecedent COVID-19 demand, but the market shifted dramatically, leaving the Company with an inventory glut and little cash.

Further, interruptions in the production and supply of the Company's products due to supply chain disruptions and worldwide shortages in the availability of raw materials and labor, alongside related inflation, led to higher production costs. The cost of medical grade resin, a crucial product ingredient, increased eight-fold. The Company's limited access to certain materials and component parts negatively impacted its ability to fulfill customer demand. Moreover, once the products were ultimately produced, the pandemic's role in rising freight and delivery costs caused Vyaire significant financial strain. Additionally, certain suppliers refused to distribute or substantially delayed shipments to Vyaire because of the significant ongoing stress on the global supply chain. Ultimately, following a banner year for Ventilation in 2020 touting $620 million in revenue, the business' revenue plummeted to $163 million by 2023. And while Respiratory Diagnostics' demand continued to climb post-COVID-19, supply chain constraints impacted Vyaire's ability to fulfill order backlog.

B.    *Internal Business Challenges.*

Vyaire has faced challenges as a standalone company.  Operations have largely been cash flow negative after factoring out the temporary demand spike from COVID-19.  The Consumables Sale provided some—but not enough—runway for the Company to solve its enduring operational challenges.  Several noteworthy challenges are highlighted below.

The Company has faced concerns related to corporate strategy, particularly in Ventilation. *First*, the Company's business model only had limited synergies between its now-divested Consumables business and its Respiratory Diagnostics and Ventilation businesses. *Second*, while the Company sought to execute on a business plan centered on developing new product lines and converting customers from outdated models (*e.g.*, Vmax and MasterScreen) to newer lines (*e.g.*, Vyntus and Bellavista), executing on such a plan was capital-intensive due to upfront research and development investments and long customer conversion timelines.  The Company's liquidity profile and balance sheet simply could not support those efforts over a longer time horizon. *Third*, SG&A expenditures needed to be right-sized to operations.  While the Company ultimately prioritized substantial cost-cutting initiatives to reduce overhead and plummeting available capital, these austerity measures were not drastic or quick enough to stabilize the Company's operations. *Fourth*, the Company needed to solve for post-COVID-19 demand challenges for Ventilation offerings and certain overproduction and inventory glut issues.

In response to increased COVID-19-related demand, the Company up-sized its operations, particularly with respect to manufacturing, which caused its fixed costs to rise.  As performance dipped in the Ventilation business (especially overseas), the Company began to move to adjust these heightened fixed costs, including by transitioning from a direct-sales strategy to a distributor-sales strategy for select foreign markets.  Further, the Company took efforts to rationalize distributor contracts by signing more favorable deals with new distributors.  However, the increased reliance on a distributor model came with a downside as the model proved to be unwieldy.  Not only did the Company cede a certain amount of control over the sales cycles, but it also was reliant on sales teams marketing and distributing several other products.  The Company became further removed from the sales process, which blunted its ability to quickly and directly carry out changes to sales and marketing.

The Company also encountered regulatory challenges in important overseas markets (*e.g.*, China and India) that have caused major disruption in those markets and lost sales.  The Consumables Sale provided a one-time liquidity boost that was intended, among other things, to provide breathing room for the Company's efforts to address legacy SG&A and remedy certain operational challenges, but these efforts did not fully address the Company's issues, and the prolonged challenges in Ventilation continued to hamper the Company's balance sheet and liquidity profile.  In short, the Company's performance has not allowed it to outlast a high cash-burn rate long enough to make appropriate adjustments to, and investments in, the Company's underlying business model.

C.    *Business Plan and Operational Pivot*

In response to these various operational, business, and macroeconomic challenges, Vyaire initiated a strategic realignment consisting of certain cost-reduction programs coupled with a shift

in focus to higher-margin, higher-growth opportunities among its Ventilation and Respiratory Diagnostics divisions. For instance, the Company worked to: (a) convert its installed customer base to innovative new products; (b) realign geographic priorities to account for foreign-nation preferences (*e.g.*, by shifting the manufacture of products for sale in China to China to account for domestic-preference policies); (c) streamline manufacturing operations by shifting European manufacturing operations to the U.S.; (d) invest in data analytics to reduce the Company's services and software spend; (e) roll out a global, margin-expansion strategy to increase liquidity; and (f) pursue a radical cost-cutting initiative.

The business plan's results were especially positive with respect to Respiratory Diagnostics, resulting in improved sales year over year, and achieving double-digit growth with increasing profitability in the U.S. in the several quarters preceding the Petition Date. However, Ventilation performance has challenged the business plan. In the first half of 2024, Ventilation revenue declined approximately 20%, while Respiratory Diagnostics revenue grew between 5% and 10%. Overall, the Company's liquidity could not sustain the Company through the challenged turnaround efforts, and the Company pursued options to address its over-levered balance sheet.

D.    *Prepetition Efforts to Address the Company's Balance Sheet.*

The Company began to negotiate with various stakeholders in mid-2023 to better align the Company's balance sheet to support its business plan. The Consumables Sale provided the Company with the capital to allow for time to analyze, in detail, the contours and strategy of a prospective balance sheet enhancing transaction.

***Amend and Extend Efforts***. In March 2024, after months of hard-fought, arm's-length, and intense negotiations, the Company and the 1L Ad Hoc Group neared final transaction terms regarding the Amend and Extend. The Amend and Extend was designed to provide the Company with breathing room while it engaged in an operational restructuring. The downturn in Ventilation sales, however, contributed to the need for additional equity or a capital backstop to maintain the minimum liquidity requirements of the proposed Amend and Extend. Despite over a year of significant efforts, the Amend and Extend transaction was not actionable due to greater than anticipated capital investment requirements, chiefly because of challenges related to the Ventilation business, worsening operational challenges, and a stubbornly high cash-burn rate. Accordingly, the Company and its stakeholders pivoted to considering a potential in-court restructuring and authorized Advisors to engage with the 1L Ad Hoc Group and its other stakeholders to pursue alternative transactions.

***Forbearance Agreement***. To facilitate further solution-oriented discussions between the parties, on April 10, 2024, the Debtors and the 1L Ad Hoc Group entered into Amendment No. 9 to the First Lien Credit Agreement (the "<u>Forbearance Agreement</u>"), whereby the parties agreed to forbear from the exercise of remedies with respect to any existing defaults or to declare that an "event of default" had occurred with respect to the non-payment of interest under the First Lien Credit Agreement, among other things. Further, the Forbearance Agreement set forth (a) enhanced reporting requirements, including the provision of substantial unaudited financial statements to the 1L Ad Hoc Group; and (b) certain milestones related to the restructuring. The 1L Ad Hoc Group continued to provide forbearance relief by agreeing to extend deadlines and waive other

41

requirements repeatedly though the Petition Date, which enabled the parties to reach agreement on a value-maximizing path and help the Company avoid a fire sale liquidation.

*Bridge Financing Efforts.*  In April and May of 2024, the Company and its Advisors worked extensively with the 1L Ad Hoc Group, trading numerous term sheets and drafting and negotiating various ancillary and collateral deliverables, in order to agree to terms for a $30 million new-money, multi-draw term loan facility to bridge the Company's immediate financing needs, subject to certain milestones and covenants related to the Company's marketing efforts to effectuate a sale.  The purpose of this bridge financing was to allow more time for the Company to market a sale of the business in whole or in parts.  The Company also received a bridge financing proposal from the Second Lien Lenders, but it was not actionable given it required the First Lien Lenders' consent to be primed by the proposed bridge facility.

Ultimately, the parties were not able to finalize terms and close on the bridge financing. However, the exercise in the bridge financing discussions, though unsuccessful, revealed that there was considerable consensus among the Company and its stakeholders that the value-maximizing path forward for the Company would be a fulsome marketing and sale process for some, substantially all, or all of the Company's assets, including the potential for sales exclusively of the assets related to the Company's Ventilation and Respiratory Diagnostics business units, or for the Company as a whole (the "Marketing and Sale Process").

E.    *The Prepetition Marketing and Sale Process and the RSA.*

In April 2024, with the assistance of its Advisors, Vyaire commenced the Marketing and Sale Process, which would continue through an in-court process, facilitated by an RSA.

*Prepetition Marketing and Sale Process.*  This process has resulted in substantial interest in the Company.  In the weeks leading up to the Petition Date, Company management and PJT prepared confidential information memoranda separately for the Ventilation and Respiratory Diagnostics businesses and populated virtual data sites containing significant diligence documentation.  Prior to the Petition Date, the Company reached out to over 110 identified strategic and financial parties.  The Company executed over 30 non-disclosure agreements with access granted to virtual data rooms, financial models, and business segment standalone models. Prior to the Petition Date, the Debtors already received multiple first-round nonbinding indications of interest for various portions of the businesses.

*Entry into the RSA.*  To best orchestrate the Marketing and Sale Process postpetition, the Debtors and the RSA Parties reached an agreement to pursue and potentially effectuate certain restructuring sale transactions in chapter 11 and executed the Restructuring Support Agreement on June 9, 2024.  Under the Restructuring Support Agreement, the RSA Parties agreed, subject to the terms and conditions thereof, to support the sale process, consummation of any sale transactions, and to wind down the remaining Company.

F.    *Corporate Governance Efforts.*

To ensure that the entire restructuring and sale process is fair and efficient, the Debtors have implemented strong governance protocols.  In April 2024, the Board appointed the Independent Directors to the Special Committee.

Most recently, David Barse joined the Board as an Independent Director in April 2024 and the Company retained Cole Schotz P.C. ("Cole Schotz") to aid Mr. Barse in his investigation. David Barse and Cole Schotz have been engaged in a review and evaluation of potential claims or causes of action that the Debtors or certain of their stakeholders may possess against third parties. No potential claims or causes of action were identified as a result of the investigation, which has been completed. The results of the investigation have been shared with the UCC, along with voluminous diligence information regarding the same.

The Committee is also conducting its own independent investigation into potential estate Claims and Causes of Action, including potential Claims against the Debtors' current and former directors and officers and the Sponsor, who will receive releases if the Plan is confirmed. The Committee is continuing to review documents and communications that have been produced by the Debtors, but as of the date hereof, the Committee is not in a position to make a determination as to whether it agrees with the sufficiency of the investigation or the conclusions reached by Cole Schotz with respect to the Claims and Causes of Action that that will be released under the Plan in its current form.

The decision to commence these Chapter 11 Cases was the culmination of months of negotiations and strategic review, including regular meetings of the Debtors, Special Committee, management, and advisors. Ultimately, the boards of each Debtor determined that chapter 11 was the only viable path forward for the Debtors and thus provided the best path to maximize value for all stakeholders, preserve the Company's operations, and give the Company an opportunity for future growth.

## VIII.  MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

A.  *First Day Relief.*

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Debtors' Chapter 11 Cases following the commencement of the Chapter 11 Cases. A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of John Bibb, Group Chief Executive Officer of Vyaire Medical, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration").

The First Day Motions were heard and approved on an interim or final (as applicable) basis at the June 11, 2024, hearing (the "First Day Hearing"), and all First Day Motions and orders for interim and final relief granted in the Chapter 11 Cases can be viewed free of charge at https://omniagentsolutions.com/Vyaire.

B.  *Appointment of Official Committee of Unsecured Creditors*

On June 26, 2024, the U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 121], notifying parties in interest that the U.S. Trustee had appointed an official committee of unsecured creditors (the "Committee") in these Chapter 11 Cases. The Committee is currently comprised of: (a) Sunmed Group Holdings, LLC (d/b/a

AirLife); (b) Zensar Technologies Inc.; (c) Cognizant Worldwide Ltd.; (d) Presido; (e) Vizient, Inc.; (f) David M. Lewis Company; and (g) Data Modul, Inc.

On June 30, 2024, the Committee Filed the *Notice of Appearance and Request for Service of All Documents and Notices* [Docket No. 128], identifying their proposed counsel as McDermott Will & Emery LLP. The Committee subsequently retained Berkeley Research Group, LLC as its financial advisor. The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on July 17, 2024.

C.      *Second Day Relief.*

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens. Following a hearing held on July 9, 2024, the Bankruptcy Court entered orders granting the following relief:

(i)     **The Interim Compensation Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 218];

(ii)    **The Ordinary Course Professionals Order** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 225]; and

(iii)   **The Contract Rejection Procedures Order** approving procedures to reject executory contracts and unexpired leases [Docket No. 250].

D.      *The Debtors' Professionals' Retention Applications.*

To further facilitate the Debtors restructuring efforts and ease administrative burdens, the Debtors filed applications to retain professionals postpetition pursuant to sections 327, 328, 105, and 363 of the Bankruptcy Code, including:

(i)     **Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession** [Docket No. 236];

(ii)    **AlixPartners, LLP as Financial Advisor to the Debtors and Debtors in Possession** [Docket No. 241];

(iii)   **PJT Partners LP as Investment Banker to the Debtors and Debtors in Possession** [Docket No. 240];

(iv)    **Omni Agent Solutions, Inc. as Administrative Advisor to the Debtors and Debtors in Possession** [Docket No. 237];

(v)     **Cole Schotz P.C. as Delaware Counsel for the Debtors and Debtors in Possession** [Docket No. 239]; and

(vi)    **BDO USA, P.C. as Tax Services Provider for the Debtors and Debtors in Possession** [Docket No. 238].

44

E.       *Approval of Debtor in Possession Financing.*

On June 10, 2024, the Debtors Filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 12] (the "DIP Motion") and on July 7, 2024, the Bankruptcy Court entered a final order approving the DIP Motion [Docket No. 248] (the "DIP Order").  Pursuant to the DIP Motion and DIP Order and to provide the Debtors with the liquidity to commence a smooth landing into these Chapter 11 Cases, certain prepetition First Lien Term Loan lenders holding over 90% of the First Lien Term Loans (the "1L Ad Hoc Group") agreed to provide the DIP Facility and continued access to prepetition Cash Collateral.  The DIP Order authorized the Debtors to receive senior secured postpetition financing on a superpriority basis in the form of a senior secured, super priority multiple draw term loan facility in an aggregate principal amount of $45 million and to continue using the 1L Ad Hoc Group's cash collateral to provide sufficient liquidity for their operations during these Chapter 11 Cases.

The DIP Facility and access to Cash Collateral have given the Debtors the necessary liquidity to facilitate their Marketing and Sale Process, to fund their business operations and administrative expenses during these Chapter 11 Cases, and to fund a wind-down of any remaining estate assets and liabilities in accordance with an agreed wind-down budget between the Company and the Required Consenting Lenders.  The DIP Facility has provided a $45 million new money commitment (the "New Money Commitment"), including $25 million available to the Debtors on an interim basis and $20 million available on entry of a final order, and the consensual use of Cash Collateral.  The DIP Facility also features a $135 million roll-up (the "Roll Up") of the DIP Lenders' prepetition first lien term loans (*i.e.*, a 3:1 roll up of prepetition secured first lien term loans relative to $45 million of New Money Commitment).  The Roll-Up is only granted to the DIP Lenders on account of their portion of the New Money Commitment actually funded to the Debtors.  The DIP Facility matures on October 7, 2024.  In consideration for the consensual use of cash collateral, the Debtors agreed to provide the 1L Ad Hoc Group with adequate protection as set forth in the DIP Motion and the accompanying proposed interim order.  Importantly, in connection with the Debtors' restructuring, the applicable DIP documents and Restructuring Support Agreement set forth a mechanism to limit recovery of the DIP Claims to net sale proceeds from the Marketing and Sale Process.

The DIP Facility was the culmination of rigorous, arm's-length negotiations between the Debtors and the 1L Ad Hoc Group, was the best DIP financing proposal available to the Debtors after concerted efforts undertaken by PJT to obtain superior DIP financing proposals, and provided the Debtors with crucial liquidity at the outset of these Chapter 11 Cases, allowing the Debtors and their Advisors to focus on exiting chapter 11 expeditiously.

F.       *Schedules and Statements.*

The Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") on July 9, 2024.

G.    *Bar Date Motion.*

On June 25, 2024, the Debtors filed the *Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 116] (the "Bar Date Motion"). On July 9, 2024, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 227] (the "Bar Date Order"), which established procedures and deadlines for filing Proofs of Claim against the Debtors and approval of the form and manner of the bar date notice (the "Bar Date Notice").  Pursuant to the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases was August 2, 2024, at 11:59 p.m. Eastern Time (the "General Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is December 9, 2024, at 11:59 p.m. Eastern Time.  On July 11, 2024, the Bar Date Notice was published in *The New York Times* (national edition).

H.    *Bidding Procedures and Marketing Process.*[5]

As described above, the Debtors conducted a marketing process for all or substantially all of their assets.  The marketing process was an extensive, far reaching, and months-long process in which the Debtors and their advisors sought strategic and financial investors to effectuate a value maximizing transaction.  PJT, with the assistance of the Debtors, identified more than 100 parties, including strategic and financial partners, as potential bidders for the Debtors' assets.  In the period leading up to the Petition Date, PJT worked to prepare for a robust postpetition marketing process on an expedited basis that aligned with the milestones provided in the RSA and the Bidding Procedures Order, including:

| Deadline | Item |
|---|---|
| July 11, 2024 | Stalking Horse Bidder Designation |
| July 22, 2024, at 4:00 p.m. (prevailing Eastern Time) | Sale Transaction Objection Deadline |
| July 22, 2024, at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| July 24, 2024, at 10:00 a.m. (prevailing Eastern Time) | Auction Date (if any) |
| July 24, 2024 (or as soon as reasonably practicable) | Deadline to File Successful Bidder Notice |
| July 25, 2024, at 4:00 p.m. (prevailing Eastern Time) | Post-Auction Objection Deadline |
| July 26, 2024, at 4:00 p.m. (prevailing Eastern Time) | Sale Transaction Reply Deadline |
| July 29, 2024, at 4:00 p.m. (prevailing Eastern Time) | Adequate Assurance Objection Deadline |

---

[5]    Capitalized terms used but not otherwise defined in this section have the meaning given to them in the Bidding Procedures.

| July 31, 2024, at 2:00 p.m. (prevailing Eastern Time) (subject to the Court's availability) | Sale Hearing |
| --- | --- |
| August 19, 2024 | Deadline to consummate Sale Transaction |

To allow more time to receive and evaluate bids, and contemplate the designation of a stalking horse bidder, the Debtors filed the *Notice of Extension of Certain Key Dates and Deadlines* [Docket No. 263] on July 17, 2024, *Second Notice of Extension of Certain Key Dates and Deadlines* [Docket No. 311] on July 24, 2024, *Third Notice of Extension of Certain Key Dates and Deadlines* [Docket No. 353] on August 7, 2024, and *Fourth Notice of Extension of Certain Key Dates and Deadlines* [Docket No. 394] on August 16, 2024, extending the Stalking Horse Bidder Designation deadline to July 22, 2024, the Bid Deadline to August 5, 2024, the Auction Date to August 8, 2024, and the Sale Hearing to August 15, 2024. The Debtors explored the possibility of designating a Stalking Horse Bidder based on indications of interest received by the IOI Deadline, but ultimately did not designate a Stalking Horse Bidder. Instead, the Debtors determined that the best path forward was to allow parties to continue to develop their diligence and submit fulsome bids in advance of the Bid Deadline.

While the Auction was scheduled for August 8, 2024, to evaluate the bids in hand and provide Qualified Bidders with the opportunity to consider increasing their bids, the Debtors adjourned the Auction until August 12, 2024.[6] The Auction was associated with the Debtors' Ventilation Assets and was competitive and involved hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the three-day Auction, the Debtors determined that Zoll's bid represented the highest and otherwise best bid for a value-maximizing transaction of the Debtors' business. Accordingly, the Debtors designated Zoll as the Successful Bidder with respect to the Debtors' Ventilation Assets.[7] Zoll's bid includes, among other things, a base purchase price of $37 million in cash consideration, plus additional non-cash consideration including the assumption of certain liabilities, subject to certain terms and conditions.

On August 20, 2024, the Debtors filed a notice identifying Trudell as the Successful Bidder with respect to the Debtors' Respiratory Diagnostics Assets.[8] Trudell's bid includes, among other things, a base purchase price of $53.5 million in cash consideration, plus additional non-cash consideration including the assumption of certain liabilities, subject to certain terms and conditions.

On August 27, 2024, the Debtors sought Court approval to execute asset purchase agreements with Trudell and Zoll to consummate the Sale Transactions pursuant to the *Notice of Debtors' Revised Proposed Order (I) Approving the Trudell Asset Purchase Agreement and Authorizing the Sale of Certain Respiratory Diagnostics Assets of the Debtors Outside the*

---

[6]    *See Third Notice of Extension of Certain Key Dates and Deadlines* [Docket No. 353].

[7]    *See Notice of (I) Successful Bidder for the Sale of Certain of the Debtors' Ventilation Assets, (II) Proposed Purchase Agreement in Connection Therewith, and (III) Proposed Sale Order in Connection Therewith* [Docket No. 388].

[8]    *See Notice of (I) Successful Bidder for the Sale of Certain of the Debtors' Respiratory Diagnostics Assets, (II) Proposed Purchase Agreement in Connection Therewith, and (III) Proposed Sale Order in Connection Therewith* [Docket No. 400].

*Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and clear of All Liens, Claims, Interests, and Encumbrances, (III) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 471] (the "Proposed Respiratory Diagnostics Sale Order"), and the *Notice of Debtors' Revised Proposed Order (I) Approving the Zoll Asset Purchase Agreement and Authorizing the Sale of Certain Ventilation Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and clear of All Liens, Claims, Interests, and Encumbrances, (III) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 470] (the "Proposed Ventilation Sale Order," and, together with the Proposed Respiratory Diagnostics Sale Order, the "Sale Orders").  After a hearing on August 30, 2024, to consider the Sale Transactions, the Court approved the Sale Orders authorizing the Sale Transactions, which were entered on September 4, 2024.  *See* Docket Nos. 496 and 497.

Pursuant to the Sale Orders, the Court approved the Allocation Agreement reached by the Debtors and the DIP Lenders, which, among other things, reduced the new money commitment of the DIP Lenders under the DIP Facility by $5 million and allocated $25.1 million of the proceeds of the sale transactions with Zoll and Trudell to fund the Wind-Down Budget.  The Wind-Down Budget will take effect on October 18, 2024, at which point the Debtors will have $25.1 million (contingent up the sale to Trudell closing) to confirm the Plan, satisfy the debts of the Non-Debtor Affiliates, administer these Chapter 11 Cases, satisfy Administrative Claims and Professional Fee Claims, and wind down the Debtors and the Non-Debtor Foreign Affiliates.  As noted above, there are no amounts allocated under the Wind-Down Budget to satisfy the Debtors' obligations with respect to cure amounts in excess of the Zoll Cure Cap.

I. *Litigation Matters.*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.  With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

## IX.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.

Holders of Claims and Interests entitled to vote should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.     *Risks Related to the Confirmation and Consummation of the Plan.*

    1.     <u>Parties in Interest May Object to the Plan's Classification of Claims and Interests</u>.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

    2.     <u>The Conditions Precedent to the Effective Date of the Plan May Not Occur</u>.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are waived or not met, the Effective Date will not take place.

    3.     <u>The Debtors May Fail to Satisfy Vote Requirements</u>.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to Wind-Down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

    4.     <u>The Debtors May Not Be Able to Secure Confirmation of the Plan</u>.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and

voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.  The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5.    Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.    The Debtors Could Lose Exclusivity.

In addition, at the outset of these Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors obtained the exclusive right to propose the Plan upon filing their petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

### 7.    These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals.  Such expenses may decrease recoveries for

50

Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c).

8.  The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.  Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10. Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11. The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtor, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

As noted above, the Committee opposes the Plan Releases. As of the date hereof this Disclosure Statement, the Committee does not support the Plan, including, without limitation, the proposed Plan Releases thereunder. For this, among other reasons, the Committee may object to confirmation of the Plan on the grounds that the Plan does not satisfy some or all of the confirmation requirements under section 1129 of the Bankruptcy Code. There are no assurances

that the Bankruptcy Court will agree that the Plan complies with the requirements necessary for confirmation.

        12.    <u>The Total Amount of Allowed Administrative Claims and/or General Unsecured Claims May Be Higher Than Anticipated by the Debtors</u>.

With respect to Holders of Allowed Administrative Claims and/or General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated.

        13.    <u>Certain Tax Implications of the Plan.</u>

Holders of Allowed Claims should carefully review <u>Article XII</u> of this Disclosure Statement, entitled "*Material United States Federal Income Tax Consequences*," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Wind-Down Debtor, Liquidating Trust, and Holders of Claims.

  B.    *Disclosure Statement Disclaimer.*

        1.    <u>The Financial Information Contained in this Disclosure Statement Has Not Been Audited.</u>

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

        2.    <u>Information Contained in this Disclosure Statement is for Soliciting Votes.</u>

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

        3.    <u>This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission</u>.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the

accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

4.     <u>No Legal or Tax Advice Is Provided to You by this Disclosure Statement</u>.

**<u>This Disclosure Statement does not constitute legal advice to you.</u>** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.     <u>This Disclosure Statement May Contain Forward Looking Statements</u>.

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

6.     <u>No Admissions Made</u>.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7.     <u>Failure to Identify Litigation Claims or Projected Objections</u>.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Plan Administrator may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

8.     <u>No Waiver of Right to Object Claims or Interests</u>.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of

action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

9.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.      No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## X.      SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

A.      *Holders of Claims Entitled to Vote on the Plan.*

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims and Interests in Class 4 and Class 5 (the "Voting Classes").  The Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims and Interests in Classes 1, 2, 3, 6, 7, 8, 9 or 10.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims and Interests in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.      *Voting Record Date.*

**The Voting Record Date is October 2, 2024**.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

C.      *Voting on the Plan.*

**The Voting Deadline is November 4, 2024, at 4:00 p.m., prevailing Eastern Time**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Claims and Noticing Agent on or before the Voting Deadline:

<div style="border:1px solid">

**DELIVERY OF BALLOTS**

**Vyaire Medical, Inc.** *et al.*
**c/o Omni Agent Solutions, Inc.**
**5955 De Soto Avenue, Suite 100**
**Woodland Hills, CA 91367**

**and/or**

**To submit your ballot to the Claims and Noticing Agent via electronic mail:**
**Vyaireinquiries@omniagnt.com**

</div>

D.      *Ballots Not Counted.*

**No ballot will be counted toward Confirmation if, among other things**: (i) it is illegible or contains insufficient information to permit the identification of the Holder of such Claim or Interest; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

<div style="border:1px solid">

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT**

**(866) 956-2140 (Toll Free) or +1 (818) 666-3635 (International)**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE**
**NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

</div>

XI.      **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN.**

The following is a brief summary of the confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in the Disclosure Statement.

A.    *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  **The Bankruptcy Court has scheduled the Confirmation Hearing for November 14, at 10:00 a.m., prevailing Eastern Time.**  The Confirmation Hearing may be adjourned from time to time by the Debtors or Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures.  Any objection to the Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties no later than the Confirmation Objection Deadline.  **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court**.

B.    *Confirmation Standards.*

1.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1)  the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

2.    Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit B** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' Advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors'

businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide the same or a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction.  Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the increased expenses that would be incurred in a chapter 7 liquidation, with the appointment of the chapter 7 trustee.  The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' business that the Debtors had when they proposed to sell their assets pursuant to the Plan.  Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses.  Therefore, the appointment of a chapter 7 trustee would potentially delay distributions to creditors and reduce the present value of any recover for Holders.  *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).  Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case.

The conversion to chapter 7 would also require entry of a new bar date.  *See* Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases.  Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

3.    <u>Feasibility</u>.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

4.    <u>Valuation</u>

As described above, the Debtors engaged in marketing their assets for sale and soliciting bids in connection therewith pursuant to the Bidding Procedures Order.  The Debtors believe that this process provided the best method of valuing their enterprise, as it allows the market to speak as to that value.  The Debtors' marketing and sale process was a comprehensive and arm's length processes with the goal of identifying counterparties for one or more potential value-maximizing sale transactions, including an extensive prepetition process that began in April 2024.  To ensure that the integrity of the marketing and sale process is preserved, and value is maximized, this Disclosure Statement does not include a valuation analysis (which the Debtors at this time do not anticipate filing).  *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282) (order approving disclosure statement that conducted valuation analysis through a comprehensive marketing process).

C.    *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the

Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

        D.    *Confirmation Without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided,* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

        1.    <u>No Unfair Discrimination</u>.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

        2.    <u>Fair and Equitable Test</u>.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "Holder").  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein.  Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority

to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.    *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors*

The Sale Transactions and the liquidation of any remaining assets of the Debtors are generally expected to be treated as one or more taxable sales of assets and/or equity interests of the Debtors, with the Debtors recognizing gain or loss equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.

The Debtors expect to realize significant COD Income as a result of the consummation of the Plan. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan.

B. *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 First Lien Claims and Allowed Class 5 Second Lien Claims*

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Class 4 First Lien Claims and Allowed Class 5 Second Lien Claims, each Holder thereof will receive its Pro Rata share of the Additional Value pursuant to the waterfall recovery described in the Plan.

Each such Holder will be treated as exchanging their Claim in a taxable exchange under section 1001 of the Tax Code for the Additional Value. Accordingly, subject to the rules regarding accrued but untaxed interest, each Holder of such Claim should recognize gain or loss equal to the difference between (1) the amount of Additional Value received, as applicable, in exchange for such Claim, and (2) such Holder's adjusted basis, if any, in such Claim.

C. *Character of Gain or Loss*

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

D. *Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the

case of a debt instrument issued with "original issue discount" ("OID"), its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

E.    *Accrued Interest.*

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

F.    *Limitation on Use of Capital Losses*

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses.  For a non-corporate Holder, capital losses may be used to offset any capital gains recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains.  A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years.  For corporate Holders, capital losses recognized may only be used to offset capital gains recognized.  A corporate Holder that recognizes more capital losses than may

be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

G.    *Information Reporting and Backup Withholding*

The Debtors will withhold all amounts required by law to be withheld from distributions or payments.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

H.    *U.S. Federal Income Tax Treatment of the Liquidating Trust*

1.    <u>Liquidating Trust</u>

It is intended that any Liquidating Trust will qualify as a "liquidating trust" under Treasury Regulation section 301.7701-4(d).  Accordingly, it is intended that any Liquidating Trust will be treated as a grantor trust for U.S. federal income tax purposes, and that the beneficiaries will be treated as grantors of such trust.

In general, a grantor trust is not a separate taxable entity.  The IRS, in Revenue Procedure 94-45, sets forth the general criteria for obtaining an advance ruling as to the grantor

trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Revenue Procedure 94-45, the Liquidating Trust agreement will require all relevant parties to treat the transfer of the Liquidating Trust Assets for U.S. federal income tax purposes as (i) a transfer of the Liquidating Trust Assets directly to the beneficiaries in satisfaction of the Claims against the Debtors (to the extent of the value of the beneficiaries' respective interests in the applicable Liquidating Trust Assets) followed by (ii) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets in exchange for beneficial interests in the Liquidating Trust (to the extent of the value of the beneficiaries' respective interests in the applicable Liquidating Trust Assets), provided, however, that the Liquidating Trust Assets will be subject to any post-Effective Date liabilities or obligations incurred by the Liquidating Trust relating to the pursuit of Liquidating Trust Assets.

Accordingly, the beneficiaries should be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets. The foregoing treatment should also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As a grantor trust, the Liquidating Trust agreement will require all items of income, gain, loss, deduction and credit to be included in the income of the beneficiaries, and reported on such beneficiaries' U.S. federal income tax returns as if such items had been recognized directly by the beneficiaries in the proportions in which they own beneficial interests in the Liquidating Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the trustee of any Liquidating Trust so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the trustee of any Liquidating Trust), the  trustee of any Liquidating Trust may (i) timely elect to treat any portion or all of the Liquidating Trust or any Liquidating Trust Assets as a "disputed ownership fund" within the meaning of Treasury Regulation Section 1.468B-9 for federal income tax purposes (the "Disputed Ownership Fund") and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Disputed Ownership Fund will be subject to tax annually on a separate entity basis on any net income earned with respect to any Liquidating Trust Assets held in any such Disputed Ownership Fund, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors.

No ruling is currently being requested from the IRS concerning the tax status of the Liquidating Trust as a liquidating trust. As such, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a liquidating trust. If the IRS were to successfully challenge the liquidating trust classification, the U.S. federal income tax consequences to the Liquidating Trust and the Holders of Claims could vary from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust). Certain U.S. federal income tax consequences of the Liquidating Trust or portions thereof relating to Disputed Claims and being treated as a Disputed Ownership Fund are also discussed below.

2.    Reporting.

Any Liquidating Trust shall comply with all tax reporting requirements, including, without limitation, filing returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and, in connection therewith, the Liquidating Trustee may require the beneficiaries to provide certain tax information as a condition to receipt of distributions. The trustee of any Liquidating Trust shall also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Liquidating Trust income, gain, loss, deduction, or credit. Each such beneficiary will be required to report such items on its U.S. federal income tax return; provided, however, that any reporting under this section is subject to the discretion of the trustee of any Liquidating Trust to elect to treat the Liquidating Trust or any Liquidating Trust Assets (in whole or in part) as a Disputed Ownership Fund, which election may alter the requirement in accordance with federal tax laws and regulations.

All taxable income and loss of the Liquidating Trust will be allocated among, and treated as directly earned and incurred by, the beneficiaries with respect to such beneficiary's interest in the assets of the Liquidating Trust (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims. The character of any income or gain and the character and ability to use any loss or loss will depend on the particular situation of the beneficiary.

The U.S. federal income tax obligations of a beneficiary with respect to its beneficial interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any Cash or other proceeds, subject to any portion(s) of the Liquidating Trust allocable to Disputed Claims. Thus, a beneficiary may incur U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the U.S. Holder.

In general, other than in respect of amounts retained on account of Disputed Claims, a distribution of Cash by the Liquidating Trust will not be separately taxable to a beneficiary of the Liquidating Trust, since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and will be taxed at the time the Cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

3.    Valuation.

After the Effective Date, the Liquidating Trustee shall (i) determine the fair market value of the Liquidating Trust Assets as of the Effective Date, based on the Liquidating Trustee's good faith determination (in conjunction with guidance provided by trust professionals if any); and (ii) establish appropriate means to apprise the beneficiaries of such valuation; provided, however, that no such valuation will be required if the trustee of any Liquidating Trust elects to treat the Liquidating Trust or the Liquidating Trust Assets (in whole or in part) as a Disputed Ownership Fund. The valuation, if established pursuant to the terms of the Liquidating Trust agreement, shall be used consistently by all Parties (including, without limitation, the Debtors, the Liquidating Trust, the trustee of any Liquidating Trust, and the beneficiaries) for all U.S. federal income tax purposes.

4.     Tax Returns.

In accordance with the provisions of section 6012(b)(3) of the Tax Code (and any comparable provision of state or local tax law), the trustee of any Liquidating Trust shall cause to be prepared, at the cost and expense of the Liquidating Trust, the income tax returns (federal, state and local) that the Debtors are required to file (to the extent such returns have not already been filed by the Effective Date). The trustee of any Liquidating Trust shall also cause to be prepared, at the cost and expense of the Liquidating Trust, the income tax returns (federal, and if applicable, state and local) required to be filed on behalf of the Liquidating Trust, and such returns filed on behalf of the Liquidating Trust shall be consistent with the treatment of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) (other than with respect to any election by the trustee of any Liquidating Trust to treat the Liquidating Trust or any of the Liquidating Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund), and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. The trustee of any Liquidating Trust shall timely file each such tax return with the appropriate taxing authority and shall pay out of the assets of the Liquidating Trust all taxes due with respect to the period covered by each such tax return.

5.     Attribution of Income.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the trustee of any Liquidating Trust of a private letter ruling if the trustee of such Liquidating Trust so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the trustee of such Liquidating Trust), taxable income, gain, loss or deduction in respect of the Liquidating Trust Assets shall be attributed to the beneficiaries in proportion to their beneficial interests in the Liquidating Trust Assets. Notwithstanding anything in the Plan or Disclosure Statement, the timing of distributions shall comply with the requirements of Revenue Procedure 94-45, as determined by the Liquidating Trustee in its reasonable discretion.

6.     Tax Identification Numbers.

The trustee of any Liquidating Trust may require any beneficiary to furnish to the trustee of such Liquidating Trust its employer or taxpayer identification number as assigned by the IRS (e.g., via signed W-9 or for any non-U.S. Beneficiary a W-8) or otherwise certify in writing to the satisfaction of the trustee of such Liquidating Trust that distributions from the Liquidating Trust to the beneficiary are exempt from backup withholding. The trustee of any Liquidating Trust may condition any distribution to any beneficiary upon receipt of such identification number or exemption certification. If after reasonable inquiry and reasonable time constraints for responding (in each case, as determined by the trustee of any Liquidating Trust in its sole discretion), any beneficiary fails to provide such identification number, then distributions to such beneficiary shall

become undeliverable property to be made available for distribution to the remaining beneficiaries, in accordance with the terms of the Plan and the Liquidating Trust agreement.

7.    Annual Statements.

The trustee of any Liquidating Trust shall annually (for tax years in which distributions from the Liquidating Trust are made) send to each beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction or credit, and all such beneficiaries shall report such items on their federal income tax returns; provided, however, that any such reporting obligation under this subsection is subject to the discretion trustee of such Liquidating Trust to elect to treat the Liquidating Trust or any of the Liquidating Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund, which may impact the requirement of such annual statements pursuant to federal tax regulations and applicable laws.

8.    Notices.

The trustee of any Liquidating Trust shall distribute such notices to the beneficiaries as the trustee of such Liquidating Trust determines are necessary or desirable.

9.    Expedited Determination

The trustee of any Liquidating Trust may request an expedited determination of taxes of the Debtors or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

10.    Withholding.

The trustee of any Liquidating Trust will comply with all applicable governmental withholding requirements.

## XIII.    RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  September 30, 2024                VYAIRE MEDICAL, INC.
                                          on behalf of itself and all other Debtors


                                          /s/ Charles N. Braley
                                          Charles N. Braley
                                          Chief Restructuring Officer

**<u>EXHIBIT A</u>**

**Chapter 11 Plan**

[Filed Separately]

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

[Filed at Docket No. 532]