## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VYAIRE MEDICAL, INC., *et al.*,[1] | ) | Case No. 24-11217 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF CHARLES N. BRALEY IN
## SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER
## 11 PLAN OF VYAIRE MEDICAL, INC. AND ITS DEBTOR AFFILIATES

I, Charles N. Braley, hereby declare under penalty of perjury as follows:[2]

1.      I am a Partner and Managing Director of AlixPartners LLP ("AlixPartners") and the Chief Restructuring Officer ("CRO") of Vyaire Medical, Inc., and its affiliated debtors and debtors in possession (collectively, with its debtor affiliates, the "Debtors" and, together with its non-debtor affiliates, "Vyaire" or the "Company"). Vyaire is a private company based in Mettawa, Illinois, organized under the laws of Delaware, and is a debtor and debtor in possession in the above-captioned cases along with 27 of its direct and indirect subsidiaries or affiliates.

2.      I have over 20 years of experience in the restructuring and turnaround management industry and have led turnaround or restructuring efforts for various companies during that time.

---

[1]     The last four digits of Debtor Vyaire Medical, Inc.'s federal tax identification number are 6495. A complete list of each of the Debtors in these chapter 11 cases and each such Debtor's federal tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Vyaire. The location of Debtor Vyaire Medical, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 26125 North Riverwoods Boulevard, Mettawa, Illinois, USA 60045.

[2]     Capitalized terms used but not defined herein have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Vyaire Medical, Inc. and its Debtor Affiliates* [Docket No. 719] (as may be further amended, supplemented, or modified, the "Plan"), the *Motion of Debtors for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement on an Interim and Final Basis, (II) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (III) Approving the Solicitation and Notice Procedures, (IV) Approving the Combined Hearing Notice, and (V) Granting Related Relief* [Docket No. 520], or the *Debtors' Memorandum of Law in Support of an Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Debtors' Joint Chapter 11 Plan*, filed contemporaneously herewith, as applicable.

I have personally been involved in many comparable chapter 11 reorganizations including *In re Mallinckrodt plc*, Case No. 20-12522 (Bankr. D. Del. 2020); *In re NPC International Inc.*, Case No. 20-33353 (Bankr. S.D. Tex. 2020); *In re Basic Energy Services, Inc.*, Case No. 16-12320 (Bankr. D. Del. 2016), *In re Dendreon Corporation*, Case No. 14-12515 (Bankr. D. Del. 2014); *In re BearingPoint, Inc.*, Case No. 09-10691 (Bankr. S.D.N.Y. 2009); and *In re Remy Int'l, Inc.*, Case No. 07-11481 (Bankr. D. Del. 2007), among others. I specialize in advising senior executives, boards of directors, and creditors in distressed situations. My combination of restructuring, operating, and transaction experience spans multiple countries and a variety of industries.

3.     I submit this declaration (this "Declaration") in support of Confirmation of the Plan. In my capacity as CRO, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' restructuring efforts. I am also familiar with the terms of the Plan as well as its negotiation and development.

4.     Except as otherwise indicated, all statements set forth in this Declaration are based on: (a) my personal knowledge of the Debtors' business operations, my discussions with other members of the AlixPartners team, the Debtors' management team, and/or the Debtors' other advisors, and my review of relevant information provided to me by other members of the Debtors' management and the Debtors' professional advisors; (b) my opinion based upon my experience, knowledge, and information concerning the Debtors' operations; and (c) my review of relevant documents. I am not being specifically compensated for this testimony other than through payments received by AlixPartners as a professional retained by the Debtors. I am above 18 years of age, and if I were called upon to testify, I could and would testify competently to the facts set forth herein.

## General Background and the Development of the Plan

5.      The Plan is the product of extensive, good-faith, arm's-length negotiations among the Debtors, their lenders, the Purchasers, and the Committee, with all parties working towards an outcome that maximizes the value of the Debtors' Estates for the benefit of their stakeholders. The Plan is designed to bring an orderly and efficient conclusion to these Chapter 11 Cases.

6.      On September 11, 2024, the Debtors filed an initial version of the Plan [Docket No. 518].  After discussions with various stakeholders, on September 30, 2024, the Debtors filed the first amended version of the Plan [Docket No. 581].  On October 2, 2023, the Bankruptcy Court entered an order [Docket No. 596] (the "Disclosure Statement Order"), approving the Disclosure Statement on an interim basis, approving solicitation and notice procedures and a schedule for Confirmation, scheduling a combined hearing on final approval of the Disclosure Statement and Confirmation of the Plan, and approving the Combined Hearing Notice.

7.      In accordance with the Solicitation and Voting Procedures approved pursuant to the Disclosure Statement Order, the Debtors caused the Holders of Claims entitled to vote on the Plan to receive service of the Solicitation Packages that included:  (i) the Disclosure Statement Order; (ii) the applicable form of Ballot; (iii) the Cover Letter, including instructions to obtain access, free of charge, to the Plan and Disclosure Statement and the Disclosure Statement Order, which urged the Holders of Claims in the Voting Classes to vote to accept the Plan; and (iv) the Combined Hearing Notice to consider (a) approval of the Disclosure Statement on a final basis and (b) Confirmation of the Plan.  In accordance with the Solicitation and Voting Procedures, the Debtors also caused the Holders of Claims and Interests not entitled to vote on the Confirmation of the Plan to receive service of a Non-Voting Status Notice and Opt in Form.  It is my

understanding that on or about October 7, 2024, the Debtors caused the Claims and Noticing Agent, Omni Agent Solutions, Inc. ("Omni"), to begin service of (a) the Solicitation Packages to Holders of Claims entitled to vote on the Plan, as of the Voting Record Date, and (b) each applicable Non-Voting Status Notice to Holders of Claims and Interests not entitled to vote on the Plan, each in accordance with the provisions of the Disclosure Statement Order.  It is also my understanding that Omni completed the distribution of the Solicitation Packages and Non-Voting Status Notice.

8.      In accordance with the Disclosure Statement Order, the Debtors filed the Combined Hearing Notice and Omni provided service of the Combined Hearing Notice on October 7, 2024, October 11, 2024, and October 16, 2024 [Docket Nos. 601 & 707].  The Debtors also caused the Combined Hearing Notice to be published in the *New York Times* on October 11, 2024 [Docket No. 620].

9.      On October 28, 2024, the Debtors filed the initial version of the *Plan Supplement* [Docket No. 689], which included, as applicable, the (a) Rejected Executory Contracts and Unexpired Leases Schedule, (b) Assumed Executory Contracts and Unexpired Leases Schedule, (c) Transition Services Agreements Schedule of Contracts and Unexpired Leases Schedule, (d) Schedule of Retained Causes of Action, (e) Identity of Plan Administrator and Plan Administrator Agreement, (f) Wind-Down Budget, and (g) Restructuring Transactions Memorandum.

10.     On November 11, 2024, the Debtors filed an amended Plan Supplement [Docket No. 720], primarily revising the Schedule of Retained Causes of Action pursuant to the Committee Settlement discussed further below.

11.     Concurrently with this Declaration, the Debtors have filed (a) their second amended Plan [Docket No. 719], which incorporates changes in accordance with subsequent comments the

Debtors received to the Plan, including those from Committee, the U.S. Trustee, and other interested parties, and (b) the *Debtors' Memorandum of Law in Support of an Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Debtors' Joint Chapter 11 Plan.*  The Debtors have also caused Omni to file its report of plan voting [Docket No. 712] (the "Voting Report").

12.     Finally, the Plan (as amended) commemorates the comprehensive Committee Settlement that provides, among other things, a potential for a Cash recovery to Holders of General Unsecured Claims following satisfaction of Allowed Administrative Claims and Wind Down obligations.  The Debtors have worked closely with advisors to the Committee in an effort to achieve consensus among their stakeholders.  As a result, the Debtors and the Committee came to terms on the Committee Settlement in the week prior to the Confirmation Hearing.  The Committee Settlement provides, among other things, (i) a reserve of approximately $3 million for payment of Allowed Administrative Claims, (ii) a "Residual GUC Recovery Pool" that provides for the greater of (x) $250,000 and (y) the amount of excess funds of the Professional Fee Escrow Account, if any, to be distributed *pro rata* to Holders of Class 6 (General Unsecured Claims), as specified in the Plan, following satisfaction of the Debtors' Wind Down obligations; (iii) the Debtors' release of preference claims pursuant to section 547 of the Bankruptcy Code; and (iv) treatment of the Debtors' vendors and service providers servicing the Purchasers pursuant to the Transition Services Agreements.

13.     With respect to the Third-Party Release, the Plan was amended to restrict those Third-Party Releases to Holders of Claims and Interests who opted in to providing those releases. In addition, the injunction provision was revised pursuant to a resolution with the U.S. Trustee to

provide a temporal injunction as to the Debtors and Wind-Down Debtors with respect to the releases granted to the Debtors as Released Parties.

14.     I believe the Committee Settlement is reasonable and in the best interests of the Debtors and is a valid exercise of the Debtors' business judgment.  I also believe that, with the support from each of the key stakeholders in these Chapter 11 Cases in light of the Committee Settlement, the prompt Confirmation and consummation of the Plan is in the best interest of the Debtors, their creditors, and all other parties in interest, and that, accordingly, the Bankruptcy Court should approve the Disclosure Statement on a final basis and confirm the Plan.

## The Plan Satisfies the Requirements for Confirmation

15.     For the reasons detailed below and with the assistance of the Debtors' advisors, I believe the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a chapter 11 plan.  Specifically, it is my understanding that the Plan: (a) complies with all applicable provisions of the Bankruptcy Code as required by section 1129 of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code; (b) satisfies the mandatory requirements of section 1123(a) of the Bankruptcy Code; and (c) is consistent with section 1123(b) of the Bankruptcy Code.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents or where it will be the subject of evidence introduced at the Confirmation Hearing.

**I.      The Plan Satisfies Each Requirement for Confirmation.**

**A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

16.     It is my understanding that the Plan complies with 11 U.S.C. § 1129(a)(1), which requires the Plan to comply with 11 U.S.C. §§ 1122 and 1123 in all respects.

### 1. The Plan's Classification of Claims and Interests Under Section 1122

17.     Article III.A of the Plan provides for the separate classification of Claims and Interests as follows:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | First Lien Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

18.     I believe each Class is composed of substantially similar Claims or Interests, and each instance of separate classifications of similar Claims and Interests was based on valid business, factual, and legal reasons. No classification has been made for purposes of gerrymandering votes.

19.     First, dissimilar Claims and Interests are not classified together under the Plan. Generally speaking, the classification scheme follows the Debtors' capital structure. For example, debt and equity are classified separately, and secured debt is classified separately based upon its priority and separately from unsecured debt. It is my understanding that other aspects of the

classification scheme reasonably recognize the different legal or factual nature of Claims or Interests.

20.     Specifically, the Plan separately classifies Claims in Class 1 to reflect the priority of such Claims under section 507(a) of the Bankruptcy Code and separately classifies Other Secured Claims in Class 2 and Other Priority Claims in Class 3 based on their distinct legal nature. Class 4 consists of First Lien Claims, whereas Class 5 consists of Second Lien Claims and Class 6 consists of General Unsecured Claims that are separately classified due to the differences in the underlying nature of the Claims in each such Class.  Class 7 Intercompany Claims are separately classified because they do not involve third-party creditors, and Class 8 Intercompany Interests are separately classified from Class 9 Existing Equity Interests in TopCo (*i.e.* Vyaire Holding Company).  Finally, Class 10, Section 510(b) Claims, are separately classified to reflect the treatment of such Claims under section 510(b) of the Bankruptcy Code.

21.     It is my understanding that valid factual and legal reasons exist for separately classifying the various Classes of Claims and Interests under the Plan.  In each instance, the Plan classifies Claims based upon their different rights and attributes.  Additionally, each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.  Accordingly, I believe the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

**2.     The Plan Satisfies the Mandatory Requirements of Section 1123(a).**

22.     I have been advised that the Plan satisfies the six applicable[3] requirements set forth in section 1123(a) of the Bankruptcy Code because:

---

[3]     It is my understanding that, because the Debtors are not issuing any new securities under the Plan, the confirmation requirements set forth in section 1123(a)(6) of the Bankruptcy Code are inapplicable to these Chapter 11 Cases. In addition, section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

- Article III of the Plan designates Classes of Claims and Interests;

- Article III of the Plan identifies unimpaired Classes of Claims and Interests;

- Article III of the Plan specifies treatment of Impaired Classes of Claims and Interests;

- Subject to the Committee Settlement, Article III of the Plan provides the same treatment for each Claim or Interest of a particular Class, unless the Holder of a particular Claim agrees to a less favorable treatment of such particular Claim or Interest;

- Article IV of the Plan provides adequate means for its implementation, including by providing for, among other things, consummation of the Restructuring Transactions and the appointment of a Plan Administrator;

- Article IV.E of the Plan is consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of the Company's officers and directors by appointing the Plan Administrator as the sole director and the sole officer of the Wind-Down Debtor who shall succeed to the powers of directors and officers.

**B.      The Discretionary Contents of the Plan Are Appropriate and Should Be Approved.**

23.      It is my understanding that the Plan includes various discretionary provisions that are consistent with section 1123(b) of the Bankruptcy Code.  For example, the Plan provides for a general settlement of Claims and Interests, impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, provides a structure for Claim allowance and disallowance and establishes a distribution process for the satisfaction of Allowed Claims entitled to distributions under the Plan.  In addition, the Plan contains provisions implementing certain releases and exculpations, and permanently enjoining certain causes of action.

24.      I believe each of these provisions are appropriate because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and

equitable and in the best interests of the Debtors, these Estates, and these Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law. Such provisions are discussed in turn below but, in summary, satisfy the requirements of section 1123(b).

> **1.      The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b).**

25.      The Plan includes certain releases, an exculpation provision, and an injunction provision. I believe these discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are supported by the Debtors and their constituents, and, as I have been advised, are consistent with applicable precedent.

> **a.      The Debtor Release in the Plan is Appropriate.**

26.      Article VIII.B of the Plan provides for certain releases by the Debtors, the Wind-Down Debtor, their Estates, and certain Related Parties of any and all Claims and Causes of Action, including any derivative claims, the Debtors could assert against each of the Released Parties (the "Debtor Release"). I believe that the Debtor Release was negotiated in connection with the comprehensive settlement to be implemented through the Plan (including the Committee Settlement), and is an indispensable component to achieve final resolution of potential disputes would negatively affect these Chapter 11 Cases and the available recoveries under the Plan.

27.      ***First***, an identity of interest exists between the Debtors and the parties to be released. Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan without the Debtor Release. Like the Debtors, these parties seek to confirm the Plan and implement the Restructurings Transactions contemplated therein. Moreover, with respect to

certain of the releases—*e.g.*, those releasing the Debtors' current and former directors, officers, affiliates, and principals—there is a clear identity of interest supporting the release because the Debtors will assume certain indemnification obligations under the Plan that will be honored by the Wind-Down Debtor. Thus, a lawsuit commenced by the Debtors (or derivatively on behalf of the Debtors) against certain individuals would effectively be a lawsuit against the Wind-Down Debtor itself.

28.    ***Second***, substantial contributions have been made by the Released Parties. The Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in these Chapter 11 Cases to reach this value-maximizing outcome. The Released Parties have also given up material economic interests to ensure the viability of the Plan. Moreover, the Released Parties have expended time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.

29.    In particular, in exchange for the Debtor Release, the 1L Ad Hoc Group and the 2L Consenting Creditors agreed to a greatly reduced recovery under the Plan of all Distributable Value after accounting for the costs of the Wind Down, the satisfaction of DIP and Allowed Administrative Claims, and the Committee Settlement. Those same parties consented to the Debtors' use of Cash Collateral throughout the Chapter 11 Cases, and have otherwise agreed to be impaired while some recovery is diverted to General Unsecured Creditors. In addition, the Debtor Release was a material inducement for the Consenting Stakeholders to support the Debtors' chapter 11 efforts, as set forth in the Restructuring Support Agreement. Absent those significant concessions, the Debtors would not have a viable means of confirming a chapter 11 plan. In sum,

the value contributed by the Released Parties is substantial.  Without the contributions of each of these parties, the consummation of the Plan would not be possible.

30.     ***Third***, the Debtor Release is essential to the successful resolution of these Chapter 11 Cases because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan and the Restructuring Transactions contemplated therein.  The Debtors' DIP Lenders and Consenting Stakeholder made clear throughout the process (and as shown in the Restructuring Support Agreement) that the Debtor Release was a condition to implementing the Plan and funding the Chapter 11 Cases.  Importantly, the Debtor Release is the product of arm's-length negotiations between the Debtors and their key stakeholders and is limited in scope.  As consideration for the Debtor Release, the Debtors and their Estates will receive releases from potential Claims and Causes of Action from each of the Releasing Parties in addition to the significant benefits to the Debtors provided throughout the chapter 11 process.  The Debtor Release, as part of the broader settlement under the Plan, provides finality and avoids delay in consummating the Plan, and, therefore, the inclusion of the Debtor Release is worthwhile and inures to the benefit of each stakeholder of the Debtors.

31.     ***Fourth***, no party in interest has contested the Debtor Release of any hypothetical claims, and as evidenced by the Voting Report and noted herein, parties voting in Class 4 and 5 have **unanimously** voted to approve the Plan (including the Debtor Release).

32.     ***Fifth***, as described in the Disclosure Statement, the Debtors, with the assistance of their professional advisors, conducted an independent investigation to evaluate potential claims. That investigation was led by the special committee of the board of directors of Vyaire Holding Company (the "Special Committee").  I understand that process involved an exhaustive advisor

review of over 385 non-custodial documents, over 2.3 million custodial documents from ten custodians (with extensive review of over 56,000 of those documents relating to key search terms), and over 6,600 documents from the Sponsor. I further understand that advisors to the Special Committee also conducted seven interviews with the following key individuals:

| Interviewee | Role | Date[4] |
|---|---|---|
| Bret Wise | Independent Director | June 24, 2024 |
| Gaurav Agarwal | Former Chief Executive Officer | July 10, 2024 |
| John Bibb | Chief Executive Officer | June 26, 2024 |
| Mehmet Tar | Representative of Sponsor | June 27, 2024 |
| Phillip Cutting | Former Chief Financial Officer | June 25, 2024 |
| Steven Dyson | Chairman of Board of Vyaire Holding Company | June 27, 2024 |
| Vikram Bajaj | Chief Financial Officer | July 8, 2024 |

33.     From the review and analysis of those documents and interviews, advisors to the Special Committee produced an in-depth investigation report, which was reviewed by the Special Committee (and a non-privileged version was shared with the Committee). The Special Committee determined that, aside from the Causes of Action arising under section 547 of the Bankruptcy Code, the Debtor Release would not extinguish valuable claims worth pursuing because among other things, any theoretical claims lacked merit, were not viable, would be subject to defenses, and/or would involve extremely costly and time-consuming litigation. With respect to preference actions, in exchange for releasing Causes of Action arising under section 547 of the Bankruptcy Code in connection with the Committee Settlement, the Debtors secured the Committee's support for the Plan, including the Plan's terms regarding the estate's provision of critical transition services to the Purchasers, and avoided costly litigation over Confirmation of the Plan.

34.     I further understand that as the Chapter 11 Cases progressed, the Committee also undertook an investigation into Claims and Causes of Action that could be released under the

---

[4]     I understand that counsel to the Committee attended the interviews of Mr. Agarwal and Mr. Bajaj.

Debtor Release, analyzing approximately 26,000 documents produced by the Debtors. Following the Committee's review of the relevant documents and dialogue with the Debtors, the Committee ultimately agreed to the Committee Settlement, including supporting the Debtor Release. The Committee was not the only interested party to consider the scope of the Debtor Release and find it was appropriate: the Plan, including the Debtor Release, was heavily negotiated by sophisticated entities, such as those in the 1L Ad Hoc Group and the DIP Lenders, that were represented by able counsel and financial advisors. I believe that the Debtor Release is a compromise reflecting the underlying good faith, arm's-length negotiation that took place among the Debtors and their key stakeholders.

35.     For these reasons, I believe that the Debtor Release is justified, is a sound exercise of the Debtors' business judgment, is in the best interests of creditors and all stakeholders, is an integral part of the Plan, and satisfies key factors considered by courts in determining whether a debtor release is proper.

**b.     The Third-Party Release Is Wholly Consensual.**

36.     In addition to the Debtor Release, the Plan provides for releases by certain Holders of Claims and Interests who elect to opt-in to such release. Specifically, Article VIII.C of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such parties could assert against the Released Parties (the "Third-Party Release" and, together with the Debtor Release, the "Releases"). The Releasing Parties include, among others, each Consenting Stakeholder, the DIP Lenders, the Agents, the Committee, and its members (in their capacity as Committee members), all Holders of Claims or Interests who have opted in to the Third-Party Release, the Debtor and Wind-Down Debtor, and the Plan Administrator.

37.     I believe the Third-Party Release is consensual and integral to the Plan, and I have been advised that they are consistent with Third Circuit law.  The Third-Party Release only applies to the extent a party affirmatively **opts in** to the release.  All parties in interest had ample opportunity to evaluate and opt-in to the Third-Party Release.  Importantly, the ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the Third-Party Release, clearly informing Holders of Claims entitled to vote of the steps they should take, if they agreed with the scope of the release, and provided a method to opt in to the Third-Party Release. Similarly, the Non-Voting Status Notices distributed to Holders of Claims and Interests not entitled to vote on the Plan also quoted the entirety of the Third-Party Release, clearly informing Holders of Claims and Interests not entitled to vote of the steps they should take if they wished to elect to opt in to the Third-Party Release.  As such, I believe the Third-Party Release is a consensual release of all Holders of Claims or Interests who completed an Opt-In Form in accordance with the terms of the Disclosure Statement Order.

38.     Moreover, I believe the Third-Party Release is fair and necessary to the success of these Chapter 11 Cases, and that fair consideration is given in exchange for the release.

39.     The circumstances of these Chapter 11 Cases warrant the Third-Party Release because it is critical to the success of the Plan, and it is fair and appropriate.  Without the efforts of certain of the Released Parties in providing the DIP Financing and actively participating in the Sale Transactions and Plan negotiations, the Debtors would not been able to consummate the value-maximizing Sale Transactions for the benefit of all stakeholders and an orderly post-sale wind down through the Plan.  In addition, the Released Parties have been instrumental in supporting these Chapter 11 Cases and facilitating a smooth administration thereof.  Finally, throughout the entire case and all these negotiations, the Debtors' directors and officers steadfastly

maintained their duties to maximize value for the benefit of all stakeholders, investing countless hours both pre- and postpetition.

40.      Accordingly, for all the above reasons, I believe that the Debtors have a good-faith basis for including the Releases in the Plan.  I further believe that the Third-Party Release is reasonable and appropriate in light of the unique circumstances of these Chapter 11 Cases and satisfies all applicable requirements of the Bankruptcy Code.

### c.      The Injunction Provision Is Appropriate.

41.      Article VIII.E of the Plan provides for an injunction provision (the "Injunction Provision").  The Injunction Provision specifically provides that "[i]n accordance with Bankruptcy Code section 1143(d)(3), the Plan does not discharge the Debtors." Instead, the Injunction Provision implements the Plan's release and exculpation provisions by enjoining all Entities from commencing or maintaining any action against the Released Parties and Exculpated Parties on account of or in connection with any Claims or Interests released, exculpated, or settled under the Plan.  In addition, the Injunction provision is narrowly tailored to achieve its purpose, in that it only enjoins those entities that "held, hold, or may hold Claims or Interests that have been released or are subject to exculpation pursuant to the Plan" and is further consensual as to any party that did not specifically object to it.  No Entity which is subject to this provision has objected.

42.      The Injunction Provision is a necessary part of the Plan precisely because it enforces the release and exculpation provisions that are centrally important to the Plan. As such, I believe that the Injunction Provision should be approved.

### d.      The Exculpation Provision Is Appropriate.

43.      Article VIII.D of the Plan provides for the exculpation of the Exculpated Parties (the "Exculpation Provision").  I believe the Exculpation Provision is fair and appropriate under

the facts and circumstances of these Chapter 11 Cases.  The Plan's Exculpation Provision is the product of arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' stakeholders. The Exculpation Provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the Exculpation Provision.

44.     The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.  Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive, and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys support from the requisite Holders of Claims entitled to vote.  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement and the solicitation process, the Plan, the Asset Purchase Agreements, and related documents in furtherance of the Debtors' chapter 11 efforts.  Furthermore, the Exculpation Provision is limited to acts during these Chapter 11 Cases and does not extend beyond such time period.

45.     Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful resolution of these Chapter 11 Cases, and likely would not have been so inclined to participate in the Plan process without the promise of exculpation.  It is my

understanding that exculpation for parties participating in the Plan process is appropriate where Plan negotiations could not have occurred without protection from liability.

46.     Accordingly, I had been advised that under the circumstances, particularly where the Plan, including the Exculpation Provision, is supported by the requisite voting Classes in these Chapter 11 Cases, it is appropriate for the Bankruptcy Court to approve the Exculpation Provision, and to find that the Exculpated Parties have acted in good faith and in compliance with the law.

**C.     The Plan Complies with Section 1123(d).**

47.     Article V of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan by payment of the default amount, subject to the terms and conditions of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Therefore, to the extent the Debtors or the Wind-Down Debtors, as applicable, decide to assume an Executory Contract and Unexpired Lease and pay all outstanding Cure amounts, it is my understanding that the Plan complies with section 1123(d) of the Bankruptcy Code.

**D.     The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

48.     It is my understanding that the Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.  As set forth below, I have been advised that the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims and Noticing Agent in accordance with the Disclosure Statement Order.

1.      **The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125.**

49.     Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement on an interim basis in accordance with section 1125(a)(1).  The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.  As stated in the Voting Report, the Debtors, through Omni, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.  It is my understanding that the Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the Combined Hearing Notice, including instructions on how to obtain the Plan and the Disclosure Statement without a fee through the Debtors' restructuring website or for a fee at the Bankruptcy Court's PACER website, to be transmitted to voting parties and all parties in interest.  Moreover, at all times, the Debtors and their advisors acted in good faith and took appropriate actions in compliance with the Bankruptcy Code in connection with solicitation of the Plan.

50.     Based on the foregoing, it is my understanding that the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

2.      **The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126.**

51.     The Debtors solicited votes only from the Voting Classes, Holders of Allowed Claims and Interests in Classes 4 and 5, because each of these Classes is Impaired and entitled to receive a distribution under the Plan.  With respect to Holders of Allowed Claims in Class 6, such

Holders may, pursuant to the Committee Settlement, receive a recovery from a carveout of Cash that would otherwise go to the DIP Lenders, if available following the Debtors' Wind Down efforts.

52.     The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.  As set forth in the Voting Report, Classes 4 and 5 voted unanimously to accept the Plan.  Additionally, as discussed below, the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code and will be able to "cram down" impaired rejecting Classes pursuant to section 1129(b) of the Bankruptcy Code.  Based on the foregoing, I believe that the Debtors have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

**E.      The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

53.     I believe the Plan was proposed with honesty, good intentions, and a desire to maximize the value of the Debtors' business.  Throughout these cases, the Debtors worked to build consensus among their various stakeholders.  The Plan and the process leading up to its formulation are the result of extensive arm's-length negotiations among the Debtors, their lenders, the Purchasers, the Committee, and other parties in interest.  Throughout the negotiation of the Plan and these cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.

54.     Accordingly, I have been advised that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(3) of the Bankruptcy Code.

**F.      The Plan Provides for Court Approval of Certain Administrative Payments (Section 1129(a)(4)).**

55.     It is my understanding that all payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective

Date, including all budgeted Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.  Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 60 days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Court.  Therefore, it is my understanding that the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

      **G.**     **Post-Emergence Board Composition Has Been Appropriately Disclosed and Is Consistent with Public Policy (Section 1129(a)(5)).**

56.     The Plan provides for a Plan Administrator.  The Plan provides that the Plan Administrator will act on behalf of the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of directors and officers and also provides that on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Wind-Down Debtor shall be deemed to have resigned, solely in their capacities as such.  At that time, David M. Barse will be appointed as the sole director and sole officer of the Wind-Down Debtor.  As set forth in the Plan Administrator Agreement, the Plan Administrator may continue the employment of any former manager or officer, pursuant to any transition services agreement entered into on or after the Effective Date, by and between the Debtors and the Purchasers and may employ, retain, or designate professionals, consultants, or employees to represent him with respect to his responsibilities or otherwise effectuate the Plan.

57.     I have been advised that the Plan satisfies section 1129(a)(5)(B) of the Bankruptcy Code because the Debtors will publicly disclose the identities and affiliations of all insiders, if any, that the Wind-Down Debtor will employ or retain at or prior to the Confirmation Hearing in compliance with the Bankruptcy Code.

58.     Accordingly, I believe the above facts and circumstances comply with all of the elements of section 1129(a)(5) of the Bankruptcy Code.

**H.     The Plan Does Not Require Governmental Approval of Rate Changes (Section 1129(a)(6)).**

59.     It is my understanding that there is no governmental regulatory commission that has jurisdiction over the Debtors' or the Wind-Down Debtor's rates.

**I.     The Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).**

60.     The Debtors' advisors assisted with the preparation of the liquidation analysis that was filed at Docket No. 532 (the "Liquidation Analysis") to determine the respective value of distributions (if any) that Holders of Claims and Interests would receive on account of such Claims and Interests if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code. The Liquidation Analysis was completed with the direct involvement of people under my direct supervision. I am familiar with the methods used, and the conclusions reached, in the preparation of the Liquidation Analysis. It is my understanding that the Liquidation Analysis represents the Debtors' best estimate of the cash proceeds, net of liquidation-related costs that would be available for distribution to the Holders of Claims and Interests if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

61.     The Liquidation Analysis was based on a variety of assumptions, which are detailed in the Liquidation Analysis, and which I believe are reasonable under the circumstances. The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation if the Bankruptcy Court were to convert the Debtors' chapter 11 cases to a proceeding under chapter 7 of the Bankruptcy Code and a chapter 7 trustee were to proceed to convert the Debtors' assets into cash. The Liquidation Analysis demonstrates that recoveries under the Plan are at least as high as they would be in a hypothetical liquidation. Accordingly, I believe

that the Plan satisfies section 1129(a)(7) because creditors are getting more out of the Plan than

they would in a chapter 7 liquidation.

**J.      The Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8).**

62.      As will be discussed in greater detail below, I have been advised that Class 4 (First

Lien Claims) and Class 5 (Second Lien Claims) voted unanimously to accept the Plan.  Moreover,

it is my understanding that Holders of Claims and Interests in Class 6 (General Unsecured Claims),

Class 9 (Existing Equity Interests), and Class 10 (510(b) Claims) are deemed to have rejected the

Plan and, thus, were not entitled to vote.  Notwithstanding that Classes 6, 9, and 10 are deemed to

reject the Plan, it is my understanding that the Plan is confirmable because it satisfies section

1129(b) of the Bankruptcy Code.

**K.      The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).**

63.      The Plan generally provides that each holder of an Allowed Administrative Claim

(other than Holders of Professional Fee Claims, DIP Claims, and Claims for fees and expenses

pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive (unless

otherwise agreed by such Holder and the Debtors or the Wind-Down Debtors, as applicable) Cash

equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance

with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date

on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such

Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such

Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date

on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as

reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities

incurred by the Debtors in the ordinary course of their business after the Petition Date, in

accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

64.    Except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to section 503(b)(1)(D) of the Bankruptcy Code, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Wind-Down Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

65.    As described below, I reasonably believe based on the information currently available to me that the Debtors will be able to pay for claims that are liabilities of the Estate.  It is my understanding that, because the Plan provides for specified Cash payments to Holders of Claims entitled to priority under section 507(a), it is in compliance with section 1129(a)(9) of the Bankruptcy Code.

**L.    At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptance of Insiders (Section 1129(a)(10)).**

66.    I have been informed that section 1129(a)(10) of the Bankruptcy Code is an alternative to the requirement set forth in section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept a plan or be unimpaired under the plan.  It provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.  As set forth in the Voting Report, the Debtors have obtained the requisite acceptance to confirm the Plan, independent of any insiders' votes.

Therefore, it is my belief that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(10) of the Bankruptcy Code.

**M.    The Plan Is Feasible (Section 1129(a)(11)).**

67.    I reasonably believe the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing that based on current information available to me, the Debtors will be able to satisfy their obligations under the Plan.

68.    Under the Plan, the Debtors and Wind-Down Debtor, as applicable, shall fund the distributions and obligations under the Plan with Available Cash held by the Debtors or in reserves, and the Wind-Down Debtor Account, as applicable.  In addition to other assets, the Available Cash will be largely comprised of proceeds from the Sale Transactions with Zoll Medical and Trudell.

69.    The Sale Transaction with Zoll Medical closed on October 11, 2024.  Pursuant to the Zoll APA, the Debtors received approximately $43.1 million in cash consideration after required payments under the Ventilation Assets Sale Order on account of the DIP Paydown. As part of the $43.1 million, the Debtors received approximately $5.9 million on account of Administrative Claims and approximately $1.6 million on account of potential Cure Costs based on the Executory Contracts and Unexpired Leases if assumed. Following the closing, the Debtors have paid more than $5.9 million in Administrative Claims, and all Executory Contracts which have been assumed to date have received payment on account of such Cure Costs.

70.     In addition, pursuant to the Zoll APA, Zoll Medical assumed certain section 503(b)(9) claims totaling up to approximately $1.9 million. Rather than pay for a limited amount of these assumed obligations directly, for convenience, Zoll Medical requested that the Debtors make certain payments funded by Zoll Medical. The parties are actively in the process of arranging for the funding and payment of these assumed obligations.

71.     Pursuant to the Trudell APA, at closing, the Debtors are to receive approximately $4.4 million after required payments under the Respiratory Diagnostics Assets Sale Order on account of the DIP Paydown.  In addition, Trudell agreed to assume certain Administrative Claim liabilities totaling approximately $3.5 million and section 503(b)(9) claims totaling up to approximately $600,000.  Last, the Trudell APA includes an $8 million holdback, some, or all of which the Debtors may receive post-closing. The Sale Transaction with Trudell is currently anticipated to close on November 12, 2024, at which time Trudell will be responsible to make payment on account of the assumed obligations.

72.     In addition to the Administrative Claims being assumed and paid pursuant to the Zoll APA and the Trudell APA, based on information currently available, the Debtors estimate that approximately $2.8 in other undisputed Administrative Claims will be either due and owing or Allowed, on or about the date of the Confirmation Hearing. The Plan provides for the satisfaction of such Claims on or before the Effective Date of the Plan.  I reasonably believe that the Debtors currently have sufficient Available Cash to pay such estimated administrative obligations pursuant to section 1129(a)(9).

73.     Further, as indicated in Article II of the Plan, the DIP Claims will be satisfied upon payment in full in Cash of the amount of such Holder's *pro rata* share of the Distributable Value, in accordance with the terms of the DIP Documents and the Sale Orders notwithstanding any deficiency in the payment of the Allowed DIP Claims.

74.     Last, the Debtors initially sized a Wind-Down Budget in an amount no more than $25.1 million, which included certain amounts required to fund the Wind Down of the operations of certain non-Debtor Affiliates and/or satisfy certain required obligations in connection therewith (each in accordance with the Asset Purchase Agreements and the Sale Orders).  As set forth in the

Plan Supplement as <u>Exhibit F</u>, based on current information available, the Debtors have resized the expected costs of the Wind Down to approximately $18.5 million to fund Wind Down costs including the payment of certain employee-related costs, account-payable accrued liabilities, taxes, international obligations, legal and professional fees, and other Wind Down expenses. Additionally, the Purchasers assumed many contracts, and general Administrative Claims and Cure obligations related thereto (subject to the terms of the applicable Asset Purchase Agreements).  Based on information currently available to me, I believe the Wind Down estimate is reasonable.

75.     Finally, in line with the Sale Orders, the Debtors maintained a reserve account for Debtor and Committee professional fees, which will constitute the Professional Fee Escrow Account under the Plan, and which will be used to satisfy the Professional Fee Claims arising through the Confirmation Date.

76.     In sum, based on information currently available to me, I reasonably believe that the Wind-Down Debtor will have sufficient funds to satisfy requirements and obligations under the Plan.  Accordingly, based on the information above, I believe that the Plan is feasible.

**N.      The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

77.     It is my understanding that Article II.E of the Plan provides that the Debtors shall pay all fees and applicable interest under section 1930(a) of the Judicial Code and 31 U.S.C. § 3717, as applicable, for each quarter (including any fraction thereof) until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  Accordingly, it is my understanding that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

O.    **Non-Applicability of Certain Sections (Sections 1129(a)(13), (14), (15), and (16)).**

78.    It is my understanding that sections 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code do not apply to the Plan because the Debtors: (i) have no obligation to pay retiree benefits; (ii) are not subject to domestic support obligations; (iii) are not "individuals;" and (iv) are moneyed, business, or commercial corporations, and no party has asserted otherwise.

P.    **The Plan Satisfies the Requirements of Section 1129(b).**

79.    Class 4 (First Lien Claims) and Class 5 (Second Lien Claims) voted to accept the Plan.  Moreover, it is my understanding that Holders of Claims and Interests in Class 6 (General Unsecured Claims), Class 9 (Existing Equity Interests), and Class 10 (510(b) Claims) are deemed to have rejected the Plan and, thus, were not entitled to vote.  Further, the Debtors waived their right to solicit votes from Holders of Claims in Class 6 and treated such Class as rejecting the Plan.  As set forth in the Committee Settlement, those Holders may receive a recovery that only enhances their treatment relative to the version of the Plan that was solicited.  In addition, Holders of Claims and Interests in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) may be conclusively deemed to reject the Plan based on the Debtors' ultimate determination to maintain or cancel these intercompany claims and interests.  It is my understanding that nonetheless, as set forth below, the Plan does not unfairly discriminate and is "fair and equitable," and therefore satisfies the requirements under section 1129(b) of the Bankruptcy Code.

1.    **The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes That Have Not Voted to Accept the Plan.**

80.    I believe that the Plan's treatment of those Classes that are deemed to reject the Plan is proper and not "unfair" because Holders of Claims and Interests with similar legal rights will not be receiving materially different treatment under the Plan.  As I discussed above, the Plan's classification scheme categorizes Claims and Interests based on their priority within the Debtors'

28

capital structure, their differing legal nature, and their respective rights against the Debtors. Further, Claims and Interests in the Classes deemed to reject the Plan are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.  Accordingly, I believe that the Plan does not discriminate unfairly with respect to Classes of Claims and Interests that are deemed to reject the Plan.

### 2.    The Plan Is Fair and Equitable.

81.    I believe the Plan is "fair and equitable" to Holders of Claims and Interests in those Classes that were deemed to reject the Plan because the Plan satisfies the absolute priority rule with respect to each of these non-accepting Impaired Classes.  Specifically, no holder of any claim or interest junior to Class 6 will receive or retain any property under the Plan on account of such junior claim or interest.

82.    In addition, to the extent that Intercompany Interests are Reinstated under the Plan, it is my understanding that distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of all parties in interest. Accordingly, I believe that any reinstatement of Intercompany Interests will have no economic substance.

83.    Therefore, I believe the Plan is fair and equitable with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

### Q.    The Plan Complies with the Other Provisions of Section 1129 (Section 1129(c)–(e)).

84.    It is my understanding that the Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed chapter 11 plan.  Moreover, the Plan has not been

filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act. In addition, no party that is a governmental unit, or any other entity, has requested that the Bankruptcy Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. The Plan was proposed in good faith and not by any means forbidden by law. I believe the Debtors filed the Plan to accomplish their objective of efficiently and responsibly providing recoveries to their stakeholders. Accordingly, I believe that the Debtors have satisfied the requirements of section 1129(d) of the Bankruptcy Code.

85.     Lastly, it is my understanding that section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case." Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

## II.    The Waiver of a Stay of the Confirmation Order and the Proposed Modifications to the Plan Are Appropriate.

### A.    Cause Exists to Waive a Stay of the Confirmation Order.

86.     I have been advised that cause exists for waiving the stay of the entry of the Confirmation Order such that the Confirmation Order will be effective immediately upon its entry. As noted above, the Debtors have undertaken great efforts to facilitate their exit from chapter 11 as soon as practicable. Each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.

### B.    Modifications to the Plan.

87.     It is my understanding that the Debtors made certain modifications to the Plan in response to comments from stakeholders, including the Committee. I understand that such modifications do not adversely impact creditors who have not consented to such modified treatment. I believe that the changes are permissible modifications to the Plan and are supported

by the Debtors, and do not reflect material differences to recoveries of each affected class—*i.e.*, no Holder is "likely" to reconsider its acceptance.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 11, 2024                    */s/ Charles N. Braley*
                                            Charles N. Braley
                                            Chief Restructuring Officer of Vyaire Medical, Inc.