**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VYAIRE MEDICAL, INC., *et al.*,[1] | ) | Case No. 24-11217 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF**
**AN ORDER (I) APPROVING THE DEBTORS' DISCLOSURE STATEMENT ON A**
**FINAL BASIS AND (II) CONFIRMING THE DEBTORS' JOINT CHAPTER 11 PLAN**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Ave
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com

- and -

Spencer A. Winters, P.C. (admitted *pro hac vice*)
Yusuf U. Salloum (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:          spencer.winters@kirkland.com
                    yusuf.salloum@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**COLE SCHOTZ P.C.**
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:    (302) 652-3131
Facsimile:     (302) 652-3117
Email:          preilley@coleschotz.com

- and -

Michael D. Sirota, Esq. (admitted *pro hac vice*)
Warren A. Usatine, Esq (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:    (201) 489-3000
Facsimile:     (201) 489-1536
Email:          msirota@coleschotz.com

                    wusatine@coleschotz.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

November 11, 2024

---

[1] The last four digits of Debtor Vyaire Medical, Inc.'s federal tax identification number are 6495. A complete list of each of the Debtors in these Chapter 11 Cases and each such Debtor's federal tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Vyaire. The location of Debtor Vyaire Medical, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 26125 North Riverwoods Boulevard, Mettawa, Illinois, USA 60045.

## TABLE OF CONTENTS

Page(s)

Preliminary Statement.........................................................................................................2

Background ..........................................................................................................................5

I.      Procedural History....................................................................................................5

II.     The Plan Solicitation and Notification Process ......................................................7

Argument ...........................................................................................................................10

I.      The Disclosure Statement Contains "Adequate Information" as Required by
        Section 1125 and 1126 of the Bankruptcy Code and Satisfies Notice
        Requirements..........................................................................................................10

        A.     The Disclosure Statement Contains Adequate Information. ...........................10

        B.     The Debtors Complied with Applicable Notice Requirements.......................14

               1.     The Debtors Complied with the Notice Requirements Set Forth
                     in the Disclosure Statement Order. .....................................................15

               2.     The Ballots Used to Solicit Holders of Claims Entitled to Vote
                     on the Plan Complied with the Disclosure Statement Order...............15

               3.     The Debtors' Solicitation Period Complied with the Disclosure
                     Statement Order....................................................................................16

               4.     The Debtors' Tabulation Procedures Complied with the
                     Disclosure Statement Order..................................................................16

               5.     Solicitation of the Plan Complied with the Bankruptcy Code
                     and Was in Good Faith..........................................................................17

II.     The Plan Satisfies Each Requirement for Confirmation.......................................17

        A.     The Plan Fully Complies with the Applicable Provisions of the
              Bankruptcy Code (§ 1129(a)(1)). ..................................................................18

                1.     The Plan Satisfies the Classification Requirements of
                     Section 1122 of the Bankruptcy Code. ................................................18

                2.     The Plan Satisfies the Mandatory Plan Requirements of
                     Section 1123(a) of the Bankruptcy Code. ...........................................21

B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)). ....................................................24

      1.      The Debtors Complied with Section 1125 of the Bankruptcy Code...............................................................................25

      2.      The Debtors Satisfied the Plan Acceptance Requirements of Section 1126 of the Bankruptcy Code. ....................................26

C.      The Plan Was Proposed in Good Faith (§ 1129(a)(3)).....................28

D.      The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Bankruptcy Court Approval (§ 1129(a)(4)). ...........30

E.      The Debtors Have Complied with the Governance Disclosure Requirement (§ 1129(a)(5)). ....................................................31

F.      The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).........................................................................31

G.      The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).........................................................................32

H.      The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.......................................33

I.      The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).........................................................................35

J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).................................................................38

K.      The Plan Is Feasible (§ 1129(a)(11)). .................................................38

L.      The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12)).......................................................................41

M.      Sections 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ................................................................42

N.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.....................................................................42

      1.      The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)). .............................................................43

      2.      The Plan Is Fair and Equitable (§ 1129(b)(2)). .....................................45

O.      The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (§§ 1129(c)–(e)). ...............................................46

III.    The Discretionary Contents of the Plan Are Appropriate Under Section 1123(b) of the Bankruptcy Code. ...................................................47

A.      The Plan's Release, Exculpation, and Injunction Satisfy Section 1123(b) of the Bankruptcy Code. ...........................................50

1.      The Debtor Release in the Plan Is Appropriate. ..................................50

2.      The Third-Party Release Is Consensual and Appropriate and Should Be Approved. ................................................................55

3.      The Exculpation Provision Is Appropriate. .........................................58

4.      The Injunction Provision Is Appropriate. ............................................61

B.      The Plan Complies with Section 1123(d) of the Bankruptcy Code. ................62

IV.     The Plan Modifications Do Not Require Resolicitation or an Additional Disclosure Statement. ...................................................................62

V.      Good Cause Exists to Waive the Stay of the Confirmation Order ...........................65

Conclusion ..............................................................................................66

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship.*,
190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds* ...............................43

*In re 500 Fifth Ave. Assocs.*,
148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ...................................................................18

*In re A.H. Robins Co.*,
88 B.R. 742 (Bankr. E.D. Va. 1988), *aff'd,* 880 F.2d 694 (4th Cir. 1989) .............62

*In re Abbotts Dairies of Pa., Inc.*,
788 F.2d 143 (3d Cir. 1986) ..................................................................................28

*In re Abeinsa Holding, Inc.*,
562 B.R. 265 (Bankr. D. Del. 2016) .......................................................................52

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ....................................................................32

*In re Aegean Marine Petroleum Network, Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019) ....................................................................59

*In re Aleris Int'l, Inc.*,
2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ...........................................24, 43

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ...............................................................63, 64

*In re Ambanc La Mesa L.P.*,
115 F.3d 650 (9th Cir. 1997) ...........................................................................42, 43

*In re Anna Holdings, Inc.*,
No. 19-12551 (CSS) (Bankr. D. Del. Dec. 17, 2019) ............................................65

*In re APC Auto. Techs. Intermediate Holdings, LLC*,
No. 20-11466 (CSS) (Bankr. D. Del. July 10, 2020) ...........................................65

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006) ......................................................................17, 18, 43

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................43

iv

**Page(s)**

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)..............................................................................................32, 43, 44

*In re Bed Bath & Beyond Inc.*,
No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) ...................................................58

*In re BlockFi Inc.*,
No. 22 19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) .............................................................58

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
764 F.2d 406 (5th Cir. 1985) ............................................................................................28

*In re Capmark Fin. Grp.*,
2011 WL 6013718 ...........................................................................................................38

*In re Century Glove, Inc.*,
Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489 (D. Del. Feb. 10, 1993)
..........................................................................................................................28, 32, 63, 64

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
860 F.2d 94 (3d Cir. 1988)...............................................................................................11

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986)................................................................................30

*In re Clover Techs. Grp., LLC*,
No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22, 2020)...........................................................65

*In re Congoleum Corp.*,
362 B.R. 167 (Bankr. D.N.J. 2007) ...................................................................................58

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ...............................................................43, 48, 50, 55

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
699 F.2d 599 (2d Cir. 1983)..............................................................................................48

*In re Cyxtera Techs., Inc.*,
No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) ............................................................58

*In re Dow Coming Corp.*,
237 B.R. 374 (Bankr. E.D. Mich. 1999) .............................................................................62

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992)................................................................................18

*In re Drexel Burnham Lambert Grp., Inc.*,
960 F.2d 285 (2d Cir. 1992)..............................................................................................60

**Page(s)**

*In re Enron Corp.*,
 326 B.R. 497 (S.D.N.Y. 2005) .............................................................................60

*In re Exaeris, Inc.*,
 380 B.R. 741 (Bankr. D. Del. 2008) ...............................................................48, 50

*In re FAH Liquidating Corp.*,
 No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) ...............................................58

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
 Ltd. P'ship)*,
 116 F.3d 790 (5th Cir. 1997) ...............................................................................28

*First Am. Bank of N.Y. v. Century Glove, Inc.*,
 81 B.R. 274 (D. Del. 1988) ...................................................................................11

*In re Flintkote Co.*,
 486 B.R. 99 (Bankr. D. Del. 2012) .........................................................................38

*In re Freymiller Trucking, Inc.*,
 190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................43

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
 10 F.3d 944 (2d Cir. 1993)....................................................................................18

*In re Future Energy Corp.*,
 83 B.R. 470 (Bankr. S.D. Ohio 1988).....................................................................29

*In re G-1 Holdings Inc.*,
 420 B.R. 216 (D.N.J. 2009) ............................................................................63, 64

*In re Genesis Health Ventures, Inc.*,
 266 B.R. 591 (Bankr. D. Del. 2001) ......................................................................17

*In re Heritage Org., L.L.C.*,
 375 B.R. 230 (Bankr. N.D. Tex. 2007)...................................................................18

*In re HighPoint Res. Corp.*,
 No. 21-10565 (CSS) (Bankr. D. Del. Mar. 18, 2021)...............................................65

*In re Indianapolis Downs, LLC*,
 486 B.R. 286 (Bankr. D. Del. 2013) ..................................................51, 52, 55, 60

*In re ION Media Networks, Inc.*,
 No. 09-13125 (JMP), 419 B.R. 585 (Bankr. S.D.N.Y. Nov. 24, 2009).......................45

*In re Jersey City Med. Ctr.*,
 817 F.2d 1055 (3d Cir. 1987)................................................................................18

**Page(s)**

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)..................................................................18, 42

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ....................................................................43

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)..................................................................................38

*In re Laboratory Partners, Inc.*,
    No. 13-12769 (PJW) (Bankr. D. Del. July 10,2014) ............................................58

*In re Lapworth*,
    1998 WL 767456 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) ....................................24

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003) .....................................................................43

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (Bankr. D. N.J. 2005) ...............................................................12, 29

*In re Longview Power, LLC*,
    No. 20-10951 (BLS) (Bankr. D. Del. May 22, 2020)...........................................65

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996).....................................................................................48

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994).................................................................51

*In re Metrocraft Pub. Serv., Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ....................................................................13

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994)..................................................................................25

*In re Monnier Bros.*,
    755 F.2d 1336 (8th Cir. 1985) ...............................................................................11

*In re Neshaminy Office Bldg. Assocs.*,
    62 B.R. 798 (E.D. Pa. 1986) .................................................................................48

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) .....................................................................28

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) .....................................................................17

Page(s)

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988)...................................................................11

*In re PC Liquidation Corp.*,
    383 B.R. 856 (E.D.N.Y. 2008) ............................................................12

*In re Phoenix Petrol., Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) ........................................11, 12, 13

*Matter of Pizza of Haw.*,
    761 F.2d 1374 (9th Cir. 1985) ............................................................38

*In re Premier Int'l. Holdings, Inc.*,
    No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29,
    2010) ...................................................................................................59

*In re Prussia Assocs.*,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ...............................................38

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000).......................................................28, 59, 60

*In re River Village Assoc.*,
    181 B.R. 795 (E.D. Pa. 1995) ............................................................12

*In re S&W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ..................................................17

*In re Scioto Valley Mortg. Co.*,
    88 B.R. 168 (Bankr. S.D. Ohio 1988)................................................13

*In re Sea Garden Motel & Apartments*,
    195 B.R. 294 (D. N.J. 1996) ..............................................................38

*In re Sentinel Mgmt. Grp., Inc.*,
    398 B.R. 281 (Bankr. N.D. Ill. 2008) ................................................62

*In re SiO2 Med. Prods., Inc.*,
    No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) .........................65

*In re Smith*,
    357 B.R. 60 (Bankr. M.D.N.C. 2007)................................................32

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) .............................................50, 55

*In re Sponsion, Inc.*,
    No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. 2010) .........59

**Page(s)**

*In re Stone & Webster, Inc.*,
    286 B.R. 532 (Bankr. D. Del. 2002) .......................................................32

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464
    B.R. 208 (Bankr. D. Del. 2011) ..........................................................38

*In re Tricidia, Inc.*,
    No. 23-10023 (JTD) (Bankr. D. Del. May 23, 2023) ...........................65

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) .................................................13

*In re U.S. Truck Co.*,
    47 B.R. 932 (E.D. Mich. 1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) ....38

*In re Unichem Corp.*,
    72 B.R. 95 (Bankr. N.D. Ill. 1987) .....................................................11

*In re Vyaire Med., Inc.*
    No. 24-11217 (BLS) ...........................................................................37

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ...........................................................28, 38

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ...............................50, 51, 52, 58

*In re WCI Cable, Inc.*,
    282 B.R. 457 (Bankr. D. Or. 2002) .....................................................50

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) ..............................................48, 50

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .................................51, 52, 55

**Statutes**

11 U.S.C. § 101(51D)(B) .............................................................................46

11 U.S.C. § 365(f) .......................................................................................65

11 U.S.C. § 502 ...........................................................................................26

11 U.S.C. § 503(b) .......................................................................................34

11 U.S.C. § 507(a)(1) ...................................................................................35

11 U.S.C. § 507(a)(2).............................................................................34, 40, 41

11 U.S.C. § 507(a)(4).............................................................................35

11 U.S.C. § 507(a)(5).............................................................................35

11 U.S.C. § 507(a)(6).............................................................................35

11 U.S.C. § 507(a)(7).............................................................................35

11 U.S.C. § 507(a)(8).............................................................................35

11 U.S.C. § 547.............................................................................*passim*

11 U.S.C. § 1107(a).............................................................................5

11 U.S.C. § 1108.............................................................................5

11 U.S.C. § 1114.............................................................................41

11 U.S.C. § 1122.............................................................................17, 18, 19, 21

11 U.S.C. § 1122(a).............................................................................18, 20

11 U.S.C. § 1122(b).............................................................................18

11 U.S.C. § 1123.............................................................................17, 48, 50

11 U.S.C. § 1123(a).............................................................................20

11 U.S.C. § 1123(a)(1).............................................................................21

11 U.S.C. § 1123(a)(2).............................................................................21

11 U.S.C. § 1123(a)(3).............................................................................21

11 U.S.C. § 1123(a)(4).............................................................................21, 22

11 U.S.C. § 1123(a)(5).............................................................................22, 23

11 U.S.C. § 1123(a)(6).............................................................................23

11 U.S.C. § 1123(a)(7).............................................................................23

11 U.S.C. § 1123(b).............................................................................*passim*

11 U.S.C. § 1123(b)(1).............................................................................47

11 U.S.C. § 1123(b)(2).............................................................................47

**Page(s)**

11 U.S.C. § 1123(b)(3) .................................................................................47

11 U.S.C. § 1123(b)(3)(A) ......................................................................48, 50

11 U.S.C. § 1123(b)(4) .................................................................................47

11 U.S.C. § 1123(b)(5) .................................................................................47

11 U.S.C. § 1123(b)(6) .................................................................................47

11 U.S.C. § 1123(d) ...............................................................................61, 62

11 U.S.C. § 1125 ................................................................................... *passim*

11 U.S.C. § 1125(a) ...............................................................................14, 25

11 U.S.C. § 1125(a)(1) ...............................................................10, 11, 25

11 U.S.C. § 1125(b) ...............................................................................24, 25

11 U.S.C. § 1125(c) .......................................................................................25

11 U.S.C. § 1125(e) ...............................................................................16, 17

11 U.S.C. § 1126 ................................................................................... *passim*

11 U.S.C. § 1126(a) ...............................................................................26, 27

11 U.S.C. § 1126(b)(2) ................................................................................14

11 U.S.C. § 1126(c) .......................................................................16, 27, 33

11 U.S.C. § 1126(d) .....................................................................................33

11 U.S.C. § 1126(f) .........................................................................7, 26, 27

11 U.S.C. § 1126(g) ..............................................................................8, 27

11 U.S.C. § 1127 ...........................................................................................64

11 U.S.C. § 1127(a) .....................................................................................62

11 U.S.C. § 1128 ...........................................................................................41

11 U.S.C. § 1129 .......................................................................1, 10, 17, 45

11 U.S.C. § 1129(a) .....................................................................................42

11 U.S.C. § 1129(a)(1) ................................................................................17

Page(s)

11 U.S.C. § 1129(a)(2)............................................................................................24, 28, 59

11 U.S.C. § 1129(a)(3)............................................................................................28, 29, 59

11 U.S.C. § 1129(a)(4)................................................................................................29, 30

11 U.S.C. § 1129(a)(5)................................................................................................30, 31

11 U.S.C. § 1129(a)(5)(A)................................................................................................30

11 U.S.C. § 1129(a)(5)(A)(ii)...........................................................................................30

11 U.S.C. § 1129(a)(6).....................................................................................................31

11 U.S.C. § 1129(a)(7)............................................................................................31, 32, 33

11 U.S.C. § 1129(a)(8)......................................................................................33, 34, 37, 42

11 U.S.C. § 1129(a)(9)......................................................................................34, 35, 37, 39

11 U.S.C. § 1129(a)(9)(A)..........................................................................................34, 35

11 U.S.C. § 1129(a)(9)(B)..........................................................................................35, 36

11 U.S.C. § 1129(a)(9)(C)......................................................................................35, 36, 37

11 U.S.C. § 1129(a)(10)..............................................................................................28, 37

11 U.S.C. § 1129(a)(11)..............................................................................................38, 40

11 U.S.C. § 1129(a)(12)..............................................................................................40, 41

11 U.S.C. § 1129(a)(13)...................................................................................................41

11 U.S.C. § 1129(a)(14)...................................................................................................41

11 U.S.C. § 1129(a)(15)..............................................................................................41, 42

11 U.S.C. § 1129(a)(16)..............................................................................................41, 42

11 U.S.C. § 1129(b) ................................................................................................. *passim*

11 U.S.C. § 1129(b)(1) ..............................................................................................42, 43

11 U.S.C. § 1129(b)(2) ..............................................................................................44, 45

11 U.S.C. § 1129(b)(2)(B)(i) ...........................................................................................44

11 U.S.C. § 1129(b)(2)(B)(ii) ..........................................................................................44

**Page(s)**

11 U.S.C. § 1129(c) ...................................................................................45, 46

11 U.S.C. § 1129(d) ...................................................................................45, 46

11 U.S.C. § 1129(e) ...................................................................................45, 46

28 U.S.C. § 1930 .......................................................................................40, 41

28 U.S.C. § 1930(a) ...........................................................................................41

Securities Act of 1933, § 5 ...............................................................................46

**Rules**

Fed. R. Bankr. P. 1015(b) ..................................................................................5

Fed. R. Bankr. P. 3017 ................................................................................14, 24

Fed. R. Bankr. P. 3018 .....................................................................................24

Fed. R. Bankr. P. 3018(c) .................................................................................15

Fed. R. Bankr. P. 3019 ...........................................................................62, 63, 64

Fed. R. Bankr. P. 3019(a) ............................................................................62, 63

Fed. R. Bankr. P. 3020 .....................................................................................65

Fed. R. Bankr. P. 3020(e) .................................................................................64

Fed. R. Bankr. P. 6004 .....................................................................................65

Fed. R. Bankr. P. 6004(h) .................................................................................65

Fed. R. Bankr. P. 6006 .....................................................................................65

Fed. R. Bankr. P. 6006(d) .................................................................................65

Fed. R. Bankr. P. 9019 ................................................................................48, 50

Local Rule 3017-1 .............................................................................................14

**Other Authorities**

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ...........17

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) ............................................24

S. Rep. No. 989, 95th Cong., 2d Sess. (1978) .............................................24, 63

## **RELIEF REQUESTED**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
submit this memorandum of law in support of (a) final approval of the *Disclosure Statement for
the Joint Chapter 11 Plan of Vyaire Medical, Inc. and Its Debtor Affiliates* [Docket No. 582] (as
modified, amended, or supplemented from time to time, the "Disclosure Statement"), pursuant to
section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532
(the "Bankruptcy Code") and (b) confirmation of the *Joint Chapter 11 Plan of Vyaire
Medical, Inc. and Its Debtor Affiliates* [Docket No. 518], as amended by the *Joint Chapter 11 Plan
of Vyaire Medical, Inc. and Its Debtor Affiliates* [Docket No. 581], and as further amended by the
*Second Amended Joint Chapter 11 Plan of Vyaire Medical, Inc. and Its Debtor Affiliates* [Docket
No. 719] (as modified, amended, or supplemented from time to time, the "Plan"),[2] pursuant to
sections 1125, 1126, and 1129, respectively, of the Bankruptcy Code.

In support of the Plan, the Debtors have filed the *Declaration of Charles N. Braley in
Support of Confirmation of the Joint Chapter 11 Plan of Vyaire Medical, Inc. and Its Debtor
Affiliates* [Docket No. 721] (the "Braley Declaration") concurrently herewith, and the *Declaration
of Paul H. Deutch Regarding the Solicitation and Tabulation of Votes on, and Elections to Opt-In
to the Third-Party Release in, the Joint Chapter 11 Plan of Vyaire Medical, Inc. and Its Debtor
Affiliates* (the "Voting Report") [Docket No. 712].  On or about the date hereof, the Debtors
submitted a proposed order confirming the Plan (the "Confirmation Order").  In further support of

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the
Confirmation Order (as defined herein), or the *Order (I) Approving the Adequacy of the Disclosure Statement on
an Interim Basis, (II) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing,
(III) Approving the Solicitation and Notice Procedures, (IV) Approving the Combined Hearing Notice, and
(V) Granting Related Relief* [Docket No. 596] (the "Disclosure Statement Order").

confirmation of the Plan and approval of the Disclosure Statement, the Debtors respectfully state as follows:

**Preliminary Statement**

1.      The Debtors commenced these Chapter 11 Cases amidst a liquidity crunch to effectuate value-maximizing sale transactions that would allow their businesses to be recapitalized and continue as going concerns.  The Debtors are poised to complete sale transactions resulting in approximately $90 million in cash proceeds to the estate, plus the assumption of certain liabilities. And five months after the commencement of these Chapter 11 Cases, the Debtors seek to confirm a chapter 11 plan in support of the sale processes, providing a path to servicing their transition services obligations to the Purchasers and ultimately winding down the Debtors and their non-Debtor affiliates in an efficient manner.  The Plan has been unanimously accepted by those creditors entitled to vote and has the support of the whole capital structure, and the Debtors are not aware of any contested issues with respect to approval of the Disclosure Statement or Confirmation of the Plan.

2.      The path to plan confirmation has been challenging but fruitful.  In the lead up to these Chapter 11 Cases, the Debtors, facing dwindling liquidity: (i) initiated their prepetition marketing process, (ii) began marketing and negotiating for debtor-in-possession financing to support their sale efforts, and (iii) engaged in negotiations with their lenders and prepetition sponsor on the terms of a restructuring support agreement to secure their key stakeholders' support for continuation of the sale process on a postpetition basis and an orderly wind-down of the Debtors' estates through confirmation of a chapter 11 plan of liquidation.  Accordingly, the Debtors filed these Chapter 11 Cases with the support of the majority of the First Lien Lenders, their Second Lien Lenders, and their Sponsor through execution of the Restructuring Support Agreement to support the sale and marketing process.  In further support of the Debtors' sale

2

efforts, the 1L Ad Hoc Group provided the Debtors with the DIP Facility consisting of $25 million of new liquidity on an interim basis and up to $20 million of new liquidity on a final basis, including funding in support of the Wind-Down.  From initiation of the sale process in May 2024, the Debtors and their advisors connected with over 110 potentially interested parties, comprised of numerous potential strategic and financial parties.  In advance of the Petition Date, the Debtors received multiple indications of interest from interested parties.  Accordingly, the Debtors commenced these Chapter 11 Cases to complete their robust sale process.

3.      Once in chapter 11, the Debtors continued to actively market their assets.  As of the bid deadline set forth in the Bidding Procedures, the Debtors identified three qualified bids for the Ventilation Business, and one qualified bid for the Respiratory Diagnostics Business.  On August 12, the Debtors initiated a three-day auction for the Ventilation Business.  After multiple rounds of competitive bidding, on August 15, 2024, the Debtors selected Zoll Medical Corporation ("Zoll") as the successful bidder.  On August 20, 2024, the Debtors selected Trudell Medical Limited ("Trudell") as the successful bidder for the Respiratory Diagnostics Business.  On September 4, 2024, the Court approved the sale of the Ventilation Business to Zoll for approximately $37 million [Docket No. 496] (the "Zoll Transaction") and the sale of the Respiratory Diagnostics Business to Trudell for approximately $53 million [Docket No. 497] (the "Trudell Transaction") (in each case, plus the assumption of certain obligations and liabilities).  The orders approving the sale transactions authorized a paydown of the DIP Facility, subject to a "Holdback" for the Debtors to fund the Wind-Down.  On October 11, 2024, the Debtors closed the Zoll Transaction.  The Debtors anticipate closing the Trudell Transaction as soon as November 12, 2024.

4.      In further effort to achieve consensus among their stakeholders, the Debtors have engaged in good faith, arms'-length negotiations with the Committee (as defined herein) to resolve the Committee's concerns regarding the Plan and the Wind-Down.  Following these fruitful negotiations, the Debtors and the Committee reached a comprehensive settlement with the Committee, embodied in the Plan (the "Committee Settlement").  The Committee Settlement provides, among other things:  (i) a reserve of approximately $3 million for payment of Allowed Administrative Claims; (ii) a "Residual GUC Recovery Pool" that provides for the greater of (x) $250,000 and (y) the amount of excess funds of the Professional Fee Escrow Account, if any, to be distributed *pro rata* to Holders of Class 6 (General Unsecured Claims) as specified in the Plan, following satisfaction of the Debtors' Wind-Down obligations; (iii)  the Debtors' release of preference claims pursuant to section 547 of the Bankruptcy Code; and (iv) treatment of the Debtors' vendors and service providers servicing the Purchasers pursuant to the transition services agreement.

5.      Following the consummation of the sale transactions, the final step to achieve a value-maximizing outcome for all parties is to confirm a liquidating chapter 11 plan and wind-down the Debtor entities and their non-Debtor affiliates.  As discussed further herein, all voting creditors voted in favor of the Plan, and the Plan enjoys support across the Debtors' capital structure.  The Plan is consistent with the Bankruptcy Code and maximizes the value of the Debtors' Estates under the circumstances.  The Debtors submit that the Plan is the best outcome for the Debtors, their Estates, and all constituencies affected by these Chapter 11 Cases:  it allows the Debtors to continue supporting the distribution of life-saving medical devices and equipment through provision of transition services to the Purchasers and provides a mechanism to wind-down the Debtors in an orderly, cost-efficient manner.

6.      Accordingly, for the reasons stated herein and in light of the Debtors' evidentiary support for confirmation of the Plan, the Debtors respectfully request that the Disclosure Statement be approved on a final basis and the Plan be confirmed.

**Background**

**I.      Procedural History.**

7.      On June 9, 2024 (the "Petition Date"), the Debtors commenced filing voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 84].   On June 26, 2024, the U.S. Trustee appointed an official committee of unsecured creditors [Docket No. 121] (the "Committee").   On October 30, 2024, the Bankruptcy Court appointed a fee examiner [Docket No. 690].  No trustee has been appointed in these Chapter 11 Cases.

8.      A detailed description of the Debtors and their businesses, and the facts and circumstances surrounding these Chapter 11 Cases, are set forth in greater detail in the *Declaration of John Bibb, Group Chief Executive Officer of Vyaire Medical, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 15].

9.      On September 11, 2024, the Debtors filed with the Bankruptcy Court the *Joint Chapter 11 Plan of Vyaire Medical, Inc. and Its Debtor Affiliates* [Docket No. 518] and the *Disclosure Statement for the Joint Chapter 11 Plan of Vyaire Medical, Inc. and Its Debtor Affiliates* [Docket No. 519], along with the Disclosure Statement Motion,[3] pursuant to which the

---

[3]    *Motion of Debtors for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement on an Interim and Final Basis, (II) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing,*

Debtors sought approval of the Disclosure Statement and the related solicitation and voting procedures (the "Solicitation and Voting Procedures").

10.  On September 30, 2024, the Debtors filed with the Bankruptcy Court, the *Joint Chapter 11 Plan of Vyaire Medical, Inc. and Its Debtor Affiliates* [Docket No. 581] and the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Vyaire Medical, Inc. and Its Debtor Affiliates* [Docket No. 582].

11.  On October 2, 2024, the Bankruptcy Court entered the Disclosure Statement Order, approving, among other things, the proposed procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").   On October 3, 2024, the Debtors filed with the Bankruptcy Court the *Notice of Hearing to Consider the (I) Adequacy of the Disclosure Statement and (II) Confirmation of the Joint Chapter 11 Plan Filed by the Debtors* [Docket No. 601].

12.  On October 28, 2024, the Debtors filed with the Bankruptcy Court the *Plan Supplement* [Docket No. 689], as amended on November 11, 2024 by the filing of the *First Amended Plan Supplement* [Docket No. 720] (as amended, modified, or supplemented from time to time, the "Plan Supplement"), which included the (a) Rejected Executory Contracts and Unexpired Lease Schedule, (b) Assumed Executory Contracts and Unexpired Leases Schedule, (c) Transition Services Agreements Schedule of Contracts and Unexpired Leases Schedule, (d) Schedule of Retained Causes of Action, (e) the Identity of Plan Administrator and Plan Administrator Agreement, (f) the Wind-Down Budget, and (g) the Restructuring Transactions Memorandum.

---

*(III) Approving the Solicitation and Notice Procedures, (IV) Approving the Combined Hearing Notice, and (V) Granting Related Relief* [Docket No. 520] (the "Disclosure Statement Motion").

13.     The amended Plan Supplement, primarily revises the Schedule of Retained Causes of Action pursuant to the Committee Settlement.

**II.     The Plan Solicitation and Notification Process**

14.     On or about October 7, 2024, October 11, 2024, and October 16, 2024, the Debtors caused their notice and claims agent, Omni Agent Solutions, Inc. (the "Notice and Claims Agent"), to distribute the Solicitation Packages to Holders of Claims entitled to vote on the Plan as of October 2, 2024 (the "Voting Record Date")—*i.e.*, the Holders of First Lien Claims (Class 4), and Second Lien Claims (Class 5, and together with Class 4, the "Voting Classes") — in accordance with sections 1125 and 1126 of the Bankruptcy Code.[4]  On October 11, 2024, the Debtors caused the Publication Notice (as defined in the Disclosure Statement Order) to be published in *The New York Times* as provided in the Disclosure Statement Order.[5]

15.     The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein applies separately to each of the Debtors.  For purposes of administrative convenience, the Plan consolidates the process by which distributions will be made under the Plan, but the Plan does not contemplate substantive consolidation.

16.     In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims and Interests in Impaired Classes entitled to receive or retain property on account of such Claims or Interests were entitled to vote on the Plan.[6]  Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the

---

[4]     *See Certificate of Service* [Docket No. 707] (the "Solicitation Affidavit").

[5]     *See Certificate of Publication* [Docket No. 620].

[6]     *See* 11 U.S.C. § 1126.

Bankruptcy Code) or (b) Impaired and such Holders are not entitled to receive any distribution under the Plan (in which case such Holders were conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  With respect to Holders of General Unsecured Claims (Class 6), as set forth in greater detail herein and in the Plan, pursuant to the Committee Settlement such Holders may receive a recovery from a carveout of cash that would otherwise go to the Debtors' DIP Lenders, if available following the Debtors' wind-down efforts.  Accordingly, the following Classes of Claims and Interests were ***not*** entitled to vote on the Plan, and the Debtors did ***not*** solicit votes from Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

17.    The Debtors solicited votes on the Plan only from Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims.  The deadline for all Holders of Claims and Interests entitled to vote on the Plan to cast their Ballots[7] was November 4, 2024, at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline"), and the deadline to object to confirmation of the Plan was November 4, 2024, at 4:00 p.m. (prevailing Eastern Time)

---

[7]    The forms of ballots used in solicitation were included as Exhibit 3A and 3B, attached to the Disclosure Statement Order (the "Ballots").

(the "<u>Confirmation Objection Deadline</u>").  As reflected in the Voting Report, all Ballots for Class 4 and Class 5 that were returned, voted in favor of confirmation of the Plan.

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/ Shares Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount/ Shares Voting) | NUMBER (% of Number Voting) |
|---|---|---|---|---|
| Class 4 First Lien Claims | $146,189,713.20 (100%) | 49 (100%) | $0 (0%) | $0 (0%) |
| Class 5 Second Lien Claims | $117,549,742.14 (100%) | 4 (100%) | $0 (0%) | $0 (0%) |

18.     As reflected in the Voting Report, the Voting Classes were also provided with notice and opportunity to "opt-in" to the Third-Party Release by checking the appropriate box on the Ballots.  Non-voting stakeholders were given the opportunity to opt in to the Third-Party Release and received notice and instructions for doing so in their applicable Notice of Non-Voting Status.  Such stakeholders could opt in by checking the appropriate box on the Notice of Non-Voting Status or objecting on or before the Opt-In Deadline (November 4, 2024, at 4:00 p.m. prevailing Eastern Time).

19.     Overall, the Debtors believe the Plan is in the best interest of the Debtors, their Estates, and other parties in interest, and complies with the applicable provisions of the Bankruptcy Code.  As set forth above and in the Voting Report, at least one Voting Class voted in favor of accepting the Plan.  Because the Plan meets the requirements of section 1129(b) as described below, the Bankruptcy Court should confirm the Plan over the Classes that were deemed to reject the Plan.  A chapter 7 liquidation merely creates additional administrative burn and does not result in greater recover for creditors relative to the Plan.

20.     Additionally, the Debtors have consensually resolved certain comments from the Committee and other parties in interest through modifications incorporated in the modified version of the Plan filed contemporaneously herewith.

21.     A formal objection was filed by the U.S. Trustee (the "U.S. Trustee Objection"), and the Debtors have revised the injunction provision of the Plan to consensually resolve the U.S. Trustee Objection.

22.     The sale transactions represent a significant achievement for the Debtors, their employees, their vendors and commercial partners, and the patients that rely on the Debtors' products and services around the world, and consummation of the Plan will provide finality and the most value-maximizing path forward for all constituencies.

**Argument**

23.     This memorandum is divided into five parts.  *First*, the Debtors request approval of the Disclosure Statement on a final basis and a finding that all notice requirements are satisfied. *Second*, the Debtors present their case in chief that the Plan satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence and, accordingly, request that the Bankruptcy Court confirm the Plan.  *Third*, the Debtors discuss the discretionary content of the Plan.  *Fourth*, the Debtors discuss the post-solicitation modifications to the Plan. *Fifth*, the Debtors assert that good cause exists to waive the stay of the Confirmation Order.

**I.     The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 and 1126 of the Bankruptcy Code and Satisfies Notice Requirements.**

**A.     The Disclosure Statement Contains Adequate Information.**

24.     Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide "adequate information" regarding that plan to holders of impaired

claims and interests entitled to vote on the plan.  Specifically, section 1125(a)(1) of the Bankruptcy

Code provides, in relevant part, as follows:

> '[A]dequate information' means information of a kind, and in
> sufficient detail, as far as is reasonably practicable in light of the
> nature and history of the debtor and the condition of the debtor's
> books and records, including a discussion of the potential material
> Federal tax consequences of the plan to the debtor, any successor to
> the debtor, and a hypothetical investor typical of the holders of
> claims or interests in the case, that would enable such a hypothetical
> investor of the relevant class to make an informed judgment about
> the plan.

25.    The primary purpose of a disclosure statement is to provide all material

information, or "adequate information," that allows parties entitled to vote on a proposed plan to

make an informed decision about whether to vote to accept or reject the plan.[8]  Congress intended

that such informed judgments would be needed to both negotiate the terms of, and vote on, a

chapter 11 plan.[9]

26.    "Adequate information" is a flexible standard, based on the facts and circumstances

of each case.[10]  Courts within the Third Circuit and elsewhere acknowledge that determining what

---

[8]    *See, e.g., Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan."); *In re Phoenix Petrol., Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan.").

[9]    *See Century Glove, Inc.*, 860 F.2d at 100.

[10]    11 U.S.C. § 1125(a)(1) (stating that "'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is

constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[11]  Accordingly, the determination of whether a disclosure statement contains adequate information must be made on a case-by-case basis, focusing on the unique facts and circumstances of each case.[12]

27.    In making a determination as to whether a disclosure statement contains adequate information as required by section 1125 of the Bankruptcy Code, courts typically look for disclosures related to topics such as:

    a.   the events that led to the filing of a bankruptcy petition;

    b.   the relationship of the debtor with its affiliates;

    c.   a description of the available assets and their value;

    d.   the debtor's anticipated future performance;

    e.   the source of information stated in the disclosure statement;

    f.   the debtor's condition while in chapter 11;

    g.   claims asserted against the debtor;

    h.   the estimated return to creditors under a chapter 7 liquidation of the debtor;

    i.   the future management of the debtor;

    j.   the chapter 11 plan or a summary thereof;

---

available from outside sources); S. Rep. No. 95-989, at 121 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5907 (stating that "the information required will necessarily be governed by the circumstances of the case").

[11]    *See, e.g.*, *In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *In re Phoenix Petrol.*, 278 B.R. at 393 (same).

[12]    *See In re Phoenix Petrol.*, 278 B.R. at 393; *In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes 'adequate disclosure' in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court." (internal citations omitted)); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (Bankr. D. N.J. 2005) (stating that "[t]he information required will necessarily be governed by the circumstances of the case").

    k.   financial information, valuations, and projections relevant to a creditor's decision to accept or reject the chapter 11 plan;

    l.   information relevant to the risks posed to creditors under the plan;

    m.  the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;

    n.   litigation likely to arise in a nonbankruptcy context; and

    o.   tax attributes of the debtor.[13]

28.    The Disclosure Statement contains a number of categories of information that courts consider "adequate information," including, without limitation:

- ***The Debtors' Corporate History, Structure, and Business Overview***. An overview of the Debtors' corporate history, business operations, organizational structure, and capital structure is described in Article V of the Disclosure Statement;

- ***Events Leading to the Chapter 11 Filings***. A detailed overview of the Debtors' out-of-court restructuring efforts in response to liquidity constraints is described in Article VII of the Disclosure Statement;

- ***Material Developments and Anticipated Events of these Chapter 11 Cases***. A summary of the course of events in these Chapter 11 Cases, including the sale process, is described in Article VIII of the Disclosure Statement;

- ***Risk Factors***. Certain risks associated with the Debtors' businesses, as well as certain risks associated with forward-looking statements and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement, are described in Article IX of the Disclosure Statement;

- ***Solicitation and Voting Procedures***. A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan is provided in Article X of the Disclosure Statement;

- ***Confirmation of the Plan***. Confirmation procedures and statutory requirements for confirmation and consummation of the Plan are described in Article XI of the Disclosure Statement;

---

[13]   *See In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996); *see also In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing the factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Metrocraft Pub. Serv., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same). Disclosure regarding all topics is not necessary in every case. *See In re U.S. Brass Corp.*, 194 B.R. at 424; *see also In re Phoenix Petroleum*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

- ***Material United States Federal Income Tax Consequences***.  A description of certain U.S. federal income tax law consequences of the Plan is provided in Article XII of the Disclosure Statement;

- ***Recommendation***.  A recommendation by the Debtors that Holders of Claims in the Voting Classes should vote to accept the Plan is included in Article XIII of the Disclosure Statement; and

- ***Liquidation Analysis***.  An analysis of the liquidation value of the Debtors is filed at Docket No. 532.

29.     In addition, prior to the solicitation, the Disclosure Statement and the Plan were subject to review and comment by various parties, including the DIP Lenders, the Committee, and the U.S. Trustee.  The Bankruptcy Court approved the Disclosure Statement on an interim basis on October 2, 2024, as containing adequate information to commence solicitation.  No party in interest has requested additional information nor disputed that the Disclosure Statement contained information sufficient for Impaired Classes to be able to cast an informed vote on the Plan.  For the reasons set forth above, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code in satisfaction of section 1126(b)(2), and should be approved.

**B.     The Debtors Complied with Applicable Notice Requirements.**

30.     On October 2, 2024, the Bankruptcy Court entered the Disclosure Statement Order granting the relief requested in the Disclosure Statement Motion, including, among other things, (a) approving the Solicitation and Voting Procedures, (b) approving the form and manner of the Combined Hearing Notice and the Publication Notice, and (c) approving certain dates and deadlines with respect to the Plan and Disclosure Statement.  The Debtors complied with the procedures and timeline approved by the Disclosure Statement Order.

### 1. The Debtors Complied with the Notice Requirements Set Forth in the Disclosure Statement Order.

31.     The Debtors satisfied the notice requirements set forth in the Disclosure Statement Order, Bankruptcy Rule 3017, and Local Rule 3017-1.  ***First***, on or about October 7, 2024, the Debtors caused the Notice and Claims Agent to distribute the Solicitation Packages to Holders of Claims entitled to vote on the Plan as of the Voting Record Date.[14]  ***Second***, the Debtors caused the Publication Notice to be published in *The New York Times* on October 11, 2024.[15]  ***Third***, the Combined Hearing Notice included instructions on how to obtain the Plan and the Disclosure Statement without a fee through the Debtors' restructuring website or for a fee at the Bankruptcy Court's PACER website.[16]

### 2. The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Disclosure Statement Order.

32.     The forms of Ballots used comply with the Bankruptcy Rules and were conditionally approved by the Bankruptcy Court pursuant to the Disclosure Statement Order.[17] No party has objected to the sufficiency of the Ballots.  Based on the foregoing, the Debtors submit that they complied with the Disclosure Statement Order and satisfied the requirements of Bankruptcy Rule 3018(c).

---

[14]    *See* Solicitation Affidavit.

[15]    *See* Certificate of Publication [Docket No. 620].

[16]    *See* Combined Hearing Notice [Docket No. 601].

[17]    *See* Disclosure Statement Order ¶ 8.

### 3. The Debtors' Solicitation Period Complied with the Disclosure Statement Order.

33. The Debtors' solicitation period complied with the Disclosure Statement Order, the Bankruptcy Code, Bankruptcy Rules, and Local Rules. ***First***, the Solicitation Packages, including instructions for accessing electronic or hard-copy versions of the Plan and Disclosure Statement, were transmitted to all Holders of Claims entitled to vote on the Plan.[18] ***Second***, the solicitation period, which lasted from October 7, 2024 through November 4, 2024 at 4:00 p.m. (prevailing Eastern Time), complied with the Disclosure Statement Order and was adequate under the particular facts and circumstances of these Chapter 11 Cases.[19] ***Third***, no party has objected on the basis that it did not have sufficient time to consider the Solicitation Materials. Accordingly, the Debtors submit that the solicitation period complied with the Disclosure Statement Order.

### 4. The Debtors' Tabulation Procedures Complied with the Disclosure Statement Order.

34. The Debtors request that the Bankruptcy Court find that the Debtors' tabulation of votes complied with the Disclosure Statement Order. The Notice and Claims Agent reviewed all Ballots received in accordance with the Solicitation and Voting Procedures approved pursuant to the Disclosure Statement Order.[20] Accordingly, the Debtors respectfully submit that the Bankruptcy Court should approve the Debtors' tabulation of votes, confirming that the requisite Claims voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

---

[18] *See* Solicitation Affidavit.

[19] *See* Disclosure Statement Order ¶ 6; Solicitation Affidavit.

[20] *See* Disclosure Statement Order ¶ 13.

**5.      Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

35.     Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[21]

36.     As set forth in the Disclosure Statement and Disclosure Statement Motion, and as demonstrated by the Debtors' compliance with the Disclosure Statement Order, the Debtors at all times engaged in arm's-length, good-faith negotiations and took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code. Therefore, the Debtors respectfully request that the Bankruptcy Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

**II.     The Plan Satisfies Each Requirement for Confirmation.**

37.     To confirm the Plan, the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[22]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code— including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

---

[21]   11 U.S.C. § 1125(e).

[22]   *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120, n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

**A.      The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**

38.      Section 1129(a)(1) of the Bankruptcy Code requires that a plan "compl[y] with the applicable provisions of [the Bankruptcy Code]."[23]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a chapter 11 plan, respectively.[24]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

**1.      The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

39.      The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[25]

40.      For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[26]  Instead, claims or

---

[23]      11 U.S.C. § 1129(a)(1).

[24]      S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

[25]      11 U.S.C. § 1122(a).

[26]      *Armstrong World Indus., Inc.*, 348 B.R. at 159.

18

interests designated to a particular class must be substantially similar to each other.[27]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[28]

41.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into ten separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way or based on other relevant criteria.[29]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes: (a) Class 1:  Secured Tax Claims; (b) Class 2:  Other Secured Claims; (c) Class 3:  Other Priority Claims; (d) Class 4:  First Lien Claims; (e) Class 5:  Second Lien Claims; (f) Class 6:  General Unsecured Claims; (g) Class 7:  Intercompany Claims; (h) Class 8:  Intercompany Interests; (i) Class 9:  Existing Equity Interests; and (j) Class 10:  510(b) Claims.

---

[27]   *Id.*

[28]   Courts have identified grounds justifying separate classification, including (a) where members of a class possess different legal rights and (b) where there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (explaining that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (holding that, although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .").

[29]   *See* Plan, Art. III.

42.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in each such Class.[30]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[31]  The Plan separately classifies the Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.[32]  For example, Intercompany Claims (rights to payment) are classified separately from Intercompany Interests (representing ownership in the business).  The classification scheme distinguishes Other Priority Claims (Class 3) due to their relative priority and required treatment under the Bankruptcy Code.  First Lien Claims (Class 4) are classified separately from Second Lien Claims (Class 5) because of the different circumstances of each Class and the relative priority of their Claims against the Debtors.[33]  Holders of Second Lien Claims (Class 5) are distinguished from Holders of General Unsecured Claims (Class 6) because of the different circumstances of each Class, including that the Debtors' obligations with respect to the former are secured by collateral.[34]

---

[30]    *See* Braley Declaration ¶ 18.

[31]    *See id.* at ¶ 21.

[32]    *See generally id.* at ¶ 19-21.

[33]    *See id.* at ¶ 20.

[34]    *See id.*

43.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions. The Debtors submit that the Plan fully complies with and satisfies section 1122(a) of the Bankruptcy Code.

### 2.     The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

44.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  The Plan satisfies each of these requirements.

*(1)     Designation of Classes of Claims and Equity Interests (§ 1123(a)(1))*

45.     For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[35]

*(2)     Specification of Unimpaired Classes (§ 1123(a)(2))*

46.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."[36]  The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.[37]

---

[35]   *See* Plan, Art. III.A.

[36]   11 U.S.C. § 1123(a)(2).

[37]   *See* Plan, Art. III.A-B.

### (3)    Treatment of Impaired Classes (§ 1123(a)(3))

47.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."[38] The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.[39]

### (4)    Equal Treatment within Classes (§ 1123(a)(4))

48.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[40] The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.[41]

### (5)    Means for Implementation (§ 1123(a)(5))

49.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[42]  The Plan, together with the documents and forms of agreement included in the Plan Supplement, provides a detailed blueprint for the transactions that underlie the Plan, which are focused on an orderly wind-down of the estate after all operating assets have been sold.

---

[38]    11 U.S.C. § 1123(a)(3).

[39]    *See id.*

[40]    11 U.S.C. § 1123(a)(4).

[41]    *See* Plan, Art. III.B.

[42]    11 U.S.C. § 1123(a)(5).

50.     Article IV of the Plan, in particular, sets forth the means for implementation of the Plan, which include, *inter alia*:  (a) the Restructuring Transactions, including the execution and delivery of any appropriate agreements or documents pursuant to the Plan; (b) the sources of consideration for Plan distributions; (c) the vesting of assets in Wind-Down Debtors; (d) establishment of the Liquidating Trust (if any); (e) establishment of the Plan Administrator; and (f) the preservation of Causes of Action.[43]  In addition to these core transactions, the Plan sets forth other critical mechanics of the Debtors' liquidation, such as the dissolution of the Wind-Down Debtor and non-debtor affiliates, cancellation of securities and agreements, and the payment of certain fees.[44]

51.     The precise terms governing the execution of these transactions are set forth in greater detail in the Plan and the Plan Supplement.  The Debtors believe that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

### (6)     Issuance of Non-Voting Securities (§ 1123(a)(6))

52.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.[45]  Because the Debtors and the Wind-Down Debtors, as applicable, will be wound down, there will not be any issuance of any new securities under the Plan.  Accordingly, section 1123(a)(6) of the Bankruptcy Code does not apply to the Plan.

---

[43]    *See* Plan, Art. IV.

[44]    *Id.*

[45]    11 U.S.C. § 1123(a)(6).

*(7)    Directors and Officers (§ 1123(a)(7))*

53.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[46] The Plan satisfies this requirement by providing for the deemed resignation of the Debtors' directors and officers from their duties and the appointment of the Plan Administrator to act for each Wind-Down Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to terms of the Plan (and all governance documents are deemed amended by the Plan to permit and authorize the same).[47]

**B.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

54.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[48] The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[49]    As set forth herein, the Debtors have complied with these provisions, including sections 1125 and 1126 of the

---

[46]    11 U.S.C. § 1123(a)(7).

[47]    *See* Plan, Art. IV.E.

[48]    *See* 11 U.S.C. § 1129(a)(2).

[49]    *See In re Lapworth*, 1998 WL 767456, at *3 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("[S]ection 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977).

24

Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Notice and Claims Agent in accordance with the Disclosure Statement Order.

### 1.    The Debtors Complied with Section 1125 of the Bankruptcy Code.

55.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a chapter 11 plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[50] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[51]

56.    Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement on an interim basis in accordance with section 1125(a)(1).[52]  The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant deadlines for voting on and objecting to the Plan.[53]  As reflected in the Solicitation Affidavit, the Debtors, through their Notice and Claims Agent, complied with the content and delivery requirements of the Disclosure

---

[50]    11 U.S.C. § 1125(b).

[51]    *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[52]    *See generally* Disclosure Statement Order.

[53]    *Id.*

Statement Order,[54] thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.  The

Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same

disclosure statement must be transmitted to each holder of a claim or interest in a particular class.

Here, the Debtors caused a Solicitation Package or a Non-Voting Status Notice Package, as

applicable, each of which included instructions for accessing electronic or hard-copy versions of

the Disclosure Statement, to be transmitted to each Holder of a Claim or Interest.[55]

57.     Based on the foregoing, the Debtors submit that they have complied in all respects

with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure

Statement Order.

**2.     The Debtors Satisfied the Plan Acceptance Requirements of Section 1126 of the Bankruptcy Code.**

58.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

a chapter 11 plan.  Specifically, under section 1126 of the Bankruptcy Code, only holders of

allowed claims and equity interests in impaired classes of claims or interests that will receive or

retain property under a plan on account of such claims or interests may vote to accept or reject

such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)     The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan . . . .

(f)     Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with

---

[54]   *See* Solicitation Affidavit.

[55]   *See* Solicitation Affidavit.  The "Non-Voting Status Notice Package" as used herein shall refer to the package of documents as referenced in the Solicitation Affidavit ¶ 2–4, as applicable.

respect to such class from the holders of claims or interests of such class is not required.[56]

59.    As set forth above, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Allowed Claims in Class 4 (First Lien Claims) and Class 5 (Second Lien Claims).  The Debtors did not solicit votes from Holders of Claims and Interests in Class 1 (Secured Tax Claims), Class 2 (Other Secured Claims), and Class 3 (Other Priority Claims) because Holders of Claims in these Classes are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.[57]  Depending on their ultimate treatment by the Debtors, Holders of Claims and Interests in Class 7 (Intercompany Claim Claims) and Class 8 (Intercompany Interests) will be either conclusively deemed to accept or conclusively deemed to reject the Plan, and in either scenario are not entitled to vote on the Plan.[58]  Holders of Claims and Interests in Class 9 (Existing Equity Interests) and Class 10 (510(b) Claims) will receive no distribution on account of their Claims or Interests and, pursuant to section 1126(g) of the Bankruptcy Code, are deemed to reject the Plan.[59]  Further, the Debtors waived their right to solicit votes from Holders of Claims in Class 6 (General Unsecured Claims) and treated such Class as rejecting the Plan.[60]  Pursuant to the Committee Settlement, such Holders will receive a recovery by negotiated resolution that only

---

[56]    11 U.S.C. § 1126(a), (f).

[57]    *See* Plan, Art. III.A-B.

[58]    *Id.*

[59]    *Id.*

[60]    Braley Declaration ¶ 79.

enhances their treatment relative to the version of the Plan that was solicited.[61]  Thus, pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims in Classes 4 and 5 were entitled to vote to accept or reject the Plan.[62]

60.    With respect to the voting classes, section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-thirds in amount and more than one-half in number of allowed claims in such class vote to accept such plan.

61.    The Voting Report, summarized above, reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[63]  As set forth in the Voting Declaration and summarized above, all Holders of Claims in Class 4 and Class 5 that submitted a ballot voted in favor of confirmation of the Plan.[64]  Additionally, as discussed below, the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code and will be able to "cram down" on the Holders of Claims in Classes 6, 7, 8, 9, and 10.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2).

**C.    The Plan Was Proposed in Good Faith (§ 1129(a)(3)).**

62.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[65]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement

---

[61]    *Id.*

[62]    *See* Plan, Art.III.A–B; *see also* Solicitation Affidavit.

[63]    *See generally* Voting Report.

[64]    *Id.*

[65]    11 U.S.C. § 1129(a)(3).

of section 1129(a)(3) of the Bankruptcy Code is satisfied.[66]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[67]

63.     The Debtors negotiated, developed, and proposed the Plan with integrity, good intentions, and with the goal of maximizing recoveries for the benefit of their stakeholders.[68] Throughout these Chapter 11 Cases, the Debtors worked to build consensus among their various stakeholders.[69]  The Plan and the process leading up to its formulation are the result of extensive arm's-length negotiations among the Debtors, their lenders, the Purchasers, the Committee, and other parties in interest.[70]

64.     Throughout the negotiation of the Plan and these cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.[71]  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

---

[66]   *E.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[67]   *E.g.*, *T-H New Orleans*, 116 F.3d at 802 (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *Century Glove*, 1993 WL 239489, at *4.

[68]   *See* Braley Declaration ¶ 53.

[69]   *See id.*

[70]   *See id.*

[71]   *Id.* at  ¶ 53.

**D.      The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Bankruptcy Court Approval (§ 1129(a)(4)).**

65.      Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable.[72]  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness.[73]

66.      The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.[74]  Article II.B.1 of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 60 days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Court.[75]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

---

[72]      11 U.S.C. § 1129(a)(4).

[73]      *Lisanti Foods*, 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court"), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that, before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[74]      *See* Plan, Art. II; *see also* Braley Declaration ¶ 55.

[75]      *Id.*

**E.     The Debtors Have Complied with the Governance Disclosure Requirement (§ 1129(a)(5)).**

67.     Section 1129(a)(5)(A)(ii) of the Bankruptcy Code requires the plan proponent to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan and that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and public policy.[76]

68.     The Plan satisfies section 1129(a)(5).  Article IV.E of the Plan provides for a Plan Administrator.  The Plan further provides that the Plan Administrator will act for the Wind-Down Debtor in the same fiduciary capacity as applicable to a board of managers and officers and that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Wind-Down Debtor shall be deemed to have resigned, solely in their capacities as such.[77]  At such time, the Plan Administrator, David M. Barse, will be appointed as the sole director and sole officer of the Wind-Down Debtor.[78]  Accordingly, the Plan fully complies with and satisfies all of the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

69.     Section 1129(a)(6) of the Bankruptcy Code requires that any rate change provided for in a plan be approved by or subject to the approval of all governmental regulatory commissions with jurisdiction, if any.[79]  The Plan does not provide for any rate changes, and the Debtors are not

---

[76]   11 U.S.C. § 1129(a)(5)(A).

[77]   *See* Plan, Art.IV.E.

[78]   *See* Plan, Art. IV.E; Plan Supplement, Ex. E.

[79]   11 U.S.C. § 1129(a)(6).

subject to any such regulation.[80]  Thus, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

       **G.**      **The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

     70.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a value of not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[81]  The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes,[82] and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's chapter 11 plan.[83]

     71.     As set forth in the Disclosure Statement,[84] the Debtors, with the assistance of AlixPartners, the Debtors' financial advisor, prepared a liquidation analysis, which is attached to

---

[80]    *See* Braley Declaration ¶ 59.

[81]    11 U.S.C. § 1129(a)(7).

[82]    *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at *7; *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[83]    *See In re Stone & Webster, Inc.*, 286 B.R. 532, 544–45 (Bankr. D. Del. 2002) (citation omitted) ("The application of the best interest test involves a hypothetical application of chapter 7 to a chapter 11 plan.  A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a 'hypothetical Chapter 7 distribution' to those classes."); *In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2007) ("In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions.") (citations omitted).

[84]    *See* Disclosure Statement, Art. XI.

the *Notice of Filing of Liquidation Analysis* [Docket No. 532] as <u>Exhibit 1</u> (the "<u>Liquidation Analysis</u>"). The Liquidation Analysis reflects that the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. Importantly, because this is a liquidating plan, creditors are receiving all of the remaining assets in the Debtors' estates, subject to the terms of the Plan and the settlements embodied therein. In light of the minimal remaining assets, consensual resolutions and settlements embodied in the Plan, and incremental costs of a liquidation, no party would do better in an alternative structure, including a chapter 7 liquidation.[85] Rather, the General Unsecured Creditors would likely receive nothing in a chapter 7, and would likely be pursued for preference actions pursuant to section 547 of the Bankruptcy Code, but are being provided the potential for a recovery and a release of preference actions under the Plan based on the Committee Settlement. Additionally, the provision of transition services to the Purchasers in connection with their distribution of life-saving products to hospitals and patients could be jeopardized in a disruptive liquidation process without the support of the Plan Administrator and the Wind-Down Debtors' advisors. Accordingly, with respect to remaining assets, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

**H.    The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

72.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[86] Pursuant to section 1126(c) of the Bankruptcy Code, a class of claims accepts a plan if holders of at least two thirds in amount

---

[85]   *Id. See also* Braley Declaration ¶ 61.

[86]   See 11 U.S.C. § 1129(a)(8).

and more than one half in number of the allowed claims in that class vote to accept the plan.[87] Pursuant to section 1126(d) of the Bankruptcy Code, a class of interests accepts a plan if holders of at least two thirds in amount of the allowed interests in that class vote to accept the plan.[88] A class that is not impaired under a plan, and each holder of a claim or interest in such a class, is conclusively presumed to have accepted the plan.  On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests.

73.    If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[89]  Because certain Classes are deemed to reject the Plan, the Debtors do not satisfy section 1129(a)(8) of the Bankruptcy Code.  However, the Debtors satisfy the cram down requirements, as discussed in greater detail in Section II.O below.

74.    As set forth above and as reflected in the Voting Report, Classes 1, 2, and 3 are deemed to have accepted the Plan and Classes 4 and 5 have voted to accept the Plan.  Moreover, Holders of Claims and Interests in Classes 6, 7 (if the Debtors elect to impair Intercompany Claims), 8 (if the Debtors elect to impair Intercompany Interests), 9 and 10 are deemed to have rejected the Plan and, thus, were not entitled to vote.[90]

---

[87]    *See* 11 U.S.C. § 1126(c).

[88]    *See* 11 U.S.C. § 1126(d).

[89]    *See* 11 U.S.C. § 1129(a)(8).

[90]    *See* Plan, Art. III.A–B; *see also* Braley Declaration ¶ 62.

75.     The Debtors meet the requirements of section 1129(b) of the Bankruptcy Code to "cram down" these rejecting classes, as discussed below.

**I.      The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

76.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[91]  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[92] Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[93]  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not

---

[91]   *See* 11 U.S.C. § 1129(a)(9).

[92]   11 U.S.C. § 1129(a)(9)(A).

[93]   11 U.S.C. § 1129(a)(9)(B).

to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[94]

77.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim will receive payment in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.[95]  *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Allowed Claims specified by

---

[94]    11 U.S.C. § 1129(a)(9)(C).

[95]    *See* Plan, Art. II.A.

1129(a)(9)(B) are Impaired under the Plan.[96]  More specifically, under Article III.B of the Plan, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash on account of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.[97]  ***Third***, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.[98]  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

78.     As discussed in the Braley Declaration, and in Mr. Braley's testimony before the Bankruptcy Court at the August 30, 2024 hearing for approval of the Zoll Transaction and the Trudell Transaction, the Debtors have carefully prepared the Wind-Down Budget, estimating expected Allowed Administrative Claims and maintaining adequate liquidity to satisfy such estimated Allowed Administrative Claims.[99]  The Plan provides for Cash payments to Holders of Claims entitled to priority under section 507(a).

79.     Accordingly, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

---

[96]   *See* Braley Declaration ¶ 63.

[97]   *See* Plan, Art. III.B.

[98]   *See* Plan, Art. II.D.

[99]   *See* Braley Declaration ¶ 74; *see also In re Vyaire Med., Inc.* No. 24-11217 (BLS), Hr'g Tr. 27:13–14 (Bankr. D. Del. Aug. 30, 2024).

**J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

80.      Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[100]  As detailed herein and in the Voting Report, the Debtors have obtained the requisite acceptance to confirm the Plan because Class 4 and Class 5 each voted to accept the Plan.   Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plan Is Feasible (§ 1129(a)(11)).**

81.      Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[101] To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[102]

---

[100]   11 U.S.C. § 1129(a)(10).

[101]   11 U.S.C. § 1129(a)(11).

[102]   *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115 ("[T]he bankruptcy court need not require a guarantee of success, but rather only must find that 'the plan present[s] a workable scheme of organization and operation from which there may be [a] reasonable expectation of success.'") (citations omitted); *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd,* 800 F.2d 581 (6th Cir. 1986).

Rather, a debtor must provide only a reasonable assurance of success.[103]  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[104]

82.    Here, the Plan is feasible as it is an orderly wind-down with allocated funding.  As set forth in the Braley Declaration, the Debtors and their advisors have thoroughly analyzed their ability to meet their obligations under the Plan.[105]  The Debtors and the Wind-Down Debtors, as applicable, shall fund the distributions and obligations under the Plan with Available Cash held by the Debtors or in reserves, and the Wind-Down Debtor Account, as applicable on the Effective Date.[106]  In addition to other assets, the Available Cash will be largely comprised of proceeds from the Zoll Transaction and the Trudell Transaction, along with assumptions of certain liabilities thereunder.[107]  As indicated in Article II.C. of the Plan, each Holder of an Allowed DIP Claim has consented to receive payment in full in Cash in the amount of such Holder's pro rata share of the Distributable Value, in accordance with the terms of the DIP documents and the Sale Orders, notwithstanding any deficiency in the payment of the Allowed DIP Claims.

---

[103] *Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012); *see also Matter of Pizza of Haw.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (citations omitted); *accord In re Capmark Fin. Grp.*, 2011 WL 6013718, at *61 (Bankr. D. Del. 2011) (same).

[104] *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464 B.R. 208 (Bankr. D. Del. 2011).

[105] *See* Braley Declaration ¶¶ 67–76.

[106] *See id.* at ¶ 68.

[107] *See* Braley Declaration ¶ 68.

83.     In addition, as set forth in the Braley Declaration, the Debtors sized the wind-down contribution contemplated by the Sale Transactions in order to make the Plan feasible.[108]  The Debtors anticipate having sufficient funds from the Available Cash to make all distributions contemplated by the Plan, including cash sufficient to pay all known administrative expense claims pursuant to section 1129(a)(9).[109]  Additionally, the Purchasers assumed many contracts that generated administrative claims and cure obligations related thereto (subject to the terms of the applicable asset purchase agreements).

84.     As set forth in the Braley Declaration, the Debtors believe that the Plan's required distributions and obligations have been reasonably accounted for.[110]  The Debtors have appropriately reserved, from their Available Cash from the Wind-Down Budget attached to the Plan Supplement as Exhibit F, Cash to fund their expected obligations under the Plan.[111]  The Debtors sized the Wind-Down Budget with approximately $[18.5] million to fund Wind-Down costs including the payment of certain employee-related costs, account-payable accrued liabilities, taxes, international obligations, legal and professional fees, and other Wind-Down expenses.[112] Further, in accordance with the DIP Orders, the Debtors maintained a reserve account for Debtor and Committee professional fees, which will constitute the Professional Fee Escrow Account under the Plan, and that will be used to satisfy the Professional Fee Claims arising through the

---

[108]    *See id.* at ¶¶ 74, 76.

[109]    *See id.* at ¶ 74.

[110]    *See generally id.* at ¶¶ 67–76.

[111]    *See id.* at ¶ 74.

[112]    *See id.*

Confirmation Date.[113]  The Debtors with their advisors have analyzed the Wind-Down and, based on information available, reasonably believe that they will be able to meet their obligations under the Wind Down.

85.     Overall, the Debtors anticipate having sufficient funds to satisfy all requirements and obligations under the Plan.[114]  Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.     The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12)).**

86.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[115]  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[116]

87.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.E of the Plan provides that all fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the Wind-Down Debtor (or the Disbursing Agent on behalf of the Wind-Down Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.[117]

---

[113]   *See id.* at ¶ 75.

[114]   *See id.* at ¶ 76.

[115]   11 U.S.C. § 1129(a)(12).

[116]   11 U.S.C. § 507(a)(2).

[117]   *See* Plan, Art. II.E.

88.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**M.     Sections 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

89.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).    Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.  Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.    Finally, each of the Debtors are a moneyed, business, or commercial corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of nonbankruptcy law, is not applicable to these Chapter 11 Cases.

**N.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

90.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in

section 1129(b) of the Bankruptcy Code are satisfied.[118]   To confirm a plan that has not been

accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the

Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly"

and is "fair and equitable" with respect to the non-accepting impaired classes.[119]

91.    The Plan satisfies section 1129(b) of the Bankruptcy Code.  As noted above,

Holders of Claims and Interests in Classes 6, 9, and 10 are deemed to reject the Plan. Classes 7

and 8 may be deemed to reject the Plan based on the Debtors' ultimate determination to maintain

or cancel these intercompany claims and interests.

### 1.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)).

92.    The Plan does not unfairly discriminate with respect to Classes 6, 7, 8, 9, and 10.

Although the Bankruptcy Code does not provide a standard for determining when "unfair

discrimination" exists, courts typically examine the facts and circumstances of the particular case

to make the determination.[120]   In general, courts have held that a plan unfairly discriminates in

violation of section 1129(b) of the Bankruptcy Code only if it provides materially different

treatment for creditors and interest holders with similar legal rights without compelling

---

[118]   *See* 11 U.S.C. § 1129(b).

[119]   *John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan").

[120]   *In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

justifications for doing so.[121]  A threshold inquiry to assessing whether a proposed chapter 11 plan

unfairly discriminates against a dissenting class is whether the dissenting class is equally situated

to a class allegedly receiving more favorable treatment.[122]

93.    Here, the Plan's treatment of the non-accepting Impaired Classes is proper because

all similarly situated Holders of Claims and Interests at each applicable Debtor will receive

substantially similar treatment, and the Plan's classification scheme rests on a legally acceptable

rationale, including in relation to their priority within the Debtors' capital structure, their differing

legal nature, and their respective rights against the Debtors.[123]  Claims in each of the non-accepting

Impaired Classes are not similarly situated to those of any other classes, given their distinctly

different legal character from all other Claims and Interests.[124]

94.    Accordingly, the Plan does not discriminate unfairly with respect Classes 6, 7, 8, 9,

and 10, who are deemed to reject the Plan, and satisfies the requirements of section 1129(b).

---

[121]    *See In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *Aztec Co.*, 107 B.R. at 589–91 (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[122]    *See Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *Armstrong World Indus.*, 348 B.R. at 121).

[123]    *See* Braley Declaration ¶ 80.

[124]    *Id.*

## 2. The Plan Is Fair and Equitable (§ 1129(b)(2)).

95. A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[125] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[126]

96. Here, the Plan is "fair and equitable" to Holders of Claims and Interests in those Classes that were deemed to reject the Plan because the Plan satisfies the absolute priority rule with respect to each of these non-accepting Impaired Classes.[127] Specifically, no holder of any claim or interest junior to Class 6 will receive or retain any property under the Plan on account of such junior claim or interest. With respect to Class 6 (General Unsecured Claims), to the extent such Class receives any recovery, such recovery is a result of a negotiated resolution with the Debtors' DIP Lenders embodied in the Plan, and, in any event, all Classes senior to Class 6 are Unimpaired or have voted in favor of the Plan. In light of this, the Plan structure is fair and equitable and does not violate the absolute priority rule.

97. In addition, to the extent that Intercompany Interests are Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of

---

[125] *Bank of Am.*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[126] *Id.*

[127] *See* Braley Declaration ¶¶ 71–83.

administrative convenience, for the ultimate benefit of all parties in interest.[128]  Any reinstatement

of Intercompany Interests will thus have no economic substance.[129]  Accordingly, the Plan is "fair

and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies

section 1129(b) of the Bankruptcy Code.

98.     For the foregoing reasons, and further supported by the lack of objections on any

grounds related to Section 1129(b)(2), the Plan can be crammed down on the non-consenting

Impaired Classes.

> **O.     The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (§§ 1129(c)–(e)).**

99.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy

Code.  *First*, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple

plans, is not implicated because there is only one proposed plan.  *Second*, the purpose of the Plan

is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[130]  Moreover, no

governmental unit or any other party has requested that the Bankruptcy Court decline to confirm

the Plan on such grounds.  As provided in the Braley Declaration, the Plan was proposed in good

faith and is not by any means forbidden by law.[131]  Accordingly, the Plan satisfies the requirements

of section 1129(d) of the Bankruptcy Code.  *Lastly*, section 1129(e) of the Bankruptcy Code is

---

[128]    *See id.* at ¶ 82.

[129]    *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 419 B.R. 585 (Bankr. S.D.N.Y. Nov. 24, 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan. The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure.").

[130]    *See* Braley Declaration ¶ 84.

[131]    *Id.*

inapplicable because none of the Debtors' chapter 11 cases are a "small business case."[132] Accordingly, the Plan satisfies the requirements of section 1129(c), (d), and (e) of the Bankruptcy Code.

## III.   The Discretionary Contents of the Plan Are Appropriate Under Section 1123(b) of the Bankruptcy Code.

100.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of the Debtors' estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (f) include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.[133]

101.    As set forth below, the Plan includes certain of these discretionary provisions.  The Debtors have determined, as fiduciaries of their Estates and in the exercise of their reasonable business judgment, that each of the discretionary provisions of the Plan is appropriate given the circumstances of these Chapter 11 Cases.[134]

---

[132]   *See* 11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,566,050 [] (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101(51D)(B).

[133]   *See* 11 U.S.C. § 1123(b)(1)–(6).

[134]   *See* Braley Declaration ¶¶ 23–24.

102.     Here, the Plan includes various discretionary provisions that are consistent with the discretionary authority vested under section 1123(b) of the Bankruptcy Code.  For example, the Plan impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, provides a structure for Claim allowance and disallowance, and establishes a distribution process for the satisfaction of Allowed Claims entitled to distributions under the Plan.  In addition, the Plan contains provisions implementing certain releases and exculpations, and enjoining certain causes of action.

103.     Each of these provisions are appropriate because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, these estates, and the Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law.[135]  Such provisions are discussed in turn below but, in summary, satisfy the requirements of section 1123(b).

104.     The Bankruptcy Code states that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[136]  Article VIII of the Plan provides for a general settlement of all Claims and Interests to the extent provided for by the Bankruptcy Code.

105.     The standards for approval of a settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019.  Generally, courts in the Third

---

[135]   *See id.* at ¶ 24.

[136]   11 U.S.C. § 1123(b)(3)(A).

Circuit will approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."[137]  The Third Circuit has provided the following four criteria that a bankruptcy court should consider when approving a settlement pursuant to Bankruptcy Rule 9019: (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (d) the paramount interest of creditors.[138]  In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate.

106.    The settlements embodied in the Plan satisfy the above factors.  The Plan and Confirmation Order embody certain settlement of Claims and Interests between the Debtors and certain other parties in interest, including the Debtors, the Debtors' directors and officers, and the Committee.  The settlements are fair and equitable and consistent with the Bankruptcy Code.  The Plan and Confirmation Order resolve a host of alleged Claims and Interests, which were thoroughly analyzed by the Debtors, the Special Committee, the Committee, and each of their advisors.[139]

107.    The Debtors and their advisors worked diligently to ensure the Debtors' creditors are receiving the greatest value possible on their Claims or Interests through the Plan, and are in the best interest of all stakeholders.  If the Debtors were forced to litigate the issues necessary to resolve such Claims and Interests outside of the Plan, such litigation would be costly, protracted,

---

[137]    *See In re Coram Healthcare Corp.*, 315 B.R. at 334–35.  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "is above the lowest point in the range of reasonableness." *Id.* at 330 (internal citation omitted); *see also In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citation omitted); *see Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities) (internal citation omitted).

[138]    *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (citing *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986)).

[139]    *See generally* Braley Declaration ¶¶ 32–34.

inherently uncertain, and would leave the Debtors and all stakeholders in a substantially worse position. Litigation would prolong the Debtors' bankruptcy process, draining the Debtors' Estates and distracting the Debtors' key personnel and advisors, who would otherwise be focused on winding down the Debtors' Estates. As reflected by the support of creditors for the Plan, this settlement is in the best interests of creditors and all parties in interest.

A.   **The Plan's Release, Exculpation, and Injunction Satisfy Section 1123(b) of the Bankruptcy Code.**

108.   The Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision. These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, were a material inducement for parties to enter into the Restructuring Support Agreement and support the Plan, are overwhelmingly supported by the Debtors and their key stakeholders (including unanimous support from the Voting Classes), and are consistent with applicable precedent.[140] Further, these provisions were fully and conspicuously disclosed to all parties in interest through the Combined Hearing Notice, the Ballots, and the applicable Non-Voting Status Notice Package which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.

1.   **The Debtor Release in the Plan Is Appropriate.**

109.   Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[141]   Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the

---

[140]   *See also* Braley Declaration ¶ 25.

[141]   *See Coram*, 315 B.R. at 334–35 ("The standards for approval of settlement under section 1123 [of the Bankruptcy Code] are generally the same as those under [Bankruptcy] Rule 9019."). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *Id.* at 330 (internal citations omitted). *E.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008);

Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[142]  Article VIII.B of the Plan provides for releases by the Debtors, the Wind-Down Debtors, and their estates of the Claims and Causes of Action set forth in Article VIII.B of the Plan, including any derivative claims, that the Debtors, the Wind-Down Debtors, or their Estates could assert against each of the Released Parties (the "Debtor Release").[143]

110.    Courts in this jurisdiction generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors.[144]  The analysis includes an inquiry into whether there is:  "(1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest

---

*In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be "within the reasonable range of litigation possibilities") (internal quotation marks omitted).

[142]    *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'") (internal quotation marks omitted).  *See also In re WCI Cable, Inc.*, 282 B.R. 457, 469 (Bankr. D. Or. 2002) ("a chapter 11 plan may provide for the settlement of any claim belonging to the debtor or to the estate").

[143]    The Released Parties include, among others, in each case in their capacity as such:  (a) the Debtors and the Wind-Down Debtors, as applicable; (b) the Plan Administrator; (c) each Consenting Stakeholder; (d) the Committee and its members; (e) the Purchasers; (f) the DIP Lenders; (g) the Agents; (h) all Holders of Claims who opt in to granting the releases set forth herein; (i) all Holders of Interests who opt in to granting the releases set forth herein; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clause (a) through this clause (k), each in their capacity as such; *provided* that, in each case, an Entity shall not be a Released Party if it timely objects to the releases set forth in Article VIII.C and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

[144]    *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

holders; and (5) the payment of all or substantially all of the claims of the creditors and interest

holders under the plan."[145] These factors are "neither exclusive nor conjunctive requirements" but

rather serve as guidance to courts in determining fairness of a debtor's releases.[146]

111.    The Debtor Release meets the applicable standard because they are fair, reasonable,

and in the best interests of the Debtors' estates.  As described in the Braley Declaration,[147] and as

an analysis of the *Master Mortgage* factors demonstrates, the Debtor Release embodied in

Article VIII.B of the Plan should be approved.

- ***First***, an identity of interest exists between the Debtors and the parties to be released.  Each
  of the Released Parties, as a stakeholder and critical participant in the Plan process, shares
  a common goal with the Debtors in seeing the Plan succeed and would have been unlikely
  to participate in the negotiations and compromises that led to the ultimate formation of the
  Plan without the Debtor Release.[148]  Like the Debtors, these parties seek to confirm the Plan
  and implement the transaction.[149]  Moreover, with respect to certain of the releases—*e.g.*,
  those releasing the Debtors' current and former directors, officers, affiliates, and
  principals—there is a clear identity of interest supporting the release because the Debtors
  will assume certain indemnification obligations under the Plan that will be honored by the
  Wind-Down Debtors.[150]  Thus, a lawsuit commenced by the Debtors (or derivatively on
  behalf of the Debtors) against certain individuals would effectively be a lawsuit against the
  Wind-Down Debtors themselves.

---

[145]    *See In re Washington Mut., Inc.*, 442 B.R. at 346 (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110 and *In re Master Mortg.*, 168 B.R. at 937).

[146]    *Id.* (citing *In re Master Mortg.*, 168 B.R. at 935).

[147]    *See* Braley Declaration ¶¶ 26–35.

[148]    *Id.* at ¶ 27.

[149]    *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 284 (Bankr. D. Del. 2016) (finding that "there is an identity of interest between the Debtors and the released parties arising out the shared common goal of confirming and implementing the Plan"); *see also Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").

[150]    *See* Plan Art. V.E; *see also* Braley Declaration ¶ 27; *cf. In re Indianapolis Downs, LLC*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

- **Second**, substantial contributions have been made by the Released Parties.  The Released Parties played an integral role in the formation of the Plan and the sale process and have expended significant time and resources analyzing and negotiating the issues present in these Chapter 11 Cases to reach a value-maximizing chapter 11 plan.  As Delaware bankruptcy courts have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's chapter 11 case.[151]  Moreover, the Released Parties have expended time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.[152]  The Released Parties have also sacrificed material economic interests to ensure the viability of the Plan.  Here, the value contributed by the Released Parties is certainly substantial. Without the contributions of each of these parties, the Plan and the transaction contemplated therein would not be possible.[153]

- **Third**, the Debtor Release is essential to the successful resolution of the Chapter 11 Cases because they constitute an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan and the Restructuring Transactions contemplated therein.[154]  As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases and did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors would not be in a position to confirm the Plan and emerge from chapter 11.  The Debtor Release, therefore, is essential to the successful resolution of these Chapter 11 Cases.

- **Fourth**, no party in interest has contested the Debtor Release of any hypothetical claims, and as evidenced by the Voting Report and noted herein, parties voting in Class 4 and Class 5 have **unanimously** voted to approve the Plan (including the Debtor Release).  Given the critical nature of the Debtor Release and the Plan's overall support, the Debtors submit that the releases are proper.

- **Fifth**, the Plan maximizes the value of the Debtors' assets and the distribution of available proceeds to creditors.

---

[151]  *See id.* at 304 (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *In re Wash. Mut., Inc.*, 442 B.R. at 347 (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [chapter 11 plan] or to creditors"); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding that prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

[152]  *See* Braley Declaration ¶ 28.

[153]  *See id.* at ¶ 29.

[154]  *See id.* at ¶ 30.

112.    Furthermore, as described in the Disclosure Statement, the Debtors, with the assistance of their professional advisors, conducted an independent investigation to evaluate potential claims.  That investigation was led by the special committee of the board of directors of Vyaire Holding Company (the "Special Committee").  That process involved an exhaustive advisor review of over 385 non-custodial documents, over 2.3 million custodial documents from ten custodians (with extensive review of over 56,000 of those documents relating to key search terms), over 6,600 documents from the Sponsor, and seven interviews.

113.    From the review and analysis of those documents and interviews, advisors to the Special Committee produced an in-depth investigation report, which was reviewed by the Special Committee (and a non-privileged version was shared with the Committee).  The Special Committee determined that, aside from the Causes of Action arising under section 547 of the Bankruptcy Code, the Debtor Release would not extinguish valuable claims worth pursuing because among other things, any theoretical claims lacked merit, were not viable, would be subject to defenses, and/or would involve extremely costly and time-consuming litigation.[155]  With respect to preference actions, in exchange for releasing Causes of Action arising under section 547 of the Bankruptcy Code in connection with the Committee Settlement, the Debtors secured the Committee's support for the Plan, including the Plan's terms regarding the estate's provision of critical transition services to the Purchasers, and avoided costly litigation over confirmation of the Plan.

114.    Accordingly, for the reasons set forth above, and as supported by the Braley Declaration, each of the *Master Mortgage* factors supports approval of the Debtor Release.

---

[155]    *See id.* at ¶¶ 32–33.

Moreover, the breadth of the Debtor Release is consistent with those regularly approved in this jurisdiction. The Debtors submit that they have satisfied the business judgment standard in granting the Debtor Release under the Plan. The Debtor Release easily meets the applicable standard because they are fair, reasonable, and in the best interests of the Debtors' Estates. Thus, the Bankruptcy Court should approve the Debtor Release in the Plan.

## 2. The Third-Party Release Is Consensual and Appropriate and Should Be Approved.

115. In addition to the Debtor Release, the Plan provides for releases by certain Holders of Claims and Interests. Specifically, Article VIII.C of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such parties could assert against the Released Parties (the "Third-Party Release" and, together with the Debtor Release, the "Releases"). The Releasing Parties include, among others: (a) the Debtors and the Wind-Down Debtors, as applicable; (b) the Plan Administrator; (c) each Consenting Stakeholder; (d) the Committee and its members; (e) the Purchasers; (f) the DIP Lenders; (g) the Agents; (h) all Holders of Claims who opt in to granting the releases set forth herein; (i) all Holders of Interests who opt in to granting the releases set forth herein; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clause (a) through this clause (k), for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided*, however, that in each case, an Entity shall not be Releasing Party if it timely objects to the releases set forth in Article VIII.C and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered. The Third-Party Release is consensual, consistent with established Third Circuit law, and integral to the Plan, and should therefore be approved.

116.    Numerous courts have recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.[156]  Consensual releases are permissible on the basis of general principles of contract law.[157]  Approval of the Third-Party Release under the circumstances of these Chapter 11 Cases is entirely appropriate because they are not binding on any non-consenting parties.  Courts have held that an "affirmative agreement" from an affected creditor will render a release consensual.[158]

117.    The Third-Party Release is generally being provided by parties participating in the formulation and negotiation of the Plan or to the extent a party affirmatively **opts in** to the release. Thus, the only parties providing the Third-Party Release are creditors that have affirmatively opted in, or otherwise agreed, to such releases.  All parties had ample opportunity to evaluate and opt in to the Third-Party Release.  The Disclosure Statement, the Ballots, the Confirmation Notice, the Opt-In Proof of Claim Form, and Notice of Confirmation Order (as defined in the proposed Confirmation Order) each provide recipients with timely, sufficient, appropriate and adequate notice of the Third-Party Release.

118.    The circumstances of these Chapter 11 Cases warrant the Third-Party Release because it is critical to the success of the Plan, and it is fair and appropriate.  Without the efforts of the Released Parties in providing the DIP Financing and actively participating in the Sale Transactions and Plan negotiations, the Debtors would not have been able to consummate value-maximizing Sale Transactions for the benefit of all stakeholders and an orderly post-sale

---

[156]    *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 305 (collecting cases); *Spansion*, 426 B.R. at 144 (stating that "a third party release [sic] may be included in a plan if the release is consensual").

[157]    *Coram*, 315 B.R. at 336.

[158]    *See In re Zenith*, 241 B.R. at 111.

wind down through the Plan.[159]  In addition, many of the Released Parties have been instrumental in supporting these Chapter 11 Cases and facilitating a smooth administration thereof.  Finally, throughout the entire case and all these negotiations, the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders, investing countless hours both pre- and post- petition.[160]

119.    The Third-Party Release is specific and precisely describe the nature and type of claims released and the parties being released.  This provision provides that each Releasing Party will release any and all claims and Causes of Action such party could assert against the Released Parties.  Additionally, the Plan, including the Third-Party Release, was heavily negotiated.  The Third-Party Release is a key component of the Debtors' restructuring and were a key inducement to bring stakeholder groups to the bargaining table.  Put simply, the Debtors' key stakeholders would be unwilling to support the Plan without the assurance that they would not be subject to post-emergence litigation or other disputes.  The Third-Party Release therefore not only benefits the non-Debtor Released Parties, but also the Debtors as a whole.

120.    Moreover, the third parties bound by the Releases have affirmatively opted in to such releases, or were otherwise party to negotiating such releases, and have received sufficient consideration in exchange for the release of their Claims against the Released Parties to justify the Third-Party Release.  Many of the Released Parties have been active and important participants in the development of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the

---

[159]    *See* Braley Declaration ¶ 39.

[160]    *See id.*

resolution thereof.[161]   In addition to significant concessions under the Plan, the Released Parties made the contributions as discussed above, each in exchange for, among other things, the Third-Party Release.

121.    The Third-Party Release is an integral and necessary party of the Plan, are consensual, given in exchange for good and valuable consideration, and are narrowly tailored to the circumstances of these Chapter 11 Cases.

### 3.    The Exculpation Provision Is Appropriate.

122.    Article VIII.D of the Plan provides that each Exculpated Party shall be exculpated, "to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release,"[162] from any Cause of Action arising out of acts or omissions in connection with these Chapter 11 Cases and certain related transactions, except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation").  The Exculpation is intended to prevent collateral attacks against estate fiduciaries that have acted in good faith to help facilitate the Debtors' restructuring. The Exculpation is an integral part of the Plan and otherwise satisfies the governing standards in the Third Circuit.   This provision provides necessary and customary protections to estate fiduciaries whose efforts were and continue to be vital to implementing the Plan.

123.    In the Third Circuit, exculpation provisions like the one set forth in the Plan are regularly approved.[163]  Courts evaluate the appropriateness of exculpation provisions based on a

---

[161]   *See generally id.*

[162]   Plan, Art. VIII.D.

[163]   *See In re Cyxtera Techs., Inc.,* No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (approving a chapter 11 plan with a similar exculpation provision to the Plan); *In re BlockFi Inc.,* No. 22 19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (same); *In re Laboratory Partners, Inc.,* No. 13-12769 (PJW) (Bankr. D. Del. July 10,2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating*

number of factors, including whether the plan was proposed in good faith, whether liability is

limited, and whether the exculpation provision was necessary for plan negotiations.[164] Exculpation

provisions that are limited to claims not involving a criminal act, actual fraud, willful misconduct,

or gross negligence, are customary and generally approved in this district under appropriate

circumstances.[165] Unlike third-party releases, exculpation provisions do not affect the liability of

third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in

future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the

Debtors' restructuring.[166] Exculpation for parties participating in the Plan process is appropriate

where Plan negotiations could not have occurred without protection from liability.[167]

124.    Moreover, the Exculpation and the liability standard it sets represents a conclusion

of law that flows logically from certain findings of fact that the Bankruptcy Court must reach in

---

*Corp.,* No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under section 1123(b)).

[164] *See In re Congoleum Corp.,* 362 B.R. 167, 195-97 (Bankr. D.N.J. 2007) (evaluating the appropriateness of the plan's exculpation provisions based on whether the parties played a significant role in the negotiations that led to the plan and whether the exculpation is necessary to the plan).

[165] *See In re Wash. Mut., Inc.,* 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the debtors' directors and officers" was appropriate); *In re BlockFi Inc.,* No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming plan where exculpation provision covered the debtors and wind down debtors, the creditors' committee, and related parties, including current and former control persons and professionals); *In re Bed Bath & Beyond Inc.,* No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same).

[166] *See In re PWS Holding Corp.,* 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l. Holdings, Inc.,* No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Sponsion, Inc.,* No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. 2010) (same).

[167] *In re Aegean Marine Petroleum Network, Inc.,* 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").

confirming the Plan as it relates to the Debtors.  As discussed above, the Bankruptcy Court must find, under section 1129(a)(2) of the Bankruptcy Code, that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, the Bankruptcy Court must find, under section 1129(a)(3) of the Bankruptcy Code, that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to certain of the Debtors' officers, directors, employees, and professionals.  Furthermore, these findings imply that the Plan was negotiated at arm's-length and in good faith.  Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack.

125.    Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure as part of the Plan and these Chapter 11 Cases.  Such negotiations were extensive, and the resulting agreements were implemented in good faith with a high degree of transparency.[168]  As a result, the Plan enjoys unanimous support from Holders of Claims entitled to vote.[169]  Accordingly, the Bankruptcy Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.

126.    In addition, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful reorganization, and likely would not have been so inclined to participate in the plan process without the promise of exculpation.[170]  Exculpation for parties participating in the

---

[168]    *See* Braley Declaration ¶ 44.

[169]    *See, e.g.*, Voting Report, Exhibit A.

[170]    *See* Braley Declaration ¶ 45.

plan process is appropriate where plan negotiations could not have occurred without protection from liability.[171]

127.    Accordingly, under the circumstances, it is appropriate for the Bankruptcy Court to approve the Exculpation and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[172]

128.    The Exculpation is fair and appropriate under both applicable law and the facts and circumstances of these Chapter 11 Cases.  It is appropriate for the Bankruptcy Court to approve the exculpation provision, and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[173]

### 4.    The Injunction Provision Is Appropriate.

129.    The injunction provision set forth in Article VIII.E of the Plan (the "Injunction Provision") merely implements the Plan's releases and Exculpation, in part, by enjoining entities from commencing or maintaining any action against the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such claims or interests released or subject to exculpation.  Thus, the Injunction Provision is a key provision of the Plan because it enforces the release and Exculpation that are centrally important to the Plan.

130.    In addition, the injunction provision was revised pursuant to a resolution with the U.S. Trustee to provide a temporary injunction as to the Debtors and the Wind-Down Debtors with

---

[171] *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[172] *See PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

[173] *See id.*

respect to the releases granted to the Debtors as Released Parties, and no Entity which is subject to this provision has objected.

131.    As such, to the extent the Bankruptcy Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the Injunction Provision must also be appropriate.

**B.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

132.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[174]

133.    Article V of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan by payment of the default amount, subject to the terms and conditions of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Therefore, to the extent the Debtors or the Wind-Down Debtors, as applicable, decide to assume an Executory Contract or Unexpired Lease and pay all outstanding Cure amounts, the Plan complies with section 1123(d) of the Bankruptcy Code.

134.    Accordingly, the Debtors submit that the Plan fully complies with section 1123(d) of the Bankruptcy Code.

**IV.    The Plan Modifications Do Not Require Resolicitation or an Additional Disclosure Statement.**

135.    Section 1127(a) of the Bankruptcy Code permits plan modifications to a chapter 11 plan where votes have been solicited before confirmation so long as the modifications comply with

---

[174]    11 U.S.C. § 1123(d).

sections 1122 and 1123 of the Bankruptcy Code.[175]  Once filed, "the plan as modified becomes the

plan."[176]  Further, Bankruptcy Rule 3019 establishes that after a Plan has been accepted and before

its confirmation, the proponent may file a modified plan if the Court finds that the proposed

modification does not adversely change the treatment of the claim of any creditor and such

modification shall be deemed accepted by all creditors who previously accepted the plan.[177]

136.    Following solicitation, the Debtors made certain modifications to the Plan in the

spirit of good-faith compromise and settlement with the DIP Lenders, the Committee, and other

parties in interest.  These modifications to the Plan incorporate the terms of the Committee

Settlement including, among other things:  (i) a reserve of approximately $3 million for payment

of Allowed Administrative Claims; (ii) a "Residual GUC Recovery Pool" that provides for the

greater of (x) $250,000 and (y) the amount of excess funds of the Professional Fee Escrow

Account, if any, to be distributed pro rata to Holders of Class 6 (General Unsecured Claims), as

specified in the Plan, following satisfaction of the Debtors' Wind-Down obligations; (iii) the

Debtors' release of preference claims pursuant to section 547 of the Bankruptcy Code; and (iv)

treatment of the Debtors' vendors and service providers servicing the Purchasers pursuant to the

Transition Services Agreement.

---

[175]    11 U.S.C. § 1127(a).

[176]    *Id.*

[177]    *See* F. R. Bankr. P. 3019(a); *see also In re Sentinel Mgmt. Grp., Inc.,* 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class's distribution was not sufficiently material to require re-solicitation); *In re Dow Coming Corp.,* 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are presumed to accept the modified plan); *In re A.H. Robins Co.,* 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan. The Bankruptcy Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan."), *aff'd,* 880 F.2d 694 (4th Cir. 1989).

137.    In addition, the Debtors made certain other technical modifications to resolve issues raised by the U.S. Trustee and other parties in interest.

138.    The Debtors submit that these modifications do not require re-solicitation.  Courts in this Circuit have not interpreted Bankruptcy Rule 3019(a) to require resolicitation and additional disclosure to mean *any* material and adverse change to *any* creditor.[178]  The seminal case on resolicitation recognizes that "a literal reading of [Bankruptcy Rule 3019] would prevent a modified plan from being deemed accepted if it adversely affected the treatment of *any* claim in *any* way."[179]  The court decision sought to give effect to legislative intent by ensuring that creditors who voted for an un-modified plan had the opportunity to change their vote,[180] and ultimately held that additional disclosure and resolicitation was only required where "and to the extent the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties *who previously voted for the plan."[181]*  The legal standard set out by courts in this Circuit have asked whether creditors would reconsider their vote based on the modification at issue.[182]

139.    These modifications do not materially and adversely affect the treatment of Holders of Class 4 or Class 5 Claims—the only classes entitled to vote on the Plan—such that resolicitation

---

[178]  *See In re G-1 Holdings Inc.,* 420 B.R. 216 (D.N.J. 2009) (holding that resolicitation was not required where the objecting creditor's claims were not entitled to vote, either before or after modification, and further balloting was unnecessary); *In re Century Glove, Inc.,* No. Civ. A. 90-400-SLR, 1993 WL 239489 (D. Del. Feb. 10,1993).

[179]  *In re Am. Solar King Corp.,* 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) (quoting S.Rep. No. 989, 95th Cong, 2d Sess 124 (1978)).

[180]  *See id.*

[181]  *See id*; *see also In re Century Glove* 1993 WL 239489 at *3 (citing *In re Am. Solar King*) (holding that additional disclosure was not warranted where "the debtors did not *intend to solicit votes* from previously dissenting creditors. . . .").

[182]  *See In re G-I Holdings,* 420 B.R. 216 at 256.

would be required.  Importantly, all Holders of Claims in Voting Classes are receiving the same recovery as contemplated under the prior version of the Plan [Docket No. 581].  Proceeds used to fund payments to Holders of General Unsecured Claims would otherwise go to the Debtors' DIP Lenders, and such lenders have consented to the Committee Settlement.  Moreover, the "Consenting Stakeholders," which represent the supermajority of the Voting Classes, had an opportunity to review the revised Plan.  With respect to Class 6 (General Unsecured Claims), the Committee Settlement and related modifications to the Plan have resulted in improved treatment of such creditors' Claims.  Ultimately, therefore, the modifications comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and otherwise do not require resolicitation of the Plan.

**V.      Good Cause Exists to Waive the Stay of the Confirmation Order.**

140.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

141.    The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[183]  The Debtors have undertaken

---

[183]   *See, e.g.*, *In re SiO2 Med. Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Tricidia, Inc.*, No. 23-10023 (JTD) (Bankr. D. Del. May 23, 2023) (same); *In re HighPoint Res. Corp.*, No. 21-10565 (CSS) (Bankr. D. Del. Mar. 18, 2021) (same); *In re APC Auto. Techs. Intermediate Holdings, LLC*, No. 20-11466 (CSS) (Bankr. D. Del. July 10, 2020) (same); *In re Longview Power, LLC*, No. 20-10951 (BLS) (Bankr. D. Del. May 22, 2020) (same); *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22,

great efforts to facilitate their restructuring to exit chapter 11 as soon as practicable, and are seeking to consummate the Trudell sale transaction in the coming days.  Each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.[184]

142.    For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into the documents and consummation of the transactions related to the restructuring transactions so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## **Conclusion**

143.    For all of the reasons set forth herein and in the Braley Declaration and the Voting Report, the Debtors respectfully request that the Bankruptcy Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order and grant such other and further relief as is just and proper.

*[Remainder of page intentionally blank]*

---

2020) (same); *In re Anna Holdings, Inc.*, No. 19-12551 (CSS) (Bankr. D. Del. Dec. 17, 2019) (same).  Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.  Copies of these orders are available upon request to the Debtors' counsel.

[184]    *See* Braley Declaration ¶ 86.

Dated: November 11, 2024
Wilmington, Delaware

/s/ Patrick J. Reilley

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Ave
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

- and -

Spencer A. Winters, P.C. (admitted *pro hac vice*)
Yusuf U. Salloum (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        spencer.winters@kirkland.com
              yusuf.salloum@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**COLE SCHOTZ P.C.**
Patrick J. Reilley, Esq. (DE Bar No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:    (302) 652-3131
Facsimile:    (302) 652-3117
Email:        preilley@coleschotz.com

- and -

Michael D. Sirota, Esq. (admitted *pro hac vice*)
Warren A. Usatine, Esq (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:    (201) 489-3000
Facsimile:    (201) 489-1536
Email:        msirota@coleschotz.com
              wusatine@coleschotz.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*